# Exhibit 24

## DECLARATION OF RONALD GOODSTEIN
## PURSUANT TO 28 U.S.C. § 1746

I, Ronald C. Goodstein, hereby declare and state as follows:

1.      I have personal knowledge of the matters set forth in this declaration and if called as a witness I could and would testify competently to them.

2.      I am currently an Associate Professor of Marketing at Georgetown University's McDonough School of Business, where I have taught graduate and undergraduate courses in Marketing Principles, Marketing Management, Marketing Strategy, Advertising & Promotions, and Integrated Marketing Communications.

3.      I have been retained and designated by the Consumer Financial Protection Bureau ("CFPB") as an expert in connection with the matter *Consumer Financial Protection Bureau v. Weltman, Weinberg & Reis Co., L.P.A.,* Case No. 1:17-cv-00817-DCN, currently in U.S. District Court for the Northern District of Ohio.

4.      Attached and incorporated herein by this reference as Exhibit A is a true and correct copy of a written report I prepared for this matter containing certain of my opinions.

I declare under penalty of perjury that the foregoing is true and correct. Executed in WASHINGTON, DC on FEBRUARY 23 , 2018.

By:

Ronald C. Goodstein

<u>Exhibit A to Goodstein Declaration</u>

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>       Plaintiff,<br><br>    v.<br><br>WELTMAN, WEINBERG & REIS CO., L.P.A.,<br><br>     Defendant. | No. 1:17-cv-000817-DCN |

**EXPERT REPORT OF RONALD C. GOODSTEIN, PH.D.**

**January 31, 2018**

# TABLE OF CONTENTS

I.    INTRODUCTION ..............................................................................................................1

    A.    Qualifications ..........................................................................................................1

    B.    Background ..............................................................................................................2

    C.    Assignment .............................................................................................................3

    D.    Summary of Conclusions ........................................................................................4

II.   SURVEY METHODOLOGY AND RESULTS ............................................................6

    A.    Initial Research of the Subject Matter .....................................................................7

    B.    Definition of the Relevant Population ...................................................................11

    C.    Sampling of the Relevant Population .....................................................................14

    D.    The Stimuli.............................................................................................................15

    E.    Measures of Interest...............................................................................................20

III.  SURVEY RESULTS.......................................................................................................24

    A.    Perceptions of Who Reviewed the Account (Q8, Q9, Q10).........................................25

        1.    Joint Analysis of Q8, Q9, Q10....................................................................25

        2.    Individual Analysis of the Open-Ended Questions (Q8, Q9) ............................28

        3.    Individual Analysis of the Closed-Ended Question (Q10) .................................30

    B.    Perceptions of the Type of Company or Organization (Q6 and Q7) ..........................33

    C.    Sensitivities and Validation ...................................................................................37

IV.   CONCLUSION ...............................................................................................................39

## I.    INTRODUCTION

### A.    Qualifications

1.    I have a Ph.D. in Marketing from the Fuqua School of Business at Duke University. Since July 1998, I have been an Associate Professor of Marketing at Georgetown University's McDonough School of Business, where I have taught graduate and undergraduate courses in Marketing Principles, Marketing Management, Marketing Strategy, Advertising & Promotions, and Integrated Marketing Communications. At Georgetown, I carry out an active program of research and writing and have served on the Strategic Planning Committee, Executive Council, EMBA Creation Committee, and MBA Curriculum Committee for the school. During my academic career, I have also taught marketing courses to graduate students at the Wharton School of the University of Pennsylvania, Indiana University's Kelley School of Business, and UCLA's Anderson School.

2.    I serve on the executive education faculty at Georgetown, UCLA, and Duke Corporate Education. Through these executive education programs, I have taught courses in strategic marketing management, strategic positioning, building and managing brand equity, integrated marketing development, integrated marketing communications, advertising policy, and consumer behavior to executives at some of the world's leading companies including Verizon, Siemens, HSBC, J&J, and Microsoft.

3.    I have authored and co-authored numerous articles and book chapters relating to marketing that have been subjected to peer review. My research has been published in the *Journal of Consumer Research*, *Journal of Marketing Research*, *Journal of Marketing*, *Journal of Advertising*, *Journal of Public Policy & Marketing*, *Trademark Reporter*, and other journals. In addition, I sit on the editorial boards of the *Journal of the Academy of Marketing Science*, the

1

*Journal of Retailing*, and *Marketing Letters*. I also serve as a reviewer for the *Journal of Marketing*, *Journal of Consumer Research*, *Journal of Marketing Research*, *Journal of Advertising*, *Journal of Business*, *Journal of Public Policy & Marketing*, and *Journal of Consumer Psychology*. In the process of my research and duties as a reviewer and editorial board member, I have reviewed hundreds of surveys and questionnaires, in addition to teaching survey and questionnaire development to corporate executives, consulting clients, and my students. I have also developed, reviewed, and critiqued surveys and questionnaires as part of my expert witness work.

4.      My curriculum vitae, which provides more information about my background and contains a detailed list of my professional publications, is attached hereto as **Appendix A**. I have served as an expert witness on issues of survey research, consumer confusion, trademark matters, and marketing communications in several litigation matters. A list of all other cases in which I have testified as an expert witness at trial or deposition in the past four years is attached as **Appendix B**.

5.      In connection with my work on this matter, I am being compensated at a discounted government rate of $750 per hour. My compensation for work on this matter is in no way dependent upon my conclusions, the content of my analysis or opinions, or the outcome of this case. I have been assisted in this litigation matter by staff at Analysis Group, Inc., who worked under my direction.

   **B.      Background**

6.      Plaintiff, the Consumer Financial Protection Bureau ("CFPB"), is an independent agency of the United States federal government with its headquarters in Washington, D.C.[1] In

---

[1]      Complaint, *Consumer Financial Protection Bureau v. Weltman, Weinberg & Reis Co., L.P.A.*, United States District Court, Northern District of Ohio Eastern Division, No. 1:17-cv-00817-DCN,  April 17, 2017 (hereafter

addition to other responsibilities, the CFPB is responsible for enforcing federal consumer financial law, including the Fair Debt Collection Practices Act ("FDCPA") and the Consumer Financial Protection Act of 2010 ("CFPA").[2]

7.      Defendant, Weltman, Weinberg & Reis Co., L.P.A. ("WWR"), is a law firm with its headquarters in Brooklyn Heights, Ohio and offices in Illinois, Michigan, Florida, and Pennsylvania. WWR refers to itself as a "law firm with in-house collection services" and regularly provides debt collection services to creditors and debt buyers.[3]

8.      It is my understanding that since at least July 21, 2011, WWR has sent "demand letters" to consumers requesting payment of a debt.[4] If recipients of the letters fail to respond to the first letter sent to them, they are sometimes sent another letter if the debt goes unpaid. The CFPB alleges that WWR's demand letters mislead consumers. Specifically, the CFPB alleges that the demand letters misrepresent that an attorney "reviewed the consumer's file and determined that the consumer owes the amount demanded, when in fact no such review has occurred."[5]

### C.      Assignment

9.      I was retained by the CFPB to design and conduct a survey in accordance with accepted scientific standards of consumer survey methodology to determine whether and to what extent a consumer perceives that a lawyer was involved in the process that led to receiving a demand letter. The CFPB provided me with two WWR demand letters, a letter that was typically

---

"Complaint"), ¶ 5. See also, Consumer Financial Protection Bureau, "Have questions? Start here," https://www.consumerfinance.gov/about-us/contact-us/.

[2]   Complaint, ¶ 5. See also, Consumer Financial Protection Bureau, "The Bureau," https://www.consumerfinance.gov/about-us/the-bureau/.

[3]   Complaint, ¶ 7. See also, Weltman, Weinberg, & Reis Co., LPA, "Firm Overview," 2018, http://www.weltman.com/about/firm-overview; Weltman, Weinberg, & Reis Co., LPA, "WWR Offices," 2018, http://www.weltman.com/?p=9872.

[4]   Complaint, ¶ 28.

[5]   Complaint, ¶ 26.

used as the first letter sent to consumers ("initial demand letter") and a secondary demand letter ("secondary demand letter") that sometimes followed the initial demand letter.[6] In particular, I was tasked with determining (i) consumers' perceptions of who (if anyone) reviewed their account before sending these demand letters; and (ii) consumers' perceptions of the type of company that sent these demand letters. In conducting this survey and preparing this report, I have utilized processes, methodologies, analyses, and principles that I would ordinarily apply in performing research for non-litigation purposes.

10.      As part of my work, I relied upon the Complaint filed in this lawsuit, the collection letters provided by the Defendant, standard treatises on the application of survey research in law, and various publicly available sources, including government reports and academic literature. A list of the specific materials I relied upon can be found in the footnotes included herein and attached as **Appendix C**. I reserve the right to supplement this declaration as additional information, data, or testimony become available.

### D.      Summary of Conclusions

11.      At the request of counsel, I designed and conducted a consumer study to determine (i) consumers' perceptions of who (if anyone) reviewed their account before sending the initial demand letter; and (ii) consumers' perceptions of the type of company that sent the initial demand letter. In designing this study, I paid careful attention to the following key areas: the initial research of the subject matter; the definition of the relevant population; the procedures for sampling from the relevant population; the survey questions and surveying procedures; the nature of the test

---

[6]      The initial demand letter and the secondary demand letter were provided by WWR to counsel and are attached as **Appendix D.**

stimuli shown to sampled consumers; the protocol for estimating percentage differences across conditions; and the validation and robustness of results.

12.     My conclusions are based on my review of the produced letter and on empirical responses from a survey of a representative sample of actual consumers. My results reveal significantly large differences in consumer perceptions when the letter is incrementally changed so as to remove certain law-identifying aspects in the letterhead and body of WWR's letter. It is my conclusion that certain law-identifying aspects of the letter, including "Attorneys at Law" and "LPA," (i) significantly alter consumer perceptions of *who* reviewed the account at the firm that sent the letter, and (ii) significantly alter consumer perceptions of the *type of firm* that sent the letter.

13.     Specifically, I find that 41.2% of survey participants who viewed the initial demand letter used by WWR believed that an attorney or a lawyer was involved in the process of sending the letter, and approximately the same percentage of participants (38.2%) who viewed the initial demand letter provided a response that a lawyer or attorney reviewed their account before sending the letter. By contrast, only 19.8% of participants and 13.3% of participants who viewed modified letters without certain law-identifying aspects of the initial demand letter used by WWR believed that a lawyer or attorney reviewed their account. These results provide strong evidence that the demand letters sent by WWR give consumers the impression that lawyers are involved in reviewing their account before the demand letters are sent.

14.     I also find that 50.8% of survey participants who viewed the initial demand letter used by WWR believed that a legal entity sent them the letter. By contrast, only 15.3% of and 3.4% of participants who viewed modified letters without certain law-identifying aspects of the initial demand letter used by WWR believed that a legal entity sent them the letter. Further, I find

that 22.6% of survey participants who viewed the initial demand letter used by WWR articulated that a lawyer or attorney specifically sent them the letter in contrast to the 3.5% and 1.7% of participants who viewed modified letters without certain law-identifying aspects of the initial demand letter used by WWR. These results provide strong evidence that the demand letters sent by WWR give consumers the impression that legal entities and lawyers specifically sent them the letter.

15.　　I also conducted a test of the robustness of the findings garnered from my study. This test, known as a "file drawer analysis," the results of which I discuss in Section III.C, was strongly supportive of the significance of the results. In fact, the analysis supports that it would take an additional 44 to 148 studies showing no differences whatsoever in participant responses across stimuli groups to reject the findings from my current study. These strong results indicate that consumer perceptions of *who* reviewed the account at the firm that sent the initial demand letter and consumer perceptions of the *type of firm* that sent the initial demand are significantly affected by certain law-identifying aspects of the letter.

## II.　SURVEY METHODOLOGY AND RESULTS

16.　　The design of this research followed generally accepted principles for the design of surveys in litigation as described in key treatises on the topic.[7] In general, the design of the survey[8] I conducted for the purpose of this litigation required careful attention to the following key areas:

　　1)　The initial research of the subject matter;

　　2)　 The definition of the relevant population;

---

[7]　See, e.g., Diamond S. (2011), "Reference Guide on Survey Research," in the *Reference Manual on Scientific Evidence Third Edition* (henceforth "Diamond (2011)"); Federal Judicial Center (2004), *Manual for Complex Litigation Fourth*, pp. 102-104; McCarthy, J. T. (2016), *McCarthy on Trademarks and Unfair Competition 4th Edition*, Chapter 32 (henceforth "McCarthy (2016)").

[8]　I note that I will use "study" and "survey" interchangeably to refer to the experiment that I designed and conducted for this matter.

6

3)  The procedures for sampling from the relevant population;

4)  The survey questions and surveying procedures;

5)  The nature of the test stimuli shown to sampled consumers;

6)  The protocol for estimating percentage differences across conditions; and

7)  The validation and robustness of results.

17.    The rest of the report is organized around these key areas.

## A.    Initial Research of the Subject Matter

18.    According to the standards of my field, an initial step in designing a survey is to perform initial research of the subject matter. The form of this research may vary depending on the degree of specialized knowledge necessary to understand the subject matter and the potential sensitivity of the subject matter in question. For example, in a survey evaluating consumers' preferences for a men's clothing line, this step might consist of using secondary sources, such as industry reports and product reviews, to research the product line, its characteristics, and its target market. For a survey involving potentially sensitive information and specialized vocabulary, such as adherence to medical advice for a particular disease, consumer debt, or perceptions of religiosity, this step might involve focus groups or in-depth interviews of consumers to determine the proper vocabulary, survey format, and/or questions to be used. This step allows the researcher to understand consumer mental processes and therefore avoid phrasing questions in a way that might generate answers potentially affected by, among other issues, social desirability bias.[9]

---

[9]    Henry Assael notes that "[qualitative research] allows researchers to form hypotheses regarding consumer actions and to better define research areas so as to know the kinds of questions to ask in more structured surveys or experiments." See Assael, H. (2004), *Consumer Behavior A Strategic Approach*; Zikmund W. and B. Babin (2013), *Essentials of Marketing Research Fifth Edition*.

19.     Given the potential sensitivity and specialized vocabulary inherent in a discussion about consumer debt, I opted to design and conduct in-depth interviews as part of the initial research used to inform my survey.[10] In designing and implementing these interviews, I focused on learning the typical vocabulary consumers use when faced with a collections letter and determining a survey format that would be understood and elicit accurate responses. To this effect, I designed two exploratory discussion guides;[11] each discussion guide was structured so that consumers, from the relevant population of interest,[12] were asked a series of questions after being shown one of multiple stimuli modeled after the WWR demand letters.[13] The two discussion guides were exactly the same with one exception: one of the two discussion guides instructed consumers to imagine that they received the demand letter in the mail, and the other guide specifically instructed consumers to imagine that they received the demand letter in the mail *for a debt that they owed* (emphasis added).

---

[10]    Various articles speak to the stigma often associated with consumer debt. A 2015 survey found that a large proportion of individuals with credit card debt (43%) "would feel judged if family and friends knew how much credit card debt they have," see Issa, E., "7 in 10 Americans See Added Stigma in Credit Card Debt, Survey Shows," January 19, 2016, https://www.nerdwallet.com/blog/credit-cards/credit-card-debt-stigma-2016/. See also, Illinois PIRG Education Fund, "Debt Collectors, Debt Complaints: The CFPB's Consumer Complaint Database Gets Real Results for Consumers," February 2014, https://illinoispirgedfund.org/sites/pirg/files/reports/ILP%20CFPB%20DebtCollection%20Report%20Feb14% 20Web.pdf; Singletary, M., "What Deadbeats?" *The Washington Post*, February 26, 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/02/25/AR2006022500252.html.

[11]    These guides are included as **Appendix E** and **Appendix F**.

[12]    See Section II.B below for a description of the relevant population.

[13]    The exploratory interview stimuli are included as **Appendix G**.

20.     I used a panel company, Survey Sampling International (SSI),[14] to identify and schedule blind-to-the-purpose interviewees.[15] In order to participate, interviewees must have been U.S. residents above the age of 18 who did not work in an industry potentially involved in the litigation.[16] Under my direction, a third-party, blind-to-the-purpose interviewer conducted interviews over the phone while blind-to-the-purpose interviewees reviewed the stimuli on a desktop computer, laptop computer, or tablet device. In total, 30 interviews were conducted between Wednesday, November 15, 2017, and Friday, November 17, 2017.

21.     First of all, I observed that some participants who were not instructed to imagine that they received the letter for a debt that they owed were unable to give clear responses to interview questions. Specifically, many respondents answered the questions with exclamations that they would never receive such a letter given their credit history. I believe this may have been a result of social desirability bias, which is when respondents answer questions in a way that they perceive to be socially desirable. Social desirability bias is especially relevant during an in-person interview (which limits anonymity) and when the topic area is potentially sensitive. Therefore, I

---

[14]    Panels are commonly used for surveys in marketing research and litigation. See Diamond (2011), p. 382, "More recently, surveys conducted over the Internet have been administered to samples of respondents drawn from panels of volunteers; see infra Section IV.G.4 for a discussion of online surveys. Although panel members may be randomly selected from the panel population to complete the survey, the panel population itself is not usually the product of a random selection process." I note that there are a variety of panel companies, and it is important for a researcher to select a reputable, high-quality panel company. High-quality panel companies provide quality-controls to ensure non-fraudulent data and to validate respondents' identities. SSI provides a variety of measures to ensure quality data, and its panel has been audited by Mktg Inc. Further, SSI is a member of CASRO, the Council of American Survey Research Organizations. Founded in 1975, CASRO is a professional organization that represents more than 300 companies and market research organizations. To become a member of CASRO, an organization must adhere to the CASRO Code of Standards and Ethics for survey research, an "internationally cited set of standards, which has long been the benchmark for the industry." See SSI, "Market Research Data Quality," 2018, https://www.surveysampling.com/technology/data-quality/; SSI, "Survey Sampling FAQs," 2018, https://www.surveysampling.com/about/faqs/; Insights Association, "CASRO," 2018, https://www.insightsassociation.org/organization/casro; Insights Association, "Company Member Directory," January 26, 2018, http://www.insightsassociation.org/company-member-directory.

[15]    To be "blind-to-the-purpose" means to be unaware of the sponsor or purpose of a survey.

[16]    The screening programming instructions for the exploratory discussions are attached as **Appendix H**.

instructed participants in my online survey to imagine that they received the demand letter in the mail for a debt that they owed to avoid social desirability bias. [17]

22.      Second, the stimuli that I designed for the interviews populated the first name of the survey respondent into the letter, so that it looked like the stimulus letter was addressed to the specific respondent. Respondents appeared to react to this in such a way that inhibited their answers, as most respondents became distracted and defensive. Multiple respondents refused to continue in the study after first viewing the stimulus with their name on it. To address this sensitivity and avoid any biases from respondents dropping out of the study in a nonrandom way, I used anonymized stimuli for the remainder of the exploratory discussions and in the online survey.

23.      Third, I observed that respondents who were presented with the secondary demand letter, or stimuli based on the secondary demand letter, may not have had a realistic perception of it, given that consumers who were sent the secondary demand letter will have always initially received an initial demand letter. The exploratory discussions indicated that consumers shown the secondary demand letter were distracted and confused by the fact that they had not received an initial letter. This would have led me to consider dropping the secondary demand letter from my study. However, I did not have to make this decision because based on instructions from counsel, I limited my online study to the examination of consumers' perceptions of the initial demand letter.

---

[17]   Fisher, R. (1993), "Social Desirability Bias and the Validity of Indirect Questioning," *Journal of Consumer Research,* 20(2), pp. 303-315.

24.     As discussed above, the insight and vocabulary gained from the exploratory discussions informed the development and design of my online survey.[18] In the following sections, Sections II.B-IV, I discuss my online survey and its findings. .

### B.     Definition of the Relevant Population

25.     When conducting survey-based consumer research for purposes of litigation, the relevant population to study is usually defined as ". . . that segment of the population whose perceptions and state of mind are relevant to the issues in the case."[19] I have been informed that under the FDCPA and the CFPA, deception is measured according to the standards of the "least sophisticated consumer" and the "reasonable consumer," respectively.[20] As this case relates to consumers and debt, I have also been informed that the FDCPA provides a legal definition of each term. The FDCPA defines a consumer as "any natural person obligated or allegedly obligated to pay any debt"[21] and defines debt as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."[22] Further, I have been informed that the

---

[18]     Examples of vocabulary, discussed below in section II.E, include the phrasing of the additional probe question Q9 (Who else, if anyone, other than the person you just mentioned do you think reviewed your account before sending this letter?"), which allowed participants to indicate any other parties that they perceived reviewed their account as some interviewees indicated that multiple parties could have been involved in various actions related to sending the letter. Another example is the list of job titles used as answer options in Q10 that asks respondents who they thought had reviewed their account before sending the letter. See **Appendix I** and Section II.E below.

[19]     McCarthy (2016), pp. 32:385-32:388.

[20]     Memorandum Opinion and Order, *Consumer Financial Protection Bureau v. Weltman, Weinberg & Reis Co., L.P.A.*, United States District Court, Northern District of Ohio Eastern Division, No. 1:17-cv-00817-DCN, September 29, 2017, p. 6.

[21]     Fair Debt Collection Practices Act (15 U.S.C. § 1692a(3)).

[22]     Fair Debt Collection Practices Act (15 U.S.C. § 1692a(5)).

CFPA defines "consumer" as an "individual or an agent, trustee, or representative acting on behalf of an individual."[23]

26.     Based on the standards and definitions under the FDCPA and the CFPA and on the relevant population according to consumer research methodology, I determined that the relevant population for this survey was United States consumers who have been contacted by a collections agency or who could potentially be contacted by a collections agency in the future with regards to an outstanding debt. This determination is based in part on my research on the debt collection consumer population. I note that an estimated 28 percent of consumers contacted by a collections agency have been contacted about a debt that they believed they did not owe.[24] Given the large number of consumers who have received collection letters for a debt they believed they did not owe, the relevant population of consumers is the population that could have possibly received a letter (i.e., consumers with a history of borrowing money or buying on credit). It is not necessary for consumers to have had a history of an overdue balance or unpaid debt to have had the potential of being contacted by a debt collection agency -- either in the past or in the future.

27.     Based on that description, the relevant population can generally be defined by the following  characteristics:

> 1)  Consumers who have used a credit (or charge) card for personal or household expenses or borrowed money from an entity other than a friend or family member for personal or household expenses in the last 5 years;[25]

---

[23]   United States Code, 2012 Edition, Supplement 3, Title 12 - BANKS AND BANKING (12 U.S.C. § 5481(4)).

[24]   I note that the CFPB's "Survey of Consumer Views on Debt," administered between December 2014 and March 2015, found that 28 percent of consumers who had been contacted by a collection agency reported that communications from the agency included requests for payments of debts that the consumer believed he or she did not owe. The survey found that 16 percent of surveyed consumers who had been contacted by a collections agency had been contacted regarding a debt owed not by them but by a family member. See Consumer Financial Protection Bureau, "Survey of Consumer Experiences with Debt Collection," January 2017, http://files.consumerfinance.gov/f/documents/201701_cfpb_Debt-Collection-Survey-Report.pdf, pp. 23-24.

[25]   I understand that the FDCPA defines consumer debt as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the

2)  Are adult residents of the United States;

3)  Are not affiliated with an industry that would bias their perceptions of the task at hand; and

4)  Have not previously been exposed to the task at hand, i.e., they were not part of a population used for exploratory interviews.

The first criterion is in-line with the definition of debt as set forth in the FDCPA: members of the target population must have used a credit (or charge) card or borrowed money for personal or household expenses rather than business expenses in the last 5 years. I chose to limit credit or charge card use and personal or household loans to the last 5 years to limit the potential for respondents to inaccurately recall their experience.[26]

To ensure that participants were part of the relevant population as defined for this case, they were asked a series of screening questions. Copies of the survey instrument (including the programmer instructions for screening and main questions) are attached at **Appendix I**. Screenshots (including the screenshots of the screening and main questions) of the programmed survey are included as **Appendix J**. Specifically, potential participants qualified for my online survey if they:

1)  Had used a credit (or charge) card for personal or household expenses or borrowed money from an entity other than a friend or family member for personal or household expenses in the last 5 years;

2)  Were adult residents of the United States;

3)  Were not affiliated with an industry, or in the same household as members that were affiliated with an industry, that would bias the survey; and

4)  Were not part of the population used for exploratory interviews.

---

subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." Consequently, members of the target population must have used a credit (or charge) card or borrowed money for personal or household expenses rather than business expenses in the last 5 years. See Fair Debt Collection Practices Act (15 U.S.C. § 1692a(5)).

[26]  See Tourangeau, R. and N.M. Bradburn (2010), "The Psychology of Survey Response," *Handbook of Survey Research, Second Edition*, eds. Marsden, P. V. and J. D. Wright, pp. 322-323.

## C.       Sampling of the Relevant Population

28.     Sampling procedures were used that are typical in online consumer research in which consumers need to be shown visual stimuli. These procedures include recruiting relevant consumers; for this case, the participants were recruited so as to be matched to the U.S. Census on age, gender, and region. Put simply, my representative and relevant sample was recruited from a widely distributed and relevant geographical area.[27]

29.     These procedures are also consistent with other consumer surveys administered online.[28] For this matter, I contracted the panel company, SSI, to recruit participants, host the survey, and collect data during the online survey. Panel recruits were not made aware of the purpose of the survey and they were compensated according to SSI's compensation scheme.[29]

30.     I used a series of screening questions to ensure that participants were part of the relevant population as defined for this case.[30] Qualified participants were also required to complete the survey on their desktop computer, laptop computer, or tablet device (wearing glasses or contact lenses if necessary) to ensure that they could clearly see the stimuli and survey questions.[31]

---

[27]     McCarthy (2016), pp. 32:409-32:415.
[28]     The online panel used was chosen specifically because it has been thoroughly reviewed, tested, and accepted as relevant for such research endeavors. See Coen, T., J. Lorch, and L. Piekarski (2005), "The Effects of Survey Frequency on Panelists' Responses," ESOMAR – The World Association of Research Professionals, p. 2, "[O]nline research [is] now firmly established as a widespread, reliable research methodology, and large online panels hav[e] become the primary online research methodology."
[29]     An example recruitment invitation is included as **Appendix K**.
[30]     To ensure a representative sample, I instructed SSI to recruit participants in a way such that the participants clicking on the survey link were representative of the United States census in terms of age, gender, and geographic region. See Section II.B above for a description of the relevant population.
[31]     If participants tried to access the online survey on a device other than a desktop computer, laptop, or tablet, they were shown the following message: "Sorry, only desktop computers, laptops, or tablets can be used for this survey. Please close this window and go to a desktop computer, laptop, or tablet to take the survey. Once at one of these devices, please click on the same link to take the survey." See **Appendix J.**

31.    The results described in this report are based on completed surveys from 634 participants who met the screening criteria and passed additional data quality checks.[32] These 634 participants were randomly assigned to one of the three letter conditions described below in Section II.D. See **Appendix I** for a copy of the survey programmer instructions.

D.    **The Stimuli**

32.    Three letters were used as stimuli. These letters were based on an actual initial demand letter sent by WWR to consumers.[33] To make the letters current and realistic, all of the letters were modified slightly from the original to minimize respondent distraction and make it easier for participants to imagine that they received the letter in the mail for a debt that they owed. Specifically, each of the three letters:

1)  Redacted the name and address of the recipient;

2)  Redacted the name of the original creditor;

3)  Inserted "Midland Funding LLC" as the current creditor;

4)  Displayed a randomly generated "Account No.";

5)  Displayed a randomly generated "WWR No."

6)  Displayed a randomly generated balance due between $1,300 and $1,550;[34] and

7)  Set the letter date to the current week of pretesting.[35]

---

[32]    Initially, 666 participants qualified for and completed the survey. I excluded an additional 32 participants who either (i) took too long to take the survey, (ii) took the survey too quickly (iii) did not type "Next" as instructed in question S8, or (iv) provided more than two non-responsive answers to open-ended questions. See **Exhibit 1** for sample selection criteria and summary statistics. I note that there was not a substantial difference in drop-out rates across the three conditions of my study, meaning that respondents did not drop out in a non-random way as a result of the different stimuli (see my backup calculations). The demographics of survey respondents are summarized in **Exhibit 2.**

[33]    See **Appendix D** for a copy of the initial demand letter produced by WWR to counsel.

[34]    The Federal Reserve Quarterly Report on Household Debt and Credit reports average collection per person by third party collections between approximately $1,300 and $1,550 between 2011 and 2017. The amount used on my stimuli was $1,402.92. See Federal Reserve Bank of New York, "Quarterly Report on Household Debt and Credit 2017:Q2," August 2017, p. 18. To view the stimuli used in the online survey, see **Appendix I.**

[35]    The first date of pretesting was January 18, 2018. The stimuli are dated January 16, 2018; see **Appendix I**

15

33.    **Stimulus A**. Apart from the modifications described above, applied globally across all stimuli, the first stimulus mirrors WWR's initial demand letter as closely as possible.[36] In this stimulus, as in WWR's initial demand letter, the top of the page includes a letterhead that reads "WELTMAN, WEINBERG & REIS Co., LPA" in the first line and "ATTORNEYS AT LAW" in the second line; "Weltman, Weinberg & Reis Co., L.P.A," is in the signature, and in the address at the bottom of the letter. See **Figure 1** below.

---

[36]    I contracted with a graphic designer to ensure that the stimuli matched the produced PDF of the initial demand letter as closely as possible.

## Figure 1: Stimulus A Condition

**WELTMAN, WEINBERG & REIS Co., LPA**

ATTORNEYS AT LAW

*Over 80 Years of Service.*

323 W. Lakeside Ave. Ste. 200 Cleveland, OH 44113-1009
(216) 335-5387   (877) 330-9586
Mon-Thurs 8 am-9 pm, Fri 8 am-5 pm, & Sat 8 am-12 pm EST

January 16, 2018

RE:   Current Creditor: Midland Funding LLC
       Original Creditor:
       Account No.: XXXXXXXX7762
       WWR No.: 0289154
       Balance Due as of January 16, 2018 : $1,402.92

Dear                       :

Please be advised that the above referenced account has been placed with us to collect the outstanding balance due and owing on this account to the current creditor referenced above. As of the date of this letter you owe the amount listed above. Therefore, it is important that you contact us at 1-877-330-9586 to discuss an appropriate resolution for this matter.

This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose. Unless you dispute the validity of this debt, or any portion thereof, within thirty (30) days after receipt of this letter, we will assume that the debt is valid. If you notify us in writing within the thirty (30) day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment and a copy of such verification or judgment will be mailed to you. If you request in writing within the thirty (30) day period, we will provide you with the name and address of the original creditor if different from the current creditor.

Thank you for your attention to this matter.

Sincerely,
Weltman, Weinberg & Reis Co., L.P.A.

WONWELT01323

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**WWR No.: 0289154**
Balance Due as of January 16, 2018 : $ 1,402.92

323 W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1009
ADDRESS SERVICE REQUESTED

January 16, 2018                              **WELTMAN, WEINBERG & REIS CO., L.P.A.**
                                              P.O. Box 6597
                                              Cleveland, OH 44101-1597

34.     **Stimulus B**. This stimulus removes references to WWR as a law firm by replacing "LPA" with "LTD" and "ATTORNEYS AT LAW" with "COLLECTION

17

SERVICES" in the letterhead.[37] In the body of the letter, "Weltman, Weinberg & Reis Co.,

L.P.A.," is replaced with "Weltman, Weinberg & Reis Co., LTD" See **Figure 2** below.

**Figure 2: Stimulus B Condition**



35.     **Stimulus C**. This stimulus makes one incremental change to Stimulus B, using

WWR's initials instead of the full name. I made this decision because I wanted to determine

whether other aspects of the name, such as three last names strung together, may also affect

consumer perception of the source company and perception of who reviewed the demand letter.[38] Thus, the header uses "WW&R Co., LTD" and "COLLECTION SERVICES" with "WW&R Co., LTD" in the body of the letter. See **Figure 3** below.

### Figure 3: Stimulus C Condition



---

[37]  I chose "collection services" because WWR refers to itself as a "law firm with in-house collection services" on the "Firm Overview" page of their website. See Weltman, Weinberg, & Reis Co., LPA, "Firm Overview," 2018, http://www.weltman.com/about/firm-overview.

[38]  In my exploratory interviews with consumers, I found that respondents did say that three consecutive last names sounded like a law firm. It is worth noting that WWR uses the initials WW&R on its own branding materials, including its website. See, e.g., Weltman, Weinberg, & Reis Co., LPA, "Firm Overview," 2018, http://www.weltman.com/about/firm-overview.

36.     These stimuli reflect the requirements of appropriate experimental and control stimuli, as they incrementally vary aspects of the firm's name and "tagline" so as to remove either implicit or explicit references to attorneys, lawyers, or legal organizations. A control stimulus is typically used in experimental studies as a means canceling out background "noise" or instances of confusion that are not relevant to the alleged  misrepresentation.[39] In this case, there were two separate control conditions studied. As is protocol in the design of treatment and control experiments, I designed my control stimuli to be identical to the treatment stimulus with the exception of the legal elements of the collection letter being studied.[40]

37.     In sum, the three stimuli were designed to (i) isolate the joint effect of WWR's use of "Attorneys at Law" and "L.P.A." on consumers' perceptions of the letter and (ii) isolate the joint effect of WWR's use of "Attorneys at Law" and "L.P.A." in combination with "Weltman, Weinberg & Reis," on consumers' perceptions of the letter.

### E.     Measures of Interest

38.     In the survey, three outcome measures were taken to calculate participants' relevant differences in perceptions based on their review of the three stimuli. The measures were taken after each respondent was shown one of the stimuli letters with the instructions to read the letter "assuming that you have received the letter in the mail for a debt that you owe."[41] Participants were also instructed to "answer these questions assuming that you have received the letter in the mail for a debt that you owe."[42] Participants were randomly assigned to one of the three stimuli groups so that approximately one third of the participants saw each of the three letters. The stimulus (initial

---

[39]     Diamond (2011), pp. 397-401.
[40]     Diamond (2011), p. 399, "[T]he expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." See also, Diamond (2011), p. 398.
[41]     See Appendix I.
[42]     See Appendix I.

demand letter) was available to participants as an enlargeable thumbnail image while they filled out the main questionnaire (i.e., Q4 to Q10).

39.    The first dependent measure was the participant's answer to an open-ended question asking what type of company or organization they thought had sent them the letter. Specifically, participants were asked, "Q6. What <u>type</u> of company or organization do you think sent you this letter?" This question was followed by an open-ended question allowing participants to indicate why they perceived that party sent them the letter, "Q7. Why do you say that?"[43]

40.    The second dependent measure was the participant's answer to a series of two open-ended questions asking them who, if anyone, they thought had reviewed their account before sending the letter. Specifically, participants were asked, "Q8. Assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?" and "Q9. Who else, if anyone, other than the person you just mentioned do you think reviewed your account before sending this letter?"[44] The second open-ended question in this series allowed participants to indicate any other parties that they perceived reviewed their account. The decision to include Q9 was informed by my qualitative interviews, as some interviewees indicated that multiple parties could have been involved in various actions related to sending the letter.

41.    The third dependent measure was a closed-ended question, Q10, included as shown in the programmer's instructions below.

---

[43]    I note that the use of "Why?" follow-up questions are commonplace in likelihood of confusion surveys. See Thornburg, R.H. (2004), "Trademark Surveys: Development of Computer-Based Survey Methods," *The John Marshall Review of Intellectual Property Law*, 4(91), p. 104 and p. 119.

[44]    Participants were given the option to choose "no one" instead of filling in the open-response text box.

**Q10.**  Now, you're going to see a list of people that may have been employed by the company that sent you this letter. You may have already said this, but assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?

*Mark all answers that apply*

**[RANDOMIZE OPTIONS; KEEP "NO ONE", "OTHER", AND "DON'T KNOW / I AM UNSURE" LAST]**

| | | |
|---|---|---|
| ☐₁ | An administrative assistant | |
| ☐₂ | An accountant | |
| ☐₃ | A project manager | |
| ☐₄ | An account manager | |
| ☐₅ | An attorney | |
| ☐₆ | A debt collector | |
| ☐₇ | A paralegal | |
| ☐₈ | No one | **[EXCLUSIVE]** |
| ☐₉ | Other (please specify) | **[SHORT TEXT BOX]** |
| ☐₁₀ | Don't know / I am unsure | **[EXCLUSIVE]** |

42.     This question presented a list of job titles that may or may not have existed at the company or organization that participants believed sent them the letter. Participants were asked to indicate who, if anyone, out of this list of job titles they thought had reviewed their account before sending the letter. The list of options was generated by my qualitative interviews in combination with additional research.[45]

43.     In the development of the questions, I followed standard scientific protocol. Specifically, my questions moved from broad to narrow in scope,[46] were balanced and non-

---

[45]   Responses to questions regarding who could be involved in various stages of sending a collection letter in the exploratory discussions were then cross-referenced with terminology used by WWR, Midland Funding LLC, other collection agencies, and the Federal Trade Commission ("FTC"). Job listings for Encore Capital Group, the parent company of Midland Funding LLC, includes positions such as "Project Manager" and "Account Manager" (Encore Capital Group, "Featured Jobs," 2015, http://www.encore-jobs.com). The FTC uses the term "debt collector" (Federal Trade Commission, "Debt Collection," https://www.ftc.gov/news-events/media-resources/consumer-finance/debt-collection). WWR has listings for attorneys, paralegals, and administrative assistants (Weltman, Weinberg, & Reis Co., LPA, "Jobs," 2018, https://recruiting.adp.com/srccar/public/RTI.home?c=1205601&d=External; Indeed, "Weltman, Weinberg, & Reis, Co. Employee Reviews," 2018, https://www.indeed.com/cmp/Weltman,-Weinberg-&-Reis-Co./reviews).

[46]   Asking the same question first as an open-ended question and subsequently as a closed-ended question allowed me to test two different forms of consumer confusion. Open-ended questions are a free-recall task, while closed-ended questions are a recognition task (Diamond (2011), p. 392). Asked first, the open-ended questions "give the respondents fewer hints about expected or preferred answers" (Diamond (2011), p. 392). It is expected that the closed-ended question, which requires recognition, rather than recall, will elicit a different

leading,[47] and did not force participants to guess. All questions included a "Don't know / I am unsure" option.[48] To ensure these questions were clear and understood, the survey was pretested under my direction from Thursday, January 18, 2017 to Friday, January 19, 2017.[49] A pretest, which is a standard element of most consumer survey protocols, is a test conducted before a survey is fielded that seeks to confirm respondents understand the wording of the questions and are not able to intuit the purpose of the survey. The questions used in the pretest explored respondent understanding of each dependent measure and set of answer options in the survey, in accordance with best research practice.[50]

---

response than the similar open-ended question (Diamond (2011), p. 392). See also, Plessis, E. (1994), "Recognition versus recall," *Journal of Advertising Research*, p. 75; Singh, S. N., M. L. Rothschild, and G. A. Churchill (1988), "Recognition versus recall as measures of television commercial forgetting," *Journal of Marketing Research*, 25(1), pp. 72-80.

[47]  Jacoby, J. (2012), "Are Closed-Ended Questions Leading Questions?" *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. Diamond, S. and J.B. Swann, pp. 274-275, "When the question itself or the response options provided with the question are weighted more in one direction rather than another, the question is a leading question. Failure to be balanced assumes many different forms." Examples of a failure to be balanced include "failure to provide options representing opponent's arguments or positions" and "failure to give comparable explicit emphasis to the affirmative, negative, and neutral positions."

[48]  In a survey, if forced to provide an opinion, people will do so even if they do not have an opinion. Failing to provide "don't know" or "unsure" options and instructions not to guess yields irrelevant and inaccurate answers from respondents who may be guessing. See Diamond (2011), p. 389, "Some survey respondents may have no opinion on an issue under investigation, either because they have never thought about it before or because the question mistakenly assumes a familiarity with the issue. For example, survey respondents may not have noticed that the commercial they are being questioned about guaranteed the quality of the product being advertised and thus they may have no opinion on the kind of guarantee it indicated."

[49]  A blind-to-the-purpose moderator administered the survey over the phone. Halfway through the pretesting process, I discussed the outcome of the pretest with my support team and made slight adjustments to my study to increase clarity and understanding. Specifically, I changed the presentation of Q5 and Q7 and adjusted the answer options to Q10. I had originally had designed the survey so that Q5("Why do you say that?") and Q7("Why do you say that?") were shown to respondents on a separate screen after Q4 and Q6 respectively. Feedback from the pretests indicated that consumers were confused to what the "Why?" follow-up questions (Q5 and Q7) were asking when they were displayed separately from the questions to which they were referring (Q4 and Q6). Consequently, I adjusted the survey so that the "Why?" follow-up questions were shown on the same screen as the initial questions (i.e., Q5 was shown on the same screen as Q4 once respondents began typing a response to Q4, and Q7 was shown on the same screen as Q6 once respondents began typing a response to Q6). I also increased the specificity of the Q10 answer options, relying on information from the exploratory discussions and my own qualitative research. For example, I changed "An administrative employee" to "An administrative assistant."

[50]  See Diamond (2011), pp. 388-389.

### III.    SURVEY RESULTS

44.     In this section, I first discuss consumer perceptions of who reviewed their account, looking at results across questions and results to individual questions (Q8, Q9, and Q10), and then analyze consumer perceptions of the type of firm that sent the letter (Q6 and Q7). A brief discussion of sensitivity analyses and validation concludes this section.

45.     In sum, my survey results, taken as a whole, show that 41.2% of survey participants viewing the "Weltman, Weinberg & Reis Co., LPA" (Stimulus A) believed that an attorney or a lawyer was involved in the process of sending the letter.[51] Approximately the same percentage of participants (38.2%) provided a response that a lawyer or attorney reviewed their account before sending. By contrast, only 19.8% of participants viewing "Weltman, Weinberg & Reis, Co., LTD" (Stimulus B) and 13.3% of participants viewing "WWR & Co., LTD" (Stimulus C) believed that a lawyer or attorney reviewed their account. These results provide strong evidence that the demand letters sent by WWR give consumers the impression that lawyers are involved in reviewing their account before the demand letters are sent.

46.     I also find that 50.8% of survey participants viewing the "Weltman, Weinberg & Reis Co., LPA" (Stimulus A) believed that a legal entity sent them the letter.[52] By contrast, only 15.3% of participants viewing "Weltman, Weinberg & Reis, Co., LTD" (Stimulus B) and 3.4% of participants viewing "WWR & Co., LTD" (Stimulus C) believed that a legal entity sent them the letter. Further, I find that 22.6% of survey participants viewing the "Weltman, Weinberg & Reis Co., LPA" (Stimulus A) articulated that a lawyer or attorney specifically sent them the letter in

---

[51]    These results are based on my joint analysis of questions Q8, Q9, and Q10. See section III.A.1 for a more detailed discussion of these results. I note that for the joint analysis participants are only counted once -- if a respondent answered "lawyer" in each of Q8, Q9, and Q10, his or her response is only counted once.

[52]    These results are based on my analysis of questions Q6 and Q7. See section III.B for a more detailed discussion of these results.

contrast to the 3.5% of participants viewing "Weltman, Weinberg & Reis, Co., LTD" (Stimulus B) and 1.7% of participants viewing "WWR & Co., LTD" (Stimulus C). These results provide strong evidence that the demand letters sent by WWR give consumers the impression that legal entities and lawyers specifically sent them the letter.

### A.    Perceptions of Who Reviewed the Account (Q8, Q9, Q10)

#### 1.    Joint Analysis of Q8, Q9, Q10

47.    In this section, I summarize my findings on respondents' perceptions of who, if anyone, reviewed their account before sending them the letter, looking across the series of questions on this topic (Q8, Q9, and Q10).[53] As I discussed in section II.E, Q8 and Q9 are open-ended questions while Q10 is a closed-ended question. To classify answers to the open-ended questions in my survey, I provided a detailed set of coding instructions to two trained, blind-to-the-purpose coders.[54] These coders categorized respondents' open-ended responses to Q8 and Q9 (as well as Q6 and Q7).[55] In the joint analysis of consumer perception, I analyzed whether respondents indicated a response related to lawyers or attorneys when answering any of the questions as to who reviewed their account (Q8, Q9, or Q10). Participants are only counted once

---

[53]    Q8 asked participants: "Assuming that you received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?" Q9 was a follow-up question that asked: "Who else, if anyone other than the person you just mentioned, do you think reviewed your account before sending this letter? Q10 asked participants: "Now, you're going to see a list of people that may have been employed by the company that sent you this letter. You may have already said this, but assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?"

[54]    Diamond (2011), p. 413, "Coding of answers to open-ended questions requires a detailed set of instructions so that decision standards are clear and responses can be scored consistently and accurately. Two trained coders should independently score the same responses to check for the level of consistency in classifying responses."

[55]    Specifically, two judges, blind to the purpose of the study, independently coded verbatim responses to Q8 and Q9 into a set of defined, non-mutually exclusive categories. These independent judges were Analysis Group staff who had no knowledge about this project. Instructions for coding and conflict resolution instructions are presented in **Appendix L.** The rate of agreement between the judges coding for Q8 was 97%, and the rate of agreement for Q9 was 98%. Disagreements were resolved by discussion between the two judges and final agreement was 100%.

– in other words, if a respondent answered "lawyer" in each of Q8, Q9, and Q10, his or her response is only counted once.

48.     **Table 1** presents my analysis of whether respondents indicated that a legal entity reviewed their account in either Q8, Q9, or Q10, comparing the responses of participants that saw the "Weltman, Weinberg & Reis, Co. LPA Attorneys at Law" letter (Stimulus A) to the responses of participants that saw the "Weltman, Weinberg & Reis, Co. LTD Collections Services" letter (Stimulus B) and to the responses of participants that saw the "WW&R, Co. LTD Collection Services" letter (Stimulus C).

Table 1
**Responses Referencing a Lawyer or Law Organization**

Q8. Assuming that you received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?
Q9. Who else, if anyone other than the person you just mentioned, do you think reviewed your account before sending this letter?
Q10. Now, you're going to see a list of people that may have been employed by the company that sent you this letter. You may have already said this, but assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?[1]

|  | % of Responses (n) | | | % | |
|---|---|---|---|---|---|
|  | Weltman, Weinberg & Reis Co., LPA Attorneys at Law (Stimulus A) | Weltman, Weinberg & Reis, Co., LTD Collection Services (Stimulus B) | WW&R Co., LTD Collection Services (Stimulus C) | Net [A]-[B] | Net [A]-[C] |
| **Related to Lawyers or Attorneys[2]** | 41.2% (82) | 20.8% (42) | 13.7% (32) | 20.4% *** | 27.5% *** |
| *Respondent Specifically Mentioning* |  |  |  |  |  |
| *Lawyer or Attorney[3]* | 38.2% (76) | 19.8% (40) | 13.3% (31) | 18.4% *** | 24.9% *** |
| *Law Firm or Law Office[4]* | 12.1% (24) | 2.5% (5) | 0.9% (2) | 9.6% *** | 11.2% *** |

Notes:
[1] Counts include all respondents whose response to either Q8 or Q9 was categorized as related to lawyers or attorneys or as specifically mentioning a lawyer or attorney or a law firm or law office, as defined below, or the respondent chose "An attorney" in response to Q10.
[2] Responses related to lawyers or attorneys include responses for which the respondent answered a law firm, law office, legal services organization, lawyer or attorney, or lawyers or attorneys. Any references to strictly an administrative employee or paralegal at a law firm, law office, or legal services organization were removed.
[3] Responses specifically mentioning a lawyer or attorney include responses for which the respondent answered an attorney or lawyer or attorneys or lawyers.
[4] Responses specifically mentioning a law firm or law office include responses for which the respondent answered a law firm, law office, or legal services organization.
[5] Chi-squared tests provide evidence that the Stimulus B and Stimulus C groups are statistically different from the Stimulus A group in their answers that related to lawyers or attorneys or specifically mentioned a  lawyer or attorney or a law firm or law office. All differences are found to be significant with $\chi^2_{(1)} > 13$ and $p < 0.001$.
[6] Percentages are rounded to the nearest tenth of a percentage point.
[7] The final analytical sample included 634 respondents. Initially, 666 participants qualified for and completed the survey. I excluded an additional 32 participants who either (i) took too long to take the survey, (ii) took the survey too quickly, (iii) did not type "Next" as instructed in question S8, or (iv) provided more than two non-responsive answers to open-ended questions. See Exhibit 1 for sample selection criteria and summary statistics. The Stimulus A group had 199 respondents, the Stimulus B group had 202 respondents and the Stimulus C group had 233 respondents.

Source:
"ORD-307758-H4H4 FD_23.01.xlsx"

49.     As can be seen in **Table 1**, 41.2% of all respondents shown Stimulus A, the "Weltman, Weinberg & Reis, Co. LPA Attorneys at Law" letter used by WWR, answered that a legal entity reviewed their account in either Q8, Q9, or Q10. In contrast, only 20.8% of respondents

shown Stimulus B, "Weltman, Weinberg & Reis, Co. LTD Collections Services," and only 13.7% of respondents shown Stimulus C, "WW&R, Co. LTD Collection Services," answered that a legal entity reviewed their account in Q8, Q9, or Q10. These differences in the number of respondents who believed that a legal entity reviewed their account, differences of 20.4% (Stimulus A - Stimulus B) and 27.5% (Stimulus A - Stimulus C) respectively, are each statistically significant at the p < .001 level, meaning that there is less than a 1 out of 1000 chance that each result is due to random error as opposed to real differences between participant responses across the conditions.[56]

50.  I find similar differences when looking at those who answered that a "lawyer" or "attorney" specifically reviewed their account in Q8, Q9, or Q10. As can be seen in **Table 1**, 38.2% of all respondents shown Stimulus A, the "Weltman, Weinberg & Reis, Co. LPA Attorneys at Law" letter used by WWR, answered that a "lawyer" or "attorney" reviewed their account in either Q8, Q9, or Q10. In contrast, only 19.8% of respondents shown Stimulus B, "Weltman, Weinberg & Reis, Co. LTD Collections Services," and only 13.3% of respondents shown Stimulus C, "WW&R, Co. LTD Collection Services," answered that a lawyer or attorney reviewed their account in Q8, Q9, or Q10. These differences in the number of proportions who believed that a legal entity reviewed their account, differences of 18.4% (Stimulus A - Stimulus B) and 24.9% (Stimulus A - Stimulus C) respectively, are each statistically significant at the p < .001 level, meaning that there is less than a 1 out of 1000 chance that each result is due to random error as opposed to real differences between participant responses across the conditions.[57]

---

[56]  I used a Pearson's chi-squared test to evaluate the likelihood that the difference in the proportion of respondents between two groups (e.g., Stimulus A and Stimulus B) whose answer was categorized as the given category could occur simply by chance. As a sensitivity analysis, I also ran the same test using the Bonferroni correction for multiple comparisons and my conclusions are unchanged. See Anderson, D., D. Sweeney, T. Williams, J. Camm, and J. Cochran (2017), *Essentials of Statistics for Business and Economics, 8th Edition,* pp. 567-568.

[57]  *Ibid.*

## 2.    Individual Analysis of the Open-Ended Questions (Q8, Q9)

51.    In this section, I summarize participant answers to Q8 and Q9, analyzing consumers' unprompted, open-ended responses regarding whether or not they believed anyone reviewed their account before sending them the letter (Q8 and Q9). As mentioned above, to classify answers to these open-ended questions in my survey, I provided a detailed set of coding instructions to two trained, blind-to-the-purpose coders.[58] These coders categorized respondents' open-ended responses to Q8 and Q9 (as well as Q6 and Q7).[59] I present results that analyze Q8 and Q9 together because respondents had the opportunity to include any additional parties they believed may have reviewed their account in Q9; these responses might not have been included in their response to Q8.[60] A summary table of all coded results to Q8 and Q9 is provided as **Exhibit 3**, and the raw data files are also included as backup materials to my report.[61]

52.    **Table 2** presents my analysis of responses to Q8 and Q9, comparing the responses of participants that saw the "Weltman, Weinberg & Reis, Co. LPA Attorneys at Law" letter (Stimulus A) to the responses of participants that saw the "Weltman, Weinberg & Reis, Co. LTD

---

[58]    Diamond (2011), p. 413, "Coding of answers to open-ended questions requires a detailed set of instructions so that decision standards are clear and responses can be scored consistently and accurately. Two trained coders should independently score the same responses to check for the level of consistency in classifying responses."

[59]    Specifically, two judges, blind to the purpose of the study, independently coded verbatim responses to Q8 and Q9 into a set of defined, non-mutually exclusive categories. These independent judges were Analysis Group staff who had no knowledge about this project. Instructions for coding and conflict resolution instructions are presented in **Appendix L**. The rate of agreement between the judges coding for Q8 was 97%, and the rate of agreement for Q9 was 98%. Disagreements were resolved by discussion between the two judges and final agreement was 100%.

[60]    Q8 asked participants: "Assuming that you received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?" Q9 was a follow-up question that asked: "Who else, if anyone other than the person you just mentioned, do you think reviewed your account before sending this letter? In my joint analysis of Q8 and Q9, I considered the number of *respondents* who answered in a specific way, therefore no respondents are counted twice. For example, if a respondent's answer to Q8 was categorized as "law firm" and the same respondent's answer to Q9 was categorized as "law firm," this respondent would only be counted once in terms of having respondent jointly to Q8 and Q9 with "law firm."

[61]    Diamond (2011), p. 413, "In all cases, the verbatim responses should be available so that they can be recoded using alternative criteria."

28

Collections Services" letter (Stimulus B) and to the responses of participants that saw the "WW&R, Co. LTD Collection Services" letter (Stimulus C).

**Table 2**
**Responses Referencing a Lawyer or Law Organization**

Q8. Assuming that you received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?
Q9. Who else, if anyone other than the person you just mentioned, do you think reviewed your account before sending this letter? [1]

| | % of Responses (n) | | | % | |
|---|---|---|---|---|---|
| | Weltman, Weinberg & Reis Co., LPA Attorneys at Law (Stimulus A) | Weltman, Weinberg & Reis Co., LTD Collection Services (Stimulus B) | WW&R Co., LTD Collection Services (Stimulus C) | Net [A]-[B] | Net [A]-[C] |
| Related to Lawyers or Attorneys[2] | 29.1% (58) | 7.4% (15) | 2.6% (6) | 21.7% *** | 26.6% *** |
| *Respondent Specifically Mentioning* | | | | | |
| *Lawyer or Attorney[3]* | 17.6% (35) | 5.0% (10) | 1.7% (4) | 12.6% *** | 15.9% *** |
| *Law Firm or Law Office[4]* | 12.1% (24) | 2.5% (5) | 0.9% (2) | 9.6% *** | 11.2% *** |

Notes:
[1] Counts include all respondents whose response to either Q8 or Q9 was categorized as related to lawyers or attorneys or as specifically mentioning a lawyer or attorney or a law firm or law office, as defined below.
[2] Responses related to lawyers or attorneys include responses for which the respondent answered a law firm, law office, legal services organization, lawyer or attorney, or lawyers or attorneys. Any references to strictly an administrative employee or paralegal at a law firm, law office, or legal services organization were removed.
[3] Responses specifically mentioning a lawyer or attorney include responses for which the respondent answered an attorney or lawyer or attorneys or lawyers.
[4] Responses specifically mentioning a law firm or law office include responses for which the respondent answered a law firm, law office, or legal services organization.
[5] Chi-squared tests provide evidence that the Stimulus B and Stimulus C groups are statistically different from the Stimulus A group in their answers that related to lawyers or specifically mentioned a  lawyer or attorney or a law firm or law office. All differences are found to be significant with $\chi^2(1) > 13$ and $p < 0.001$.
[6] Percentages are rounded to the nearest tenth of a percentage point.

Source:
"ORD-307758-H4H4 FD_23.01.xlsx"

53. As can be seen in **Table 2**, nearly one third (29.1%) of all respondents shown Stimulus A, the "Weltman, Weinberg, and Reis, Co. LPA Attorneys at Law" letter used by WWR, believed that a legal entity reviewed their account before sending them the letter. In contrast, only 7.4% of respondents shown Stimulus B, "Weltman, Weinberg & Reis, Co. LTD Collections Services," and only 2.6% of respondents shown Stimulus C, "WW&R, Co. LTD Collection Services," believed that a legal entity reviewed their account before sending them the letter. These differences in the number of respondents who believed that a legal entity reviewed their account, differences of 21.7% (Stimulus A - Stimulus B) and 26.6% (Stimulus A - Stimulus C) respectively, are each statistically significant at the p < .001 level, meaning that there is less than a 1 out of 1000

chance that each result is due to random error as opposed to real differences between participant responses across the conditions.[62]

54.     **Table 2** also shows the proportions of respondents who specifically answered that a lawyer or attorney reviewed their account before sending them the letter. Nearly one-fifth (17.6%) of participants shown Stimulus A, the "Weltman, Weinberg & Reis, Co. LPA Attorneys at Law" letter used by WWR, answered "lawyer" or "attorney" in response to Q8 or Q9 compared to only 5.0% of participants shown Stimulus B, "Weltman, Weinberg & Reis, Co. LTD Collections Services," and 1.7% of participants shown Stimulus C, "WW&R, Co. LTD Collection Services." The differences between the proportions of participants that answered "lawyer or attorney" between (i) Stimulus A and Stimulus B (12.6%) and (i) Stimulus A and Stimulus C (15.9%) are also significant at the $p < .001$ level, meaning that there is less than a 1 out of 1000 chance that each result is due to random error as opposed to real differences between participant responses across the conditions.[63]

### 3.     Individual Analysis of the Closed-Ended Question (Q10)

55.     In this section, I summarize participant answers to Q10, analyzing consumer perceptions regarding the type of employee that may have reviewed their file before sending the letter. As I discuss in Section II.E, Q10 is a close-ended version of Q8 and Q9, gauging respondent recognition rather than respondent recall.[64] A summary table of Q10 results is provided at **Exhibit 4**.

---

[62]   *Supra*, note 56.
[63]   *Ibid.*
[64]   Q10 asked participants: "Now, you're going to see a list of people that may have been employed by the company that sent you this letter. You may have already said this, but assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?"

56.    **Table 3** presents my analysis of responses to Q10, comparing the responses of participants that saw the "Weltman, Weinberg & Reis, Co. LPA Attorneys at Law" letter (Stimulus A) to the responses of participants that saw the "Weltman, Weinberg & Reis, Co. LTD Collections Services" letter (Stimulus B) and to the responses of participants that saw the "WW&R, Co. LTD Collection Services" letter (Stimulus C).

**Table 3**
**Responses of "Attorney"**

*Q10. Now, you're going to see a list of people that may have been employed by the company that sent you this letter. You may have already said this, but assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?*

| | % of Responses (n) | | | % | |
|---|---|---|---|---|---|
| | Weltman, Weinberg & Reis Co., LPA Attorneys at Law (Stimulus A) | Weltman, Weinberg & Reis Co., LTD Collection Services (Stimulus B) | WW&R Co., LTD Collection Services (Stimulus C) | Net [A]-[B] | Net [A]-[C] |
| Attorney | 36.2% (72) | 18.8% (38) | 13.3% (31) | 17.4% *** | 22.9% *** |

Notes:
[1] Percentages reported are the percentage of *all* respondents in that group who chose "An attorney" in response to Q10.
[2] Chi-squared tests provide evidence that the Stimulus B and Stimulus C groups are statistically different from the Stimulus A group in their answers of "An attorney" to Q10. All differences are found to be significant with $\chi2(1) > 15$ and $p < 0.001$.

Source:
"ORD-307758-H4H4 FD_23.01.xlsx"

57.    As can be seen in **Table 3**, 36.2% of all respondents shown Stimulus A, the "Weltman, Weinberg & Reis, Co. LPA Attorneys at Law" letter, believed that an attorney reviewed their account before sending them the letter. In contrast, only 18.8% of respondents shown Stimulus B, "Weltman, Weinberg & Reis, Co. LTD Collections Services," and only 13.3% of respondents shown Stimulus C, "WW&R, Co. LTD Collection Services," believed that an attorney reviewed their account before sending them the letter. These differences in the number of respondents who believed that an attorney reviewed their account, differences of 17.4% (Stimulus A - Stimulus B) and 22.9% (Stimulus A - Stimulus C) respectively, are each statistically significant at the $p < .001$ level, meaning that there is less than a 1 out of 1000 chance that each result is due

to random error as opposed to real differences between participant responses across the conditions.[65]

58.    In sum, my analysis of the open-ended responses of Q8 and Q9 in addition to the close-ended responses of Q10 indicate that a significant percentage (between 29.1% and 41.2%) of respondents who were shown the original WWR letter (Stimulus A) perceived that a legal entity reviewed their file before sending them the letter. Further, I find that between 17.6% and 38.2% of respondents shown the original WWR letter (Stimulus A) articulated that a lawyer or attorney specifically reviewed their file. The proportions of respondents shown Stimulus B or Stimulus C who perceived that a legal entity and/or lawyer reviewed their file are significantly smaller than that of those shown Stimulus A, and these differences are statistically significant at the p < .001 level. Given my treatment and control survey design, I can conclude that the statistically significant differences between the original WWR letter and the modified letters (seen in the "Net" columns of **Table 1**, **Table 2, and Table 3**) are attributable to the varied elements: 1) the "Attorneys at Law" letterhead and "LPA" moniker (as evidenced by the differences between Stimulus A and Stimulus B), and 2) the combination of the "Attorneys at Law" letterhead, "LPA" moniker, and tri-name letterhead "Weltman, Weinberg & Reis" (as evidenced by the differences between Stimulus A and Stimulus C). Consequently, after canceling out noise by netting out the proportions from the control groups (Stimulus B and Stimulus C), I can conclude that the legal aspects of the collections letter led a substantial proportion of respondents to believe that a legal entity and/or a lawyer specifically reviewed their account before the respondent was sent the letter.

---

[65]    *Supra*, note 56.

### B.   Perceptions of the Type of Company or Organization (Q6 and Q7)

59.   In this section, I summarize participant answers to Q6 and Q7, analyzing consumers' open-ended responses regarding the type of company or organization that they believed sent them the collections letter.[66] To classify answers to the open-ended questions in my survey, I provided a detailed set of coding instructions to two trained, blind-to-the-purpose coders.[67] As I mention above, these coders categorized respondents' open-ended responses to Q6 and Q7 (as well as Q8 and Q9).[68] Summary tables of all coded results to Q6 and Q7 are provided as **Exhibit 5** and **Exhibit 6**, and the raw data files, including verbatim responses, are also included as backup materials to my report.[69]

60.   **Table 4** presents my analysis of responses to Q6, comparing the responses of participants that saw the "Weltman, Weinberg & Reis, Co. LPA Attorneys at Law" letter (Stimulus A) to the responses of participants that saw the "Weltman, Weinberg & Reis, Co. LTD Collections Services" letter (Stimulus B) and to the responses of participants that saw the "WW&R, Co. LTD Collection Services" letter (Stimulus C).

---

[66]   Q6 asked participants: "What type of company or organization do you think sent this letter?" Q7 was shown on the same page and asked: "Why do you say that?"

[67]   Diamond (2011), p. 413, "Coding of answers to open-ended questions requires a detailed set of instructions so that decision standards are clear and responses can be scored consistently and accurately. Two trained coders should independently score the same responses to check for the level of consistency in classifying responses."

[68]   Specifically, two judges, blind to the purpose of the study, independently coded verbatim responses to Q6 and Q7 into a set of defined, non-mutually exclusive categories. These independent judges were Analysis Group staff who had no knowledge about this project. Instructions for coding and conflict resolution instructions are presented in **Appendix L**. The rate of agreement between the judges coding for Q6 was 98%, and the rate of agreement for Q7 was 99%. Disagreements were resolved by discussion between the two judges and final agreement was 100%.

[69]   Diamond (2011), p. 413, "In all cases, the verbatim responses should be available so that they can be recoded using alternative criteria."

**Table 4**
**Responses Referencing a Lawyer or Law Organization**
*Q6. What type of company or organization do you think sent you this letter?*

| | % of Responses (n) | | | % | |
|---|---|---|---|---|---|
| | Weltman, Weinberg & Reis Co., LPA Attorneys at Law (Stimulus A) | Weltman, Weinberg & Reis Co., LTD Collection Services (Stimulus B) | WW&R Co., LTD Collection Services (Stimulus C) | Net [A]-[B] | Net [A]-[C] |
| **Related to Lawyers or Attorneys[1]** | 49.2% (98) | 14.4% (29) | 3.4% (8) | 34.9% *** | 45.8% *** |
| *Respondent Specifically Mentioning* | | | | | |
| *Law Firm or Law Office[2]* | 32.7% (65) | 11.9% (24) | 1.7% (4) | 20.8% *** | 30.9% *** |
| *Lawyer or Attorney[3]* | 16.6% (33) | 2.5% (5) | 1.7% (4) | 14.1% *** | 14.9% *** |

Notes:
[1] Responses related to lawyers or attorneys included responses for which the respondent answered a law firm, law office, legal services organization, lawyer or attorney, or lawyers or attorneys. Any references to strictly an administrative employee or paralegal at a law firm, law office, or legal services organization were removed.
[2] Responses specifically mentioning a law firm or law office included responses for which the respondent answered a law firm, law office, or legal services organization.
[3] Responses specifically mentioning a lawyer or attorney included responses for which the respondent answered an attorney or lawyer or attorneys or lawyers.
[4] Chi-squared tests provide evidence that the Stimulus B and Stimulus C groups are statistically different from the Stimulus A group in their answers that related to lawyers or attorneys or specifically mentioned a law firm or law office or a lawyer or attorney. All differences are found to be significant with $\chi^2(1) > 23$ and $p < 0.001$.
[5] Percentages are rounded to the nearest tenth of a percentage point.

Source:
"ORD-307758-H4H4 FD_23.01.xlsx"

61.     As can be seen in **Table 4**, almost half (49.2%) of all respondents shown Stimulus A, the "Weltman, Weinberg & Reis, Co. LPA Attorneys at Law" letter used by WWR, believed that a legal entity sent them the letter. In contrast, only about 14.4% of respondents shown Stimulus B,   "Weltman, Weinberg & Reis, Co. LTD Collections Services," and only about 3.4% of respondents shown Stimulus C, "WW&R, Co. LTD Collection Services," believed that a legal entity sent them the letter. These differences, or net percentages, in the percentage of respondents who believed that a legal entity sent them the letter, differences of 34.9% (Stimulus A - Stimulus B) and 45.8% (Stimulus A - Stimulus C) respectively, are each statistically significant at the $p <$ .001 level, meaning that there is less than a 1 out of 1000 chance that each result is due to random error as opposed to real differences between participant responses across the conditions.[70]

62.     Although Q6 asked participants "What type of company or organization do you think sent you this letter?" some participants answered the open-ended question with a profession

---

[70]     *Supra*, note 56.

type rather than a company type based on their understanding of the letter. In fact, nearly one-fifth (16.6%) of participants shown Stimulus A, the "Weltman, Weinberg & Reis, Co. LPA Attorneys at Law" letter used by WWR, answered "lawyer" or "attorney" in response to Q6 compared to only 2.5% of participants shown Stimulus B, "Weltman, Weinberg & Reis, Co. LTD Collections Services," and 1.7% of participants shown Stimulus C, "WW&R, Co. LTD Collection Services." The differences between the proportions of participants that answered lawyer between Stimulus A and Stimulus B (14.1%) and Stimulus A and Stimulus C (14.9%) are also significant at the $p <$ .001 level, meaning that there is less than a 1 out of 1000 chance that each result is due to random error as opposed to real differences between participant responses across the conditions.[71]

63.    It is also possible to analyze Q6 and Q7 together. Comparing the coded results asking respondents about the type of company or organization that sent the letter with the coded results asking respondents "Why do you say that?" I find that more than half (50.8%) of participants who saw Stimulus A perceived that a legal entity sent the letter and over a fifth of the respondents (22.6%) perceived that a lawyer or attorney sent them the letter. In contrast, of respondents shown Stimulus B, only 15.3% perceived that a legal entity sent them the letter and only 3.4% explicitly answered that a lawyer sent them the letter. The proportions of respondents who were shown Stimulus C that perceived that a legal entity and/or lawyer sent the letter are even smaller, at 3.5% and 1.7% respectively. The differences between the original letter (Stimulus A) and modified letters (Stimulus B and Stimulus C) are significant at the $p < .001$ level, meaning that there is less than a 1 out of 1000 chance that each result is due to random error as opposed to real differences between participant responses across the conditions.[72] See **Table 5** below.

---

[71]    *Supra*, note 56.
[72]    *Ibid.*

**Table 5**
**Responses Referencing a Lawyer or Law Organization**

Q6. What type of company or organization do you think sent you this letter? / Q7. Why do you say that? [1]

| | % of Responses (n) | | | % | |
|---|---|---|---|---|---|
| | Weltman, Weinberg & Reis Co., LPA Attorneys at Law (Stimulus A) | Weltman, Weinberg & Reis Co., LTD Collection Services (Stimulus B) | WW&R Co., LTD Collection Services (Stimulus C) | Net [A]-[B] | Net [A]-[C] |
| Related to Lawyers or Attorneys [2] | 50.8% (101) | 15.3% (31) | 3.4% (8) | 35.4% *** | 47.3% *** |
| *Respondent Specifically Mentioning* | | | | | |
| *Law Firm or Law Office [3]* | 32.7% (65) | 12.4% (25) | 1.7% (4) | 20.3% *** | 30.9% *** |
| *Lawyer or Attorney [4]* | 22.6% (45) | 3.5% (7) | 1.7% (4) | 19.1% *** | 20.9% *** |

Notes:
[1] Counts include all respondents whose response to either Q6 or Q7 was categorized as related to lawyers or attorneys or as specifically mentioning a law firm or law office or a lawyer or attorney, as defined below.
[2] Responses related to lawyers or attorneys included responses for which the respondent answered a law firm, law office, legal services organization, lawyer or attorney, or lawyers or attorneys. Any references to strictly an administrative employee or paralegal at a law firm, law office, or legal services organization were removed.
[3] Responses specifically mentioning a law firm or law office included responses for which the respondent answered a law firm, law office, or legal services organization.
[4] Responses specifically mentioning a lawyer or attorney included responses for which the respondent answered an attorney or lawyer or attorneys or lawyers.
[5] Chi-squared tests provide evidence that the Stimulus B and Stimulus C groups are statistically different from the Stimulus A group in their answers that related to lawyers or attorneys or specifically mentioned a law firm or law office or a lawyer or attorney. All differences are found to be significant with $\chi^2(1) > 23$ and $p < 0.001$.
[6] Percentages are rounded to the nearest tenth of a percentage point.

Source:
"ORD-307758-H4H4 FD_23.01.xlsx"

64.     In sum, my analysis of the open-ended responses of Q6 and Q7 indicates that a significant percentage of respondents (approximately half) who were shown the original WWR letter (Stimulus A) perceived that a legal entity sent them the letter. Further, around one-fifth of respondents shown the original WWR letter specifically perceived that a lawyer or attorney sent them the letter. The proportions of respondents shown Stimulus B or Stimulus C who perceived that a legal entity and/or lawyer sent them the letter are significantly smaller than that of  those shown Stimulus A, and these differences are statistically significant at the p < .001 level. Given my treatment and control survey design, I can conclude that the statistically significant differences between the original WWR letter and the modified letters (seen in the "Net" columns of **Table 4** and **Table 5**) are attributable to the varied elements: 1) the "Attorneys at Law" letterhead and "LPA" moniker (as evidenced by the differences between Stimulus A and Stimulus B), and 2) the combination of the "Attorneys at Law" letterhead, "LPA" moniker, and tri-name letterhead "Weltman, Weinberg & Reis" (as evidenced by the differences between Stimulus A and Stimulus

36

C). Consequently, after canceling out noise by netting out the proportions from the control groups (Stimulus B and Stimulus C), I conclude that the legal aspects of the collections letter led a substantial proportion of respondents to believe that a legal entity (and at times, a lawyer specifically) sent them the letter.

### C.    Sensitivities and Validation

65.    As my survey was conducted online by a reputable panel provider, SSI, I was able to employ robust validation methods to ensure respondent identity.[73] In addition to the quality-control measures implemented by SSI, I built additional quality control-measures into my survey; for example, I instructed SSI to terminate those respondents who did not match the age that SSI had on file for them and included an "attention check" question (S8) so to be able to exclude those participants who were not paying attention from my analysis.[74] Additionally, my results are robust to various inclusion criteria and my conclusions do not change based upon repeating my analysis with these sensitivities.[75]

---

[73]    SSI employs a variety of quality control measures to ensure non-fraudulent data. These quality control measures include: "opt-in panel recruitment via proprietary, certified and qualified sources; " "digital fingerprinting that flags duplicate respondents, email and panel accounts;" "pattern recognition software identifies fraudulent respondents;" "SSI TrustScore monitors and excludes suspicious respondents;" and "continuous monitoring of speeding, straightlining and inattention," among other quality control and fraud prevention measures. SSI has received numerous awards and is member of CASRO, the Council of American Survey Research Organizations. See SSI, "Market Research Data Quality," 2018, https://www.surveysampling.com/technology/data-quality/; SSI, "Survey Sampling FAQs," 2018, https://www.surveysampling.com/about/faqs/; SSI, "Awards & Certifications,"2018, https://www.surveysampling.com/about/awards/; Insights Association, "CASRO," 2018, https://www.insightsassociation.org/organization/casro; Insights Association, "Company Member Directory," January 26, 2018, http://www.insightsassociation.org/company-member-directory.

[74]    See **Appendix I**.

[75]    My results do not change if I add back in those who did not type "Next" in S8; if I include or exclude respondents who knew about any litigation, or if I include or exclude respondents who had previously been contacted by a debt collector.

66.     I run a "file drawer analysis" to further test the robustness of my results. This analysis calculates the minimum number of additional studies with a null finding (i.e., no differences in responses across stimuli groups) needed in order for my current overall estimated differences across the stimuli to no longer be statistically significant at the $p < .05$ level. I will refer to the number of additional studies with a null finding necessary to invalidate the strength of my current findings as the "file drawer analysis N."[76] Taking the combined results in **Table 2**, **Table 3**, and **Table 5**, I find that the file drawer analysis N for stimuli A and B is 44, meaning that 44 additional studies showing no differences in consumers responses to Stimulus A versus Stimulus B would be needed before the findings from the study described herein would no longer be statistically significant. The file drawer analysis N for stimuli A and C is 97, and the file drawer analysis N after combining the tests for stimuli A and B and stimuli A and C is 148. Taken together, these results imply that it would take an additional 44 to 148 studies showing completely null results (i.e., no differences in responses across stimuli groups) combined with my current results in order for the differences in the stimuli to no longer be statistically significant. The large estimated values for the file drawer analysis N (i.e., 44 to 148 studies) provide further evidence of the robustness and power of my results.[77]

---

[76]   I calculate the file drawer analysis N by adapting the methods used by Fisher (1932) and Rosenthal (1979). In particular, given k current studies, each with its own p-value, I first calculate a combined value C such that C = -2*(ln (p-value from study 1) + ln(p-value from study 2) + … + (ln(p-value from study k)). The file drawer analysis N is defined as the smallest value of n such that the p-value associated with the value C in a chi-squared distribution of 2*(n+k) degrees of freedom is greater than 0.05. See Becker, B.J. (1994), "Combining significance levels," *The Handbook of Research Synthesis*, eds. Cooper, H., and L. V. Hedges, p. 223; Rosenthal, R. (1979), "The "File Drawer Problem" and Tolerance for Null Results," *Psychological Bulletin*, 86(3), p. 638; Fisher, R.A. (1932), *Statistical Methods for Research Workers, 5th Edition*, p. 103.

[77]   Rosenthal (1979) suggests a rule of thumb of a file drawer analysis N greater than 5*k + 10, where k is the number of current studies being utilized. Applying this rule of thumb implies thresholds of 25 for stimuli A and B and stimuli A and C and a threshold of 40 for the combined analysis. Each of these thresholds is surpassed by the relevant file drawer analysis N. All p-values are based on the tests comparing the percentage of responses "Related to Lawyers or Attorneys" (for **Table 2** and **Table 5)** and percentage of responses of "Attorney" (for **Table 3**). See Rosenthal, R. (1979), "The "File Drawer Problem" and Tolerance for Null Results," *Psychological Bulletin*, 86(3), p. 638.

## IV.    CONCLUSION

67.    I was asked by counsel for the CFPB to conduct a survey that would assess whether and to what extent consumers perceived that a lawyer was involved in the process that led to receiving a WWR demand letter. My conclusion is based on my review of the initial demand letter and on my empirical analysis of responses from a survey of a representative sample of actual consumers. My results reveal significantly large differences in consumers' perceptions when the letter is incrementally changed so as to remove certain law-related features of the company name and letterhead. It is my conclusion that certain law-identifying aspects of the letter, such as the use of "LPA" and "Attorneys at Law," (i) significantly alter consumer perceptions of the *type of firm* that sent the letter, and (ii) significantly alter consumer perceptions of *who* reviewed the account at the firm that sent the letter.

68.    The large differences in consumer perceptions across conditions provide strong empirical evidence that WWR's initial demand letter leads consumers to perceive that the letter was from a lawyer, a lawyer had reviewed the consumer account, and that the letter was from a law firm. Further, the results from my "file drawer analysis" imply that it would take an additional 44 to 148 studies showing completely null results (i.e., no differences in responses across stimuli groups) combined with my current results in order for the differences in consumer perceptions across the stimuli to no longer be statistically significant.

69.    This survey is of the same sort I would conduct and rely upon in my academic work. It utilizes significantly large samples to lead to statistically valid results and demonstrates high degrees of internal, content, and construct validity. The data presented in this report is purely analytical in nature and can be analyzed by other experts in this case.

70.     This report represents my analyses, opinions, and conclusions as of the date indicated herein. If additional information or testimony becomes available, I may supplement or revise my analysis, opinions, and conclusions and therefore reserve the right to modify or supplement my report as necessary. I also understand that I may be asked by the Court or the parties' attorneys to testify at trial regarding any matter raised by either party after the date of this report that is related to this report. I may also develop additional exhibits for trial purposes if so requested. This report is intended solely for use in the above-referenced litigations and is not to be used for any other purpose.

71.     I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true.


Date: January 31, 2018

_____

Ronald C. Goodstein, Ph.D.

40

**Exhibit 1**
**WWR Study: Survey Response Statistics**

| Status | N | % |
|---|---|---|
| *Final Analytical Sample* [2] | 634 | 58.4% |
| *Completed Survey* | 666 | 61.3% |
| *Excluded from Analysis* | 32 | 2.9% |
|     Took Too Long to Take the Survey or Took the Survey Too Quickly[3] | 13 | 1.2% |
|     Did Not Pass Attention Check[4] | 13 | 1.2% |
|     Non-responsive Open-ended Answers[5] | 6 | 0.6% |
| *Screened Out of Survey* | 282 | 26.0% |
|     At S1 (Age) [6] | 72 | 6.6% |
|     At S4 (Employment) [7] | 81 | 7.5% |
|     At S5/S6/S7 (Credit Card Use/Money Borrowing) [8] | 114 | 10.5% |
|     At Q1 (Timing Out or No Agreement to Participate) [9] | 15 | 1.4% |
| *Self-terminated* | 138 | 12.7% |
|     During Screener[10] | 65 | 6.0% |
|     After Screener | 73 | 6.7% |
| *Respondents Who Clicked on Survey Link While the Survey Was in the Field* [1] | 1086 | 100.0% |

**Notes:**

[1] The total number of respondents who clicked on the survey link while the survey was in the field is the sum of "Completed Survey," "Screened Out of Survey," and "Self-terminated."

[2] The final analytical sample is the difference between "Completed Survey" and "Excluded from Analysis."

[3] Respondents below the 1st percentile or above the 99th percentile of time taken were excluded from analysis.

[4] Respondents were excluded for inattention if they did not type "Next" or some reasonable variation (e.g. "next") in S8.

[5] Respondents were excluded for non-responsive open-ended answers if their responses to the open-ended questions (Q6-Q9) included at least two non-responsive open-ended answers.

[6] Respondents would be screened out at S1 if they were under 18 years old, selected "Prefer not to answer," or if the age they indicated did not match the age on file with SSI.

[7] Respondents would be screened out at S4 if they or anyone else in their household had ever been employed by "a bank, credit card company, or other financial organization," "a law firm, legal services organization, or court," "a debt or bill collection agency," or "a marketing, market research, or advertising agency."

[8] Respondents would be screened out at the series of questions, S5, S6 or S7, if they had not indicated that they had used a credit card in the last 5 years for personal or household expenses nor borrowed money from someone other than a friend or family member for personal or household expenses in the last 5 years.

[9] Respondents would be screened out at Q1 either if they did not check the box indicating they understood the instructions and were willing to participate in the survey, or if they did not check the box and select "Next" within five minutes. If respondents selected "Next" once without checking the box indicating they were willing to participate in the survey, they were shown the message "Please review the instructions and check the box if you agree." If they again selected "Next" without checking the box, they were screened out of the survey.

[10] "During Screener" indicates respondents who self-terminated before answering question Q1. "After Screener" indicates respondents who self-terminated after answering Q1.

**Source:**
"ORD-307758-H4H4 FD_23.01.xlsx"

**Exhibit 2**
**WWR Study: Survey Respondent Demographics**
**N=634**

| Demographic | Categories | N | % |
|---|---|---|---|
| *Age* | | | |
| | 18-24 | 44 | 6.9% |
| | 25-34 | 87 | 13.7% |
| | 35-44 | 119 | 18.8% |
| | 45-54 | 120 | 18.9% |
| | 55-64 | 132 | 20.8% |
| | 65+ | 132 | 20.8% |
| *Gender* | | | |
| | Male | 280 | 44.2% |
| | Female | 353 | 55.7% |
| | Other | 1 | 0.2% |
| *U.S. Region* | | | |
| | Northeast | 108 | 17.0% |
| | Midwest | 134 | 21.1% |
| | South | 240 | 37.9% |
| | West | 152 | 24.0% |
| *Credit or Charge Card Use* | | | |
| | Yes | 622 | 98.1% |
| | No / Don't know | 12 | 1.9% |
| *Borrowed Money* | | | |
| *Total* | Yes | 205 | 32.3% |
| | No / Don't know | 429 | 67.7% |
| *Yes* | A friend | 45 | 7.1% |
| | A family member | 68 | 10.7% |
| | A bank | 82 | 12.9% |
| | A retail store | 10 | 1.6% |
| | A payday lender | 31 | 4.9% |
| | A car dealership | 31 | 4.9% |
| | A utilities company | 3 | 0.5% |
| | A property owner | 7 | 1.1% |
| | The federal government | 11 | 1.7% |
| | A pawn shop | 20 | 3.2% |
| | A company that offers a car title loan | 14 | 2.2% |
| | An online lender | 29 | 4.6% |
| | A credit union | 45 | 7.1% |
| | An academic institution | 8 | 1.3% |
| | Other (please specify) | 5 | 0.8% |
| | Don't know / I am unsure | 4 | 0.6% |

**Note:**
The final analytical sample included 634 respondents. Initially, 666 participants qualified for and completed the survey. I excluded an additional 32 participants who either (i) took too long to take the survey, (ii) took the survey too quickly, (iii) did not type "Next" as instructed in question S8, or (iv) provided more than two non-responsive answers to open-ended questions. See Exhibit 1 for sample selection criteria and summary statistics.

**Source:**
"ORD-307758-H4H4 FD_23.01.xlsx"

**Exhibit 3**

*Q8. Assuming that you received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?*

*Q9. Who else, if anyone other than the person you just mentioned, do you think reviewed your account before sending this letter?[1]*

*Coded Open-Ended Responses*

| Categories | Weltman, Weinberg & Reis Co., LPA Attorneys at Law (Stimulus A) N=199 | | Weltman, Weinberg & Reis Co., LTD Collection Services (Stimulus B) N=202 | | WW&R Co., LTD Collection Services (Stimulus C) N=233 | | Differences | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Net [A]-[B] | Net [A]-[C] |
| | N | % Total | N | % Total | N | % Total | % Total | % Total |
| **Legal Related** | **58** | **29.1%** | **15** | **7.4%** | **6** | **2.6%** | **21.7%** | **26.6%** |
| Lawyer[2] | 35 | 17.6% | 10 | 5.0% | 4 | 1.7% | 12.6% | 15.9% |
| Law Firm / Office[3] | 24 | 12.1% | 5 | 2.5% | 2 | 0.9% | 9.6% | 11.2% |
| **Collections Related** | **35** | **17.6%** | **66** | **32.7%** | **61** | **26.2%** | **-15.1%** | **-8.6%** |
| Collector[4] | 15 | 7.5% | 10 | 5.0% | 11 | 4.7% | 2.6% | 2.8% |
| Collection Agency[5] | 21 | 10.6% | 57 | 28.2% | 50 | 21.5% | -17.7% | -10.9% |
| **Lender Related** | **50** | **25.1%** | **59** | **29.2%** | **57** | **24.5%** | **-4.1%** | **0.7%** |
| Original Lender[6] | 50 | 25.1% | 59 | 29.2% | 57 | 24.5% | -4.1% | 0.7% |
| **Other Category** | **139** | **69.8%** | **139** | **68.8%** | **180** | **77.3%** | **1.0%** | **-7.4%** |
| Accountant[7] | 4 | 2.0% | 0 | 0.0% | 3 | 1.3% | 2.0% | 0.7% |
| Paralegal[8] | 3 | 1.5% | 3 | 1.5% | 2 | 0.9% | 0.0% | 0.6% |
| Company Name Only[9] | 7 | 3.5% | 17 | 8.4% | 18 | 7.7% | -4.9% | -4.2% |
| No One[10] | 14 | 7.0% | 12 | 5.9% | 22 | 9.4% | 1.1% | -2.4% |
| Other[11] | 58 | 29.1% | 44 | 21.8% | 67 | 28.8% | 7.4% | 0.4% |
| Non-Response[12] | 16 | 8.0% | 29 | 14.4% | 19 | 8.2% | -6.3% | -0.1% |
| Don't know / I am unsure[13] | 44 | 22.1% | 42 | 20.8% | 58 | 24.9% | -2.8% | -2.8% |

**Notes:**

[1]  Counts indicate the number of respondents whose response to either Q8 or Q9 was coded with the given category. Respondent answers could be coded with multiple categories.

[2]  A response was categorized as "Lawyer" if the corresponding respondent answered a lawyer or attorney or lawyers or attorneys.

[3]  A response was categorized as "Law Firm / Office" if the corresponding respondent answered a law firm, law office, or legal services organization.

[4]  A response was categorized as "Collector" if the corresponding respondent answered a debt or bill collector or debt or bill collectors.

[5]  A response was categorized as "Collection Agency" if the corresponding respondent answered a debt or bill collection agency or collection service.

[6]  A response was categorized as "Original Lender" if the corresponding respondent answered a lending agency, creditor, or organization to whom money is owed.

[7]  A response was categorized as "Accountant" if the corresponding respondent answered an accountant or accountants.

[8]  A response was categorized as "Paralegal" if the corresponding respondent answered a paralegal or legal aid or paralegal or legal aids.

[9]  A response was categorized as "Company Name Only" if the corresponding respondent answered with the name of a specific company and did not describe the type of company.

[10]  A response was categorized as "No One" if the corresponding respondent answered "no one" or the sentiment of "not anyone."

[11]  A response was categorized as "Other" if the corresponding respondent answered an organization or person other than those listed in the given categories.

[12]  A response was categorized as "Non-response" if the corresponding respondent answered something other than a person or organization and did not answer "no one" nor the sentiment of "no one."

[13]  Respondents selected "Don't know / I am unsure." This count only includes respondents who selected "Don't know / I am unsure" in response to Q8.

[14]  Only categories for which at least one response to the given question was coded with that category are shown.

[15]  Bolded category subtotals show the de-duplicated counts of respondents whose responses to either Q8 or Q9 falls into the broader category. Therefore, if a respondent's responses to Q8 and/or Q9 were categorized as both "Lawyer" and "Law Firm / Office," this respondent is only counted once in the "Legal Related" subtotal.

[16]  The final analytical sample included 634 respondents. Initially, 666 participants qualified for and completed the survey. I excluded an additional 32 participants who either (i) took too long to take the survey, (ii) took the survey too quickly, (iii) did not type "Next" as instructed in question S8, or (iv) provided more than two non-responsive answers to open-ended questions. See Exhibit 1 for sample selection criteria and summary statistics.

**Source:**
"ORD-307758-H4H4 FD_23.01.xlsx"

**Exhibit 4**

*Q10. Now, you're going to see a list of people that may have been employed by the company that sent you this letter. You may have already said this, but assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?(Mark all answers that apply)*

| Answer Options | Weltman, Weinberg & Reis Co., LPA Attorneys at Law (Stimulus A) | | Weltman, Weinberg & Reis Co., LTD Collection Services (Stimulus B) | | WW&R Co., LTD Collection Services (Stimulus C) | | Differences | |
| | Experimental Group | | | | | | Net [A]-[B] | Net [A]-[C] |
| | N=199 | | N=202 | | N=233 | | | |
| | N | % Total | N | % Total | N | % Total | % Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Total Asked** | **155** | **77.9%** | **160** | **79.2%** | **175** | **75.1%** | **-1.3%** | **2.8%** |
| No one | 15 | 7.5% | 17 | 8.4% | 11 | 4.7% | -0.9% | 2.8% |
| An administrative assistant | 31 | 15.6% | 30 | 14.9% | 39 | 16.7% | 0.7% | -1.2% |
| An accountant | 21 | 10.6% | 28 | 13.9% | 25 | 10.7% | -3.3% | -0.2% |
| A project manager | 3 | 1.5% | 9 | 4.5% | 7 | 3.0% | -2.9% | -1.5% |
| An account manager | 57 | 28.6% | 63 | 31.2% | 70 | 30.0% | -2.5% | -1.4% |
| An attorney | 72 | 36.2% | 38 | 18.8% | 31 | 13.3% | 17.4% | 22.9% |
| A debt collector | 100 | 50.3% | 125 | 61.9% | 132 | 56.7% | -11.6% | -6.4% |
| A paralegal | 29 | 14.6% | 22 | 10.9% | 21 | 9.0% | 3.7% | 5.6% |
| Other | 2 | 1.0% | 6 | 3.0% | 4 | 1.7% | -2.0% | -0.7% |
| Don't know / I am unsure | 3 | 1.5% | 5 | 2.5% | 7 | 3.0% | -1.0% | -1.5% |

**Notes:**

[1] Respondents could select multiple options.

[2] The final analytical sample included 634 respondents. Initially, 666 participants qualified for and completed the survey. I excluded an additional 32 participants who either (i) took too long to take the survey, (ii) took the survey too quickly, (iii) did not type "Next" as instructed in question S8, or (iv) provided more than two non-responsive answers to open-ended questions. See Exhibit 1 for sample selection criteria and summary statistics.

**Source:**

"ORD-307758-H4H4 FD_23.01.xlsx"

**Exhibit 5**
*Q6. What type of company or organization do you think sent you this letter?*
*Coded Open-Ended Responses*

| Categories | Weltman, Weinberg & Reis Co., LPA Attorneys at Law (Stimulus A) | | Weltman, Weinberg & Reis Co., LTD Collection Services (Stimulus B) | | WW&R Co., LTD Collection Services (Stimulus C) | | Net [A]-[B] | Net [A]-[C] |
|---|---|---|---|---|---|---|---|---|
| | N=199 | | N=202 | | N=233 | | | |
| | N | % Total | N | % Total | N | % Total | % Total | % Total |
| Law Firm or Legal Organization[1] | 65 | 32.7% | 24 | 11.9% | 4 | 1.7% | 20.8% | 30.9% |
| Lawyer or Attorney[2] | 33 | 16.6% | 5 | 2.5% | 4 | 1.7% | 14.1% | 14.9% |
| Collection Agency[3] | 52 | 26.1% | 123 | 60.9% | 154 | 66.1% | -34.8% | -40.0% |
| Collector[4] | 20 | 10.1% | 19 | 9.4% | 20 | 8.6% | 0.6% | 1.5% |
| Original Lender[5] | 2 | 1.0% | 3 | 1.5% | 0 | 0.0% | -0.5% | 1.0% |
| Company Name Only[6] | 6 | 3.0% | 12 | 5.9% | 9 | 3.9% | -2.9% | -0.8% |
| Other[7] | 20 | 10.1% | 14 | 6.9% | 26 | 11.2% | 3.1% | -1.1% |
| Non-response[8] | 2 | 1.0% | 0 | 0.0% | 1 | 0.4% | 1.0% | 0.6% |
| Don't know \ I am unsure[9] | 12 | 6.0% | 13 | 6.4% | 20 | 8.6% | -0.4% | -2.6% |

**Notes:**

[1]  A response was categorized as "Law Firm or Legal Organization" if the corresponding respondent answered a law firm, law office, or legal services organization.

[2]  A response was categorized as "Lawyer" if the corresponding respondent answered a lawyer or attorney or lawyers or attorneys.

[3]  A response was categorized as "Collection Agency" if the corresponding respondent answered a debt or bill collection agency or collection service.

[4]  A response was categorized as "Collector" if the corresponding respondent answered a debt or bill collector or debt or bill collectors.

[5]  A response was categorized as "Original Lender" if the corresponding respondent answered a lending agency, creditor, or organization to whom money is owed.

[6]  A response was categorized as "Company Name Only" if the corresponding respondent answered with the name of a specific company and did not describe the type of company.

[7]  A response was categorized as "Other" if the corresponding respondent answered an organization or person other than those listed in the given categories.

[8]  A response was categorized as "Non-response" if the corresponding respondent answered something other than a person or organization and did not answer "no one" nor the sentiment of "no one.".

[9]  Respondents selected "Don't know / I am unsure." This count only includes respondents who selected "Don't know / I am unsure" in response to Q6.

[10]  Respondent answers could be coded with multiple categories.

[11]  Only categories for which at least one response to the given question was coded with that category are shown.

[12]  The final analytical sample included 634 respondents. Initially, 666 participants qualified for and completed the survey. I excluded an additional 32 participants who either (i) took too long to take the survey, (ii) took the survey too quickly, (iii) did not type "Next" as instructed in question S8, or (iv) provided more than two non-responsive answers to open-ended questions. See Exhibit 1 for sample selection criteria and summary statistics.

**Source:**
"ORD-307758-H4H4 FD_23.01.xlsx"

**Exhibit 6**

*Q6. What type of company or organization do you think sent you this letter? / Q7. Why do you say that?* [1]

*Coded Open-Ended Responses*

| Categories | Weltman, Weinberg & Reis Co., LPA Attorneys at Law (Stimulus A) | | Weltman, Weinberg & Reis Co., LTD Collection Services (Stimulus B) | | WW&R Co., LTD Collection Services (Stimulus C) | | Differences | |
| | | | | | | | Net [A]-[B] | Net [A]-[C] |
| | N=199 | | N=202 | | N=233 | | | |
| | N | % Total | N | % Total | N | % Total | % Total | % Total |
|---|---|---|---|---|---|---|---|---|
| Law Firm or Legal Organization[2] | 65 | 32.7% | 25 | 12.4% | 4 | 1.7% | 20.3% | 30.9% |
| Lawyer or Attorney[3] | 45 | 22.6% | 7 | 3.5% | 4 | 1.7% | 19.1% | 20.9% |
| Collection Agency[4] | 57 | 28.6% | 127 | 62.9% | 157 | 67.4% | -34.2% | -38.7% |
| Collector[5] | 25 | 12.6% | 22 | 10.9% | 23 | 9.9% | 1.7% | 2.7% |
| Original Lender[6] | 3 | 1.5% | 3 | 1.5% | 2 | 0.9% | 0.0% | 0.6% |
| Company Name Only[7] | 7 | 3.5% | 12 | 5.9% | 10 | 4.3% | -2.4% | -0.8% |
| Other[8] | 21 | 10.6% | 14 | 6.9% | 26 | 11.2% | 3.6% | -0.6% |
| Non-response[9] | 2 | 1.0% | 0 | 0.0% | 1 | 0.4% | 1.0% | 0.6% |
| Don't know \ I am unsure[10] | 12 | 6.0% | 13 | 6.4% | 20 | 8.6% | -0.4% | -2.6% |

**Notes:**

[1]  Counts include all respondents whose response to either Q6 or Q7 was coded with the given category. Respondent answers could be coded with multiple categories.

[2]  A response was categorized as "Law Firm or Legal Organization" if the corresponding respondent answered a law firm, law office, or legal services organization.

[3]  A response was categorized as "Lawyer" if the corresponding respondent answered a lawyer or attorney or lawyers or attorneys.

[4]  A response was categorized as "Collection Agency" if the corresponding respondent answered a debt or bill collection agency or collection service.

[5]  A response was categorized as "Collector" if the corresponding respondent answered a debt or bill collector or debt or bill collectors.

[6]  A response was categorized as "Original Lender" if the corresponding respondent answered a lending agency, creditor, or organization to whom money is owed.

[7]  A response was categorized as "Company Name Only" if the corresponding respondent answered with the name of a specific company and did not describe the type of company.

[8]  A response was categorized as "Other" if the corresponding respondent answered an organization or person other than those listed in the given categories.

[9]  A response was categorized as "Non-response" if the corresponding respondent answered something other than a person or organization and did not answer "no one" nor the sentiment of "no one." This count only includes responses to Q6 categorized as "Non-response."

[10] Respondents selected "Don't know / I am unsure." This count only includes respondents who selected "Don't know / I am unsure" in response to Q6.

[11] Only categories for which at least one response to the given question was coded with that category are shown.

[12] The final analytical sample included 634 respondents. Initially, 666 participants qualified for and completed the survey. I excluded an additional 32 participants who either (i) took too long to take the survey, (ii) took the survey too quickly, (iii) did not type "Next" as instructed in question S8, or (iv) provided more than two non-responsive answers to open-ended questions. See Exhibit 1 for sample selection criteria and summary statistics.

**Source:**

"ORD-307758-H4H4 FD_23.01.xlsx"

**APPENDIX A**

**CURRICULUM VITAE OF RONALD C. GOODSTEIN, PH.D.**

# RONALD C. GOODSTEIN

**Office:**  McDonough School of Business        **Home:**  15505 Summer Grove Ct.
Georgetown University – 310 Old North                 N. Potomac, MD 20878
Washington, DC 20057                               (301) 527-1622
(202) 687-8009
goody@msb.edu

## ACADEMIC EMPLOYMENT

**Associate Professor of Marketing**
The McDonough School of Business, Georgetown University, July 1998-Present.
         Courses Taught:        Marketing Strategy (Undergraduate Capstone Course)
                                      Core Marketing Strategy (MBA/IEMBA)
                                      Integrated Marketing Communications (MBA)
                                      Principles of Marketing (Undergraduate)

**Associate Professor of Marketing**
Indiana University School of Business, July 1996-June 1998.
         Courses Taught:        Core Marketing Strategy (MBA)
                                        Advertising and Promotion Management (MBA)

**Visiting Associate Professor of Marketing**
The Wharton School, University of Pennsylvania, July 1995-June 1996.
         Courses Taught:        Advertising Policy (Undergraduate/MBA)
                                        Marketing Strategy (MBA)

**Assistant Professor of Marketing**
Anderson Graduate School of Management, UCLA, July 1989-June 1995.
         Courses Taught:        Advertising Policy (MBA, FEMBA)
                                        Consumer Behavior (Ph.D.)
                                        Elements of Marketing (MBA)

**Selected Executive Education and Consulting Clients (Topics - Equity, Positioning, IMC, Value Development)**
         Verizon;  Sprint; HSBC;  Microsoft; Assurant; LG; IBM; Credit Suisse Private Banking;
         Siemens; Lexis/Nexis; CIAB and AICPCU; Rochester General Hospital; NASA;  Dow;
         Harcros Chemical; Kimberly-Clark; Cedars Sinai Hospital; Lincoln National; GlaxoSmithKline;
         Headstart; Hughes Aircraft Co.; Johnson & Johnson; ABB; Schneider Electric; Prudential;
         Ingersol Rand

## EDUCATION

**Ph.D. Marketing, Fuqua School of Business, Duke University**, September 1990.
         Thesis: *How Do Consumers Screen Advertisements?  A Heuristic Model of Ad Processing*

**B.S. Commerce *with Distinction*, McIntire School of Commerce, University of Virginia**, May 1982.
         Concentrations: Marketing and Organizational Management

**REFEREED ARTICLES**

Epstein, Leonardo D., Arturo Flores, Ronald C. Goodstein, and Sandra J. Milberg (2016), "A New Approach to Measuring Retail Promotion Effectiveness: The Case of Store Traffic in Chile," *Journal of Business Research*, 69 (10), 4394-4402.

Goodstein, Ronald C., Gary J. Bamossy, Basil G. Englis, and Howard S. Hogan (2015), "Using Trademarks as Keywords: Empirical Evidence of Confusion," *The Trademark Reporter*, Vol. 105, 732-771.

Dimofte, Claudiu V., Ronald C. Goodstein, and Anne M. Brumbaugh (2015), "A Social Identity Perspective on Aspirational Advertising: Implicit Threats to Collective Self-esteem and Strategies to Overcome Them," *Journal of Consumer Psychology*, 25 (3), 416-430.

Hardesty, David A., Ronald C. Goodstein, Dhruv Grewal, Anthony D. Miyazaki, and Praveen Kopalle (2014), "The Accuracy of Scanned Prices," *Journal of Retailing, 90 (2),* 291-300.

Roggeveen, Anne L., Ronald C. Goodstein, and Dhruv Grewal (2014), "Improving the Effect of Guarantees: The Role of a Retailer's Reputation," *Journal of Retailing*, 90 (March), 27-39.

    Honors: 2016 Davidson Award for Best Article of 2014

Milberg, Sandra J., Ronald C. Goodstein , Francisca Sinn, Andres Cuneo, and Leonardo D. Epstein (2013), "Call Back the Jury: Reinvestigating the Effects of Fit and Parent Brand Quality in Determining Brand Extension Success," *Journal of Marketing Management,* 29 (February), 374-390.

Milberg, Sandra J., Francisca Sinn, and Ronald C. Goodstein (2010), "Consumer Reactions to Brand Extensions in a Competitive Context: Does Fit Still Matter?" *Journal of Consumer Research,* 37 (October), 543-553.

Puccinelli, Nancy M., Ronald C. Goodstein, Dhruv Grewal, Robert Price, Priya Raghubir, David Stewart (2009), "Customer Experience Management in Retailing: Understanding the Buying Process," *Journal of Retailing*, 85 (March), 15-30.

    JR Award for Most Cited Paper within a Five-Year Window.

Sinn, Francisca, Sandra J. Milberg, Leonardo Epstein, and Ronald C. Goodstein (2007), "Compromising the Compromise Effect: Brands Matter," *Marketing Letters*, 18, 223-236.

Andreasen, Alan R., Ronald C. Goodstein, and Joan W. Wilson (2005), "Transferring Marketing Knowledge to the Nonprofit Sector," *California Management Review*, 47 (4), 46-67.

Miyazaki, Anthony, Dhruv Grewal and Ronald C. Goodstein (2005), "The Effect of Multiple Extrinsic Cues on Quality Perceptions: A Matter of Consistency," *Journal of Consumer Research*, 32 (1), 146-153.

Goodstein, Ronald C., Deborah A. Cours, Brian K. Jorgensen, and Jaideep Sengupta (2005), "The Positive Effect of Negative Advertising: It's a Matter of Time," in *Applying Social Cognition to Consumer-Focused Strategy*, F. Kardes, P. Herr, and J. Nantel, eds., Mahwah, NJ: Lawrence Erlbaum Associates, 319-330.

**REFEREED ARTICLES (continued)**

Gallagher, William E. and Ronald C. Goodstein (2004), "Inference Versus Speculation in Trademark Infringement Litigation: Abandoning the Fiction of the Vulcan Mind Meld," *Trademark Reporter*, 94 (Nov.-Dec.), 1229-1270.

Devon DelVecchio and Ronald C. Goodstein (2004), "Moving Beyond Race: The Role of Ethnicity in Evaluating Celebrity Endorsers," in *Diversity in Advertising*, P. Devine, C. Haugvedt, W. Lee, J. Williams, eds., Mahwah, NJ: Lawrence Erlbaum Associates.

Campbell, Margaret C. and Ronald C. Goodstein (2001), " The Moderating Effect of Perceived Risk on Consumers' Evaluations of Product Incongruity: Preferences for the Norm," *Journal of Consumer Research*, 28 (December 2001), 439-449.

Aylesworth, Andrew, Ronald C. Goodstein, and Ajay Kalra (1999), "Effect of Archetypal Embeds on Feelings: An Indirect Route to Affecting Attitudes?" *Journal of Advertising*, 28 (Fall), 74-81.

Kalra, Ajay and Ronald C. Goodstein (1998), "The Impact of Advertising Positioning Strategies on Consumer Price Sensitivity," *Journal of Marketing Research*, 35 (May), 210-224.

Reprinted as "Advertising Positioning Strategies*," Economic Intuition*, (Fall), 1998.

Sengupta, Jaideep, Ronald C. Goodstein, and David Boninger (1997), "All Cues Are Not Created Equal: Obtaining Low Involvement Attitude Persistence," *Journal of Consumer Research*, 23 (March), 351-361.

Goodstein, Ronald C. and Jennifer Edson Escalas (1995), "Improving Pricing Accuracy at the Supermarket: Electronic Shelving Systems and Public Policy" *Journal of Public Policy & Marketing*, 14 (2), 216-224.

Goodstein, Ronald C. and Jennifer Edson Escalas (1994), "UPC Scanner Pricing Accuracy: A Review of Research and Managerial Implications," *Pricing Strategy & Practice: An International Journal*, 2 (1), 4-10.

Goodstein, Ronald C. (1994), "UPC Scanner Pricing Systems: Are They Accurate?" *Journal of Marketing*, 58 (April), 20-30.

Reprinted as "UPC Scanner Pricing Systems: Are They Accurate?," *Stores Magazine: Retailing Review*, University of Florida Center for Retailing Education and Research, (Summer), 1994.

Goodstein, Ronald C. (1993), "Category-Based Applications and Extensions in Advertising: Motivating More Extensive Ad Processing," *Journal of Consumer Research*, 20 (June), 87-99.

Reprinted as "Las categorias y sus aplicaciones a la publicidad," *Quantum*, 1 (Diciembre), 1993.

Moore, Michael J., William Boulding, and Ronald C. Goodstein (1991), "Pioneering and Market Share: Is Entry Time Endogenous and Does It Matter?" *Journal of Marketing Research*, 28 (February), 97-104.

Goodstein, Ronald C., Julie A. Edell, and Marian C. Burke (1990), "When Are Feelings Generated? Assessing the Presence and Reliability of Feelings Generated in Pretests," in *Emotion In Advertising*, S. Agres, J. Edell and T. Dubitsky, eds., 175-193.

**SELECT CONFERENCE PRESENTATIONS & PROCEEDINGS**

Anne Roggeveen, Jens Nordfält, Dhruv Grewal, and Ronald C. Goodstein (2016), "The Impact of Congruency of a Special Display with Its Surroundings," presented at Academy of Marketing Science, Orlando, Florida.

Sandra J. Milberg, Ronald C. Goodstein, Andres Cuneo (2016), "Critical Realities: Putting the "Market" into Marketing Research," Georgetown University Research Seminar Series.

Anne Roggeveen, Jens Nordfält, Dhruv Grewal, and Ronald C. Goodstein (2016) "Product Placement: Does Congruity Matter?" presented at American Collegiate Retailing Association Conference, Secaucus, New Jersey; presented at Summer AMA Conference, Chicago, IL, August 2015.

Anne Roggeveen, Dhruv Grewal, and Ronald Goodstein (2010) ,"Combining High-Scope and Low-Scope Retail Cues: an Integrative Perspective ", in NA - Advances in Consumer Research Volume 37, eds. Margaret C. Campbell, Jeff Inman, and Rik Pieters, Duluth, MN : Association for Consumer Research, Pages: 889-890 .

Roggeveen, Anne, Ronald C. Goodstein, and Dhruv Grewal (2008), "How Does the Presence of a Guarantee Cue Impact Evaluations of a Retailer?: It Depends on Cue Typicality and the Reputation Cue's Valence," Academy of Marketing Science Conference, BEST PAPER IN TRACK AWARD.

Milberg, Sandra, Francisca Sinn, and Ronald C. Goodstein, "Re-Examining the Wisdom of Brand Extensions: The Effects of Competitor Familiarity and Product Information on Risk and Choice," *Latin American Advances in Consumer Research*, Volume 1, 2006.

Galinsky, Karen and Ronald C. Goodstein. "Targeting the Hispanic Populace: Creating Hispanic Targeted Ads," in *Proceedings of the Society for Consumer Psychology Annual Conference*, J. Edell and R. Goodstein, eds., Winter 2002.

Goodstein, Ronald C., "The Role of Ethnicity in Celebrity Endorsements," in *Abstracts from the 15th Annual Faculty Research Forum of the Washington Consortium of Business Schools*, R. Rustagi, ed., April 1999.

Campbell, Margaret and Ronald C. Goodstein, "The Moderating Role of Perceived Risk on the Effects of Congruity on Evaluations," in *Proceedings of the Society for Consumer Psychology Annual Conference*, C. Pechmann and R. Ratneshwar, eds., Winter 1997.

Goodstein, Ronald C., "Extending Measures of Advertising Effectiveness: Ads' Effects on Price Sensitivity," in *Advances in Consumer Research*, M. Brucks and D. MacInnis, eds., 23, 1996.

Goodstein, Ronald C., "Mood Effects in Consumer Behavior: A Unifying Theme," in *Advances in Consumer Research*, C. Allen and D. John, eds., 21, 1994.

Grewal, Dhruv and Ronald C. Goodstein, "Societal and Public Policy Issue with Retail Pricing," in *Advances in Consumer Research*, L. McAlister and M. Rothschild, eds., 1993.

Kassarjian, Harold H., Ronald C. Goodstein, and Jennifer Escalas, "Scanner Bar Codes and Consumer Protection: An Empirical Study," in *Marketing for Europe - Marketing for the Future: The Proceedings of the 21st Annual Conference of the European Marketing Academy*, Aarhus, ed., 1992.

Curren, Mary T. and Ronald C. Goodstein, "Affect and Consumer Behavior: Examining the Role of Emotions on Consumers' Actions and Perceptions," in *Advances in Consumer Research*, R. Holman and M. Solomon, ed., 1991.

## EDITED VOLUMES

*Proceedings of the 2002 Society for Consumer Psychology Annual Conference*, with Julie A. Edell.

"Enhancing Knowledge Development in Marketing," *1998 AMA Educators' Proceedings (Vol. 9)*, with Scott MacKenzie.

## PUBLISHED CASES

Beaudin, C.L., M. Senak, and R.C. Goodstein, "Strategic Planning at AIDS Project L.A.," in *Nonprofit Boards and Leadership: Cases on Governance, Change and Board-Staff Dynamics*, M.M. Wood (ed.), San Francisco, Josey-Bass (1996).

Beaudin, C.L., M. Senak, and R.C. Goodstein, "AIDS Project Los Angeles," *Cases in Nonprofit Governance (CGN #12), Program on Nonprofit Organizations/Institutions for Social and Policy Studies*, Yale University (1995).

## PUBLISHED CHAPTERS

Kassarjian, Harold H. and Ronald C. Goodstein (Beaudin, C.L., M. Senak, and R.C. Goodstein, "The Emergence of Consumer Research (Chapter 4), in *The SAGE Handbook of Marketing Theory*, Pauline Maclaran, Barbara Stern (eds), Thousand Oaks, SAGE Publications (2010).

## SELECT WORK IN PROGRESS

Goodstein, Ronald C., Ajay Kalra, and Claudiu V. Dimofte, "Context Sensitive Advertising: A Fitting Story," draft copy available..

## ACADEMIC HONORS AND AWARDS

*Secretary/Treasurer Elect* for Society for Consumer Psychology, 2008.
*American Marketing Association Hall of Fame Award,* Washington, DC 2004.
*Miller- Sherrerd Core Teaching Award*, Wharton, Spring 1997 (*in abstentia*)
*Summer Research Grant*, IU, 1996-1998.
*Core Faculty Teaching Award,* Wharton, Spring 1996.
*Citibank Professor of the Year Award*, UCLA, 1995.
UCLA Outstanding Faculty Member, 1993, 1995 Business Week Guide.
*George Robbins Teaching Award*, UCLA, 1993.
Marketing Professor of the Year, UCLA, 1991, 1993.
AMA Doctoral Consortium Fellow, 1988.
Beta Gamma Sigma/Alpha Mu Alpha.

## PROFESSIONAL SERVICE

### Reviewing for Academic Publications

Editorial Board, *Journal of Retailing, Marketing Letters, Journal of the Academy of Marketing Science.* Reviewer, *Journal of Consumer Research, Journal of Marketing Research, Journal of Marketing, Journal of Consumer Psychology, Journal of Retailing, Journal of Advertising, Marketing Letters, California Management Review.*

**PROFESSIONAL SERVICE (continued)**

**Reviewing for Professional Conference Publications**

    American Psychological Association Annual Meeting, Div. 23 *Chair*, 2011.
    AMA. Summer Educator's Conference, *Consumer Behavior Track Chair*, 2005.
    Society for Consumer Psychology Annual Meeting, *Co-Chair*, 2001.
    AMA. Summer Educator's Conference, *Co-Chair*, Summer 1998.
    Association for Consumer Research, Program Committee (1998-2017 various years).

**Reviewing for Professional Conference Publications**

    Association for Consumer Research.
    Western Decision Sciences Institute.
    Society for Consumer Psychology Annual Meeting,
    Southern Marketing Association's Annual Meetings.
    Southwestern Marketing Association's Annual Meeting.
    AMA Winter Educator's Conference.
    AMA Summer Educators' Conference.

**APPENDIX B**

**4 YEARS OF PRIOR TESTIMONY**

**RONALD C. GOODSTEIN, PH.D.**

# 4 Years of Prior Testimony

*United States National Soccer Team Players Association, Inc. v. US Soccer Federation, Inc.*, US District Court for the Southern District of New York.[1]

*Soft Serve Inc. dba Sprinkles v. Sprinkles Cupcakes, Inc.*, Opposition Number 91194188 (parent), United States Patent and Trademark Office before the Trademark Trial and Appeal Board.[2]

*Spark Networks USA, LLC v. Smooch Labs Inc.*, CIVIL ACTION 14-cv-9027 (LOS), US District Court for the Southern District of New York.[3]

*Café Phillips v. Sandwiches By Phillip*, Declaration in Support of Temporary Restraining Order, Washington, DC.[4]

*April Kruger and others similarly situated v. Wyeth Pharmaceuticals*, CASE NO. 03-CV-2496 JAH (AJB), United States District Court Southern Division of California.[5]

*Tressa Gattimella, and KRISTINA LENGYEL individually and on behalf of all others similarly situated v. Michael Kors (USA), Inc.* CASE NO. 14 CIV. 5731 (WHP), United States District Court Southern Division of New York.[6]

*MUSC Foundation for Research Development v. AstraZeneca Pharmaceuticals*, LP, Case No. 2:13-CV-02078-RMG, Case No. 2:13-CV-03438-RMG, United States District Court Charleston Division of District of South Carolina.[7]

*Odyssey Wireless, Inc. v. Motorola Mobility LLC*, Case No. 3:15-cv-01741-H-RBB, United States District Court San Diego Division of Southern District of California.[8]

*Odyssey Wireless, Inc. v. Samsung Mobility LLC*, Case No. 3:15-cv-01738-H-RBB, United States District Court San Diego Division of Southern District of California.[9]

*Institute for Justice, v. Media Group of America, LLC, and Imge, LLC*, Civil Action No. 1:15 CV 1410, United States District Court Eastern District Of Virginia Alexandria Division.[10]

UNITED STATES OF AMERICA FEDERAL TRADE COMMISSION OFFICE OF ADMINISTRATIVE LAW JUDGES, DOCKET NO. 9372, *In the Matter of 1-800 Contacts, Inc., a corporation.*[11]

---

[1] Provided testimony in arbitration.
[2] Deposed.
[3] Deposed.
[4] Provided declaration.
[5] Deposed.
[6] Deposed.
[7] Deposed.
[8] Deposed.
[9] Deposed.
[10] Deposed.
[11] Provided court testimony.

**APPENDIX C**

**MATERIALS  RELIED  UPON**

## Materials Relied Upon

**Legal Materials:**

Complaint, *Consumer Financial Protection Bureau v. Weltman, Weinberg, & Reis Co., L.P.A.*, United States District Court, Northern District of Ohio Eastern Division, No. 1:17-cv-00817-DCN, April 17, 2017.

Fair Debt Collection Practices Act (15 U.S.C. § 1692a).

Memorandum Opinion and Order, *Consumer Financial Protection Bureau v. Weltman, Weinberg & Reis Co., L.P.A.*, United States District Court, Northern District of Ohio Eastern Division, No. 1:17-cv-00817-DCN, September 29, 2017.

United States Code, 2012 Edition, Supplement 3, Title 12 - BANKS AND BANKING (12 U.S.C. § 5481).

**Books and Manuals:**

Anderson, D., D. Sweeney, T. Williams, J. Camm, and J. Cochran (2017), *Essentials of Statistics for Business and Economics, 8th Edition.*

Assael, H. (2004), *Consumer Behavior: A Strategic Approach.*

Diamond, S. (2011), "Reference Guide on Survey Research," in *the Reference Manual on Scientific Evidence Second Edition.*

Federal Judicial Center (2004), *Manual for Complex Litigation Fourth.*

Fisher, R.A. (1932), Statistical Methods for Research Workers, 5th Edition.

McCarthy, J. T. (2016), *McCarthy on Trademarks and Unfair Competition 4th Edition.*

Zikmund, W. and B. Babin (2013), *Essentials of Marketing Research Fifth Edition.*

**Academic Articles:**

Becker, B.J. (1994), "Combining significance levels," The Handbook of Research Synthesis, eds. Cooper, H., and L. V. Hedges.

Coen, T., J. Lorch, and L. Piekarski (2005), "The Effects of Survey Frequency on Panelists' Responses," ESOMAR – The World Association of Research Professionals.

Fisher, R. (1993), "Social Desirability Bias and the Validity of Indirect Questioning," *Journal of Consumer Research*, 20(2).

Jacoby, J. (2012), "Are Closed-Ended Questions Leading Questions?" *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. Diamond, S. and J.B. Swann.

Plessis, E. (1994), "Recognition versus recall," *Journal of Advertising Research.*

Rosenthal, R. (1979), "The "File Drawer Problem" and Tolerance for Null Results," *Psychological Bulletin*, 86(3).

Singh, S. N., M. L. Rothschild, and G. A. Churchill (1988), "Recognition versus recall as measures of television commercial forgetting," *Journal of Marketing Research*, 25(1).

Thornburg, R.H. (2004), "Trademark Surveys: Development of Computer-Based Survey Methods," *The John Marshall Review of Intellectual Property Law*, 4(91).

Tourangeau, R. and N.M. Bradburn (2010), "The Psychology of Survey Response," *Handbook of Survey Research, Second Edition*, eds. Marsden, P. M. and J. D. Wright.

**Government Report:**

Federal Reserve Bank of New York, "Quarterly Report on Household Debt and Credit 2017:Q2," August 2017.

Consumer Financial Protection Bureau, "Consumer Experiences with Debt Collection," January 2017, http://files.consumerfinance.gov/f/documents/201701_cfpb_Debt-Collection-Survey-Report.pdf.

**Websites:**

Consumer Financial Protection Bureau, "Have questions? Start here.,"
    https://www.consumerfinance.gov/about-us/contact-us/.

Consumer Financial Protection Bureau, "The Bureau," https://www.consumerfinance.gov/about-us/the-
    bureau/.

Encore Capital Group, "Featured Jobs," 2015, http://www.encore-jobs.com.

Federal Trade Commission, "Debt Collection," https://www.ftc.gov/news-events/media-
    resources/consumer-finance/debt-collection.

Illinois  PIRG Education Fund, "Debt Collectors, Debt Complaints: The CFPB's Consumer Complaint
    Database Gets Real Results for Consumers," February 2014,
    https://illinoispirgedfund.org/sites/pirg/files/reports/ILP%20CFPB%20DebtCollection%20Repo
    rt%20Feb14%20Web.pdf.

Indeed, "Weltman, Weinberg, & Reis, Co. Employee Reviews," 2018,
    https://www.indeed.com/cmp/Weltman,-Weinberg-&-Reis-Co./reviews.

Insights Association, "CASRO," 2018, https://www.insightsassociation.org/organization/casro.

Insights Association, "Company Member Directory," January 26, 2018,
    http://www.insightsassociation.org/company-member-directory.

Issa, E., "7 in 10 Americans See Added Stigma in Credit Card Debt, Survey Shows," January 19, 2016,
    https://www.nerdwallet.com/blog/credit-cards/credit-card-debt-stigma-2016/.

Singletary, M., "What Deadbeats?" The Washington Post, February 26, 2006,
    http://www.washingtonpost.com/wp-dyn/content/article/2006/02/25/AR2006022500252.html.

SSI, "Awards & Certifications,"2018, https://www.surveysampling.com/about/awards/.

SSI, "Market Research Data Quality," 2018, https://www.surveysampling.com/technology/data-quality/.

SSI, "Survey Sampling FAQs," 2018, https://www.surveysampling.com/about/faqs/.

Weltman, Weinberg, & Reis Co., LPA, "WWR Offices," 2018, http://www.weltman.com/?p=9872.

Weltman, Weinberg, & Reis Co., LPA, "Jobs," 2018,
    https://recruiting.adp.com/srccar/public/RTI.home?c=1205601&d=External.

Weltman, Weinberg, & Reis Co., LPA, "Firm Overview," 2018, http://www.weltman.com/about/firm-
    overview.

**APPENDIX D**

**EXAMPLE DEMAND LETTERS PROVIDED BY WELTMAN**

# WELTMAN, WEINBERG & REIS Co., LPA

## ATTORNEYS AT LAW

*Over 80 Years of Service.*

323 W. Lakeside Ave. Ste. 200 Cleveland, OH 44113-1009
(216) 335-5387   (877) 330-9586
Mon-Thurs 8am-9pm, Fri 8am-5pm, & Sat 8am-12pm EST

September 22, 2014                                    **323 – CONSUMER INITIAL DEMAND LETTER**

JOE CONSUMER
123 MAIN ST
ANYTOWN, STATE 44444

RE:    Current Creditor:  ABC CREDITOR
       Original Creditor: XYZ CREDITOR
       Account No.: XXXXXXXX1234
       WWR No.:  9876543
       Balance Due as of September 22, 2014:  $1,000.00


Dear JOE CONSUMER:

Please be advised that the above referenced account has been placed with us to collect the outstanding balance due and owing on this account to the current creditor referenced above. As of the date of this letter you owe the amount listed above. Therefore, it is important that you contact us at 1-877-330-9586 to discuss an appropriate resolution for this matter.

This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose. Unless you dispute the validity of this debt, or any portion thereof, within thirty (30) days after receipt of this letter, we will assume that the debt is valid. If you notify us in writing within the thirty (30) day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment and a copy of such verification or judgment will be mailed to you. If you request in writing within the thirty (30) day period, we will provide you with the name and address of the original creditor if different from the current creditor.

Thank you for your attention to this matter.

Sincerely,

Weltman, Weinberg & Reis Co., L.P.A.


WONWELT01323

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***
................................................................................................................................................

323 W. Lakeside Ave. Ste. 200                **WWR No.: 9876543**
Cleveland, OH 44113-1009                     Balance Due as of September 22, 2014: $1,000.00
ADDRESS SERVICE REQUESTED


September 22, 2014                            **WELTMAN, WEINBERG & REIS CO., L.P.A.**
                                             P.O. Box 6597
                                             Cleveland, OH 44101-1597
JOE CONSUMER
123 MAIN ST
ANYTOWN, STATE 44444

# WELTMAN, WEINBERG & REIS Co., LPA

### ATTORNEYS AT LAW

*Over 80 Years of Service.*

323 W. Lakeside Ave. Ste. 200 Cleveland, OH 44113-1009
(216) 335-5387   (877) 330-9586
Mon-Thurs 8am-9pm, Fri 8am-5pm, & Sat 8am-12pm EST

September 22, 2014             **243 – SECOND DEMAND LETTER**

JOE CONSUMER
123 MAIN ST
ANYTOWN, STATE 44444

RE:    Current Creditor:  ABC CREDITOR
       Original Creditor: XYZ CREDITOR
       Account No.: XXXXXXXX1234
       WWR No.: 9876543
       Balance Due as of September 22, 2014:  $1,000.00

Dear JOE CONSUMER:

Despite previous notices and demands for payment, you have failed to liquidate the above referenced obligation. Your continued failure to satisfy your obligation may result in additional efforts on behalf of the current creditor to collect this account.

Failure to resolve this matter may result in continued collection efforts against you or possible legal action by the current creditor to reduce this claim to judgment. In the event a judgment is rendered against you, the current creditor may choose to exercise their option to proceed with any and all post judgment proceedings as allowed by law in your state to protect their rights. Therefore, please submit your payment to us by mail.

Please contact our office should you have any further questions regarding this matter.  This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose.

Sincerely,

Weltman, Weinberg & Reis Co., L.P.A.

WONWELT01243

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***

.......................................................................................................................................................

323 W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1009
ADDRESS SERVICE REQUESTED

**WWR No.: 9876543**
Balance Due as of September 22, 2014: $1,000.00

September 22, 2014

JOE CONSUMER
123 MAIN ST
ANYTOWN, STATE 44444

**WELTMAN, WEINBERG & REIS CO., L.P.A.**
P.O. Box 6597
Cleveland, OH 44101-1597

**APPENDIX  E**

**EXPLORATORY  INTERVIEW  DISCUSSION GUIDE  A**

**Exploratory Interview Guide A**

---

*Quota: n=12 respondents (2 per treatment group)*

---

<span style="background:black;color:white">**[Section I: Introduction and Verification]**</span>

[*NOTE TO MODERATOR: Interview respondents will have taken a screener implemented by SSI. If they qualified, they were invited to participate in a phone interview. The respondent will have reported their availability for a phone interview at the end of the screener.*

*Recruitment logistics will be carried out by SSI. If during the call a respondent asks about the purpose of the interview or sponsor of the study, the following language should be used:* "We are interested in your thoughts, ideas, and opinion on certain topics. The interview will not involve a sales pitch of any kind and your name will not be released for any sales or marketing purposes. Your responses will remain anonymous. As the interviewer, I am not informed of the purpose of this study myself. If you are not comfortable with any of the questions, feel free to not answer or to end the interview." *If pressed further, terminate the interview.*]

[*Below are examples of general probing questions that can be asked throughout the discussion <u>in case the respondent hesitates or indicates confusion through statements or verbal cues</u>. If any are used, also include a caveat such as, "When I ask why did you say that, please understand that I am neither agreeing or disagreeing with your statement.  I simply want to delve deeper into the reason you made that statement."*]

What did you mean by that? [*or*] Please explain a little more to ensure I understand your answer.

What are a few reasons that make you think that? [*or*] Anything else? [*or*] What else?

I noticed you hesitated before you answered – what were you thinking about?

[*<u>Techniques to avoid:</u>*
*Please <u>do not lead</u> respondents via confirmatory remarks such as "Got it," "Clearly!," "Right," etc.* ]

**[MODERATOR TO READ OUT LOUD:]**

Hello, can I please speak to [**FIRST NAME**].  My name is _____. I work for a market research and consulting firm. A few days ago you agreed to be interviewed at this time. Is it still a good time?

**[CONTINUE,  END INTERVIEW, OR SCHEDULE  CALLBACK DEPENDING  ON RESPONSE]**

**[IF CONTINUE]**   Thank you. This call may be monitored for analysis purposes. Is that okay?

**[RESPONDENT  AGREES  OR DISAGREES]**

Thank you for agreeing to talk today. We look forward to hearing your thoughts, ideas, and opinions. You may recall that it was mentioned in the survey that several questions would be used to verify that we have reached the same person that answered the survey before we allow them to be part of the interview. So, here are those questions again.  Please answer them so that we can verify that you are the same person that took the survey.

**[FOR S1-S3 IF TERMINATE SAY:]**

Thank you for your time. Unfortunately, the information you have provided does not match the information we have on file so we cannot continue with this interview.

**S1.** What is the house number of your address? **[IF ACT CONFUSED]** This is simply to make sure you are the same person who filled out the online survey. You should have been asked the same question previously.

**[IF ADDRESS NUMBER DOES NOT MATCH THE VALUE FROM THE SCREENER, TERMINATE]**

**S2.** Now, I am going to give you a list of colors and ask you which of the colors you like best. The list of colors is blue, pink, orange, or green. Which of the colors that I just listed do you like best? **[IF ACT CONFUSED]** This is simply to make sure you are the same person who filled out the online survey. You should have been asked the same question previously.

**[REPEAT LIST IF NECESSARY]**

**[IF THEIR PREFERRED COLOR DOES NOT MATCH THEIR ANSWER FROM THE SCREENER, TERMINATE]**

**S3.** What was the name of your elementary school? **[IF ACT CONFUSED]** This is simply to make sure you are the same person who filled out the online survey. You should have been asked the same question previously.

**[IF ELEMENTARY SCHOOL DOES NOT MATCH THEIR ANSWER FROM THE SCREENER, TERMINATE]**

As mentioned at the end of the online survey that you took previously, you will need access to a desktop computer, laptop, or tablet during this interview to view an image. You should have received a link in an email.

**S4.** Can you please confirm that you are at a desktop computer, laptop, or tablet? **[IF NO]** Can you get to a desktop computer, laptop, or tablet? **[IF THEY CONFIRM THEY ARE AT A DESKTOP COMPUTER, LAPTOP, OR TABLET, CONTINUE; IF THEY DO NOT HAVE ACCESS TO A DESKTOP COMPUTER, LAPTOP, OR TABLET, RESCHEDULE]** Can you please confirm that you received an email with a link? **[IF THEY HAVE NOT RECEIVED AN EMAIL WITH A LINK TO THE STIMULI, RESCHEDULE]**

**[Section II: Interview]**

Thank you again for agreeing to talk today. I'd like our conversation to be very open-ended and I want to hear your thoughts, ideas, and opinions about the various topics that we will discuss. There are no correct or incorrect answers. Please provide your most accurate answer. If you don't have an opinion or are unsure please simply say so and do not try to guess.

A few things before we begin:

- Your responses to the interview will be anonymous.

- I want to be respectful of your time. Our conversation should last approximately 20 to 25 minutes.

- Your participation is voluntary and you are free not to participate if you choose. Do you agree to participate?  **[IF NO, TERMINATE]**

Does that sound okay? Do you have any questions before we start?

Our conversation is going to be based on an image you will see on your computer. Please select the link in the email we sent to you. Please enter the password **[INSERT PASSWORD THAT IS ASSOCIATED WITH LINK]**. This password should be in all lowercase letters.

You should be able to see an image on the screen. Do you see it? **[IF NO, ASK THEM  TO TRY THE LINK AGAIN].  [IF YES]** Can you please tell me what the image is? [**RECORD THEIR  VERBATIM ANSWER EXACTLY AS STATED**]

For the remainder of the interview, please assume you received this letter in the mail. Does that make sense?

Please review this letter as if you received this letter in the mail. As you are reviewing the letter, please think aloud to describe what you are seeing and your reactions**.** When you are done reviewing the letter, please let me know. **[GIVE PARTICIPANT 2 MINUTES  TO REVIEW LETTER]**  Do you feel you have had enough time to review the letter? **[IF NO, GIVE THEM  MORE TIME.  IF YES, CONTINUE]**

**Q1.**

   a. Again, assuming that you received this letter in the mail,  I would like  to hear your thoughts on the letter. Please describe this letter to me in your own words. **[ALLOW RESPONDENT TO ANSWER BEFORE  PROCEEDING  TO Q1b]**

      i. [*Optional Probe*] What makes you say that [repeat answer verbatim]?

   b. What are your initial  impressions?

**Q2.**

    a.  I'm going to ask you some more specific questions about the letter. Assuming you received this letter in the mail, for what reasons do you think you might have received this letter? **[ALLOW RESPONDENT TO ANSWER BEFORE PROCEEDING TO Q2b or Q2c]**

        i.  [*Optional Probe:*] Please explain.

    b.  Who do you think sent this letter?

        i.  [*Probe:*] What leads you to believe that?

    c.  [*If has not referred to kind of company*] What kind of company do you think sent this letter to you?

        i.  [*Probe:*] What makes you believe that [repeat answer verbatim]?

    d.  Why, do you think, would that type of company be sending you a letter?

        i.  [*Optional Probe:*] Please explain.

**Q3.**

    a.  Who at this company, do you think, made the decision to send you this letter?

        i.  [*Probe:*] What makes you think that?

    b.  [*If are unsure or did not refer to a particular job title in Q3a:*] What sort of position do you think the person who made the decision to send you this letter has at the company? **[IF UNSURE OR DON'T KNOW, SKIP TO Q4]**

        i.  [*Probe:*] What leads you to believe that?

    c.  What steps do you think he or she took to decide that you should receive this letter?

        i.  [*Optional Probe:*] What leads you to believe that?

**Q4.**

    a.  What, if anything, do you think this letter is asking you to do?

        i.  [*Optional Probe:*] What leads you to believe that?

**Q5.**

    a.  What, if anything, would you do if you received this letter?

        i.  [*If answer with an action as a response:*] What are your reasons for that response?

        ii.  [*If answer they would not act:*] For what reasons might you not do anything?

   b.  What do you think would happen, if anything, if you did not take the action requested of you in the letter?

       i.  [*Optional Probe:*] Please explain.

**Q6.**

   a.  Now please assume that you received this letter in the mail for a debt that you did not owe. If the letter was incorrect and you did not owe any money, what, if anything, would you do if you received this letter?

       i.  [*If answer with an action as a response:*] What are your reasons for that response?

      ii.  [*If answer they would not act:*] For what reasons might you not do anything?

**Q7.**

   a.  We're almost done, thank you for your responses so far. Now I'd like to know the answer to the following question. Have you ever received a letter similar to the one you saw here in the past five years?

   b.  [*Follow up if yes to Q7a:*] Have you ever received a letter like this in the past five years when you didn't owe the debt?

   c.  [*Follow up if yes to Q7a:*] How many times have you received letters like this in the past five years, whether you owed the debt or not?

Thank you again for your time. This concludes our interview. As I mentioned earlier, your answers will remain anonymous and only be used for research purposes. Have a great day.

**APPENDIX  F**

**EXPLORATORY  INTERVIEW  DISCUSSION GUIDE B**

## Exploratory Interview Guide B

---

*Quota: n=12 respondents (2 per treatment group)*

---

**[Section I: Introduction and Verification]**

[*NOTE TO MODERATOR: Interview respondents will have taken a screener implemented by SSI. If they qualified, they were invited to participate in a phone interview. The respondent will have reported their availability for a phone interview at the end of the screener.*

*Recruitment logistics will be carried out by SSI. If during the call a respondent asks about the purpose of the interview or sponsor of the study, the following language should be used:* "We are interested in your thoughts, ideas, and opinion on certain topics. The interview will not involve a sales pitch of any kind and your name will not be released for any sales or marketing purposes. Your responses will remain anonymous. As the interviewer, I am not informed of the purpose of this study myself. If you are not comfortable with any of the questions, feel free to not answer or to end the interview." *If pressed further, terminate the interview.*]

[*Below are examples of general probing questions that can be asked throughout the discussion <u>in case the respondent hesitates or indicates confusion through statements or verbal cues</u>. If any are used, also include a caveat such as,* "When I ask why did you say that, please understand that I am neither agreeing or disagreeing with your statement. I simply want to delve deeper into the reason you made that statement."]

> What did you mean by that? **[or]** Please explain a little more to ensure I understand your answer.

> What are a few reasons that make you think that? **[or]** Anything else? **[or]** What else?

> I noticed you hesitated before you answered – what were you thinking about?

[<u>*Techniques to avoid:*</u>
*Please <u>do not lead</u> respondents via confirmatory remarks such as* "Got it," "Clearly!," "Right," *etc.* ]

**[MODERATOR TO READ OUT LOUD:]**

Hello, can I please speak to [**FIRST NAME**]. My name is _____. I work for a market research and consulting firm. A few days ago you agreed to be interviewed at this time. Is it still a good time?

**[CONTINUE, END INTERVIEW, OR SCHEDULE CALLBACK DEPENDING ON RESPONSE]**

**[IF CONTINUE]** Thank you. This call may be monitored for analysis purposes. Is that okay?

**[RESPONDENT AGREES OR DISAGREES]**

Thank you for agreeing to talk today. We look forward to hearing your thoughts, ideas, and opinions. You may recall that it was mentioned in the survey that several questions would be used to verify that we have reached the same person that answered the survey before we allow them to be part of the interview. So, here are those questions again. Please answer them so that we can verify that you are the same person that took the survey.

**[FOR S1-S3 IF TERMINATE SAY:]**

Thank you for your time. Unfortunately, the information you have provided does not match the information we have on file so we cannot continue with this interview.

S1. What is the house number of your address? [**IF ACT CONFUSED**] This is simply to make sure you are the same person who filled out the online survey. You should have been asked the same question previously.

**[IF ADDRESS NUMBER DOES NOT MATCH THE VALUE FROM THE SCREENER, TERMINATE]**

S2. Now, I am going to give you a list of colors and ask you which of the colors you like best. The list of colors is blue, pink, orange, or green. Which of the colors that I just listed do you like best? [**IF ACT CONFUSED**] This is simply to make sure you are the same person who filled out the online survey. You should have been asked the same question previously.

 **[REPEAT LIST IF NECESSARY]**

**[IF THEIR PREFERRED COLOR DOES NOT MATCH THEIR ANSWER FROM THE SCREENER, TERMINATE]**

S3. What was the name of your elementary school? [**IF ACT CONFUSED**] This is simply to make sure you are the same person who filled out the online survey. You should have been asked the same question previously.

**[IF ELEMENTARY SCHOOL DOES NOT MATCH THEIR ANSWER FROM THE SCREENER, TERMINATE]**

As mentioned at the end of the online survey that you took previously, you will need access to a desktop computer, laptop, or tablet during this interview to view an image. You should have received a link in an email.

S4. Can you please confirm that you are at a desktop computer, laptop, or tablet? [**IF NO**] Can you get to a desktop computer, laptop, or tablet? **[IF THEY CONFIRM THEY ARE AT A DESKTOP COMPUTER, LAPTOP, OR TABLET, CONTINUE; IF THEY DO NOT HAVE ACCESS TO A DESKTOP COMPUTER, LAPTOP, OR TABLET, RESCHEDULE]** Can you please confirm that you received an email with a link? **[IF THEY HAVE NOT RECEIVED AN EMAIL WITH A LINK TO THE STIMULI, RESCHEDULE]**

**[Section II: Interview]**

Thank you again for agreeing to talk today. I'd like our conversation to be very open-ended and I want to hear your thoughts, ideas, and opinions about the various topics that we will discuss. There are no correct or incorrect answers. Please provide your most accurate answer. If you don't have an opinion or are unsure please simply say so and do not try to guess.

A few things before we begin:

- Your responses to the interview will be anonymous.

- I want to be respectful of your time. Our conversation should last approximately 20 to 25 minutes.

- Your participation is voluntary and you are free not to participate if you choose. Do you agree to participate?  **[IF NO, TERMINATE]**

Does that sound okay? Do you have any questions before we start?

Our conversation is going to be based on an image you will see on your computer. Please select the link in the email we sent to you. Please enter the password **[INSERT PASSWORD THAT IS ASSOCIATED WITH LINK]**. This password should be in all lowercase letters.

You should be able to see an image on the screen. Do you see it? **[IF NO, ASK THEM  TO TRY  THE LINK AGAIN].  [IF YES]** Can you please tell me what the image is? [**RECORD THEIR  VERBATIM ANSWER EXACTLY AS STATED**]

For the remainder of the interview, please assume you received this letter in the mail for a debt that you owe. Does that make sense?

Please review this letter as if you received this letter in the mail for a debt that you owe. As you are reviewing the letter, please think aloud to describe what you are seeing and your reactions**.** When you are done reviewing the letter, please let me know. **[GIVE PARTICIPANT 2 MINUTES  TO REVIEW LETTER]**  Do you feel you have had enough time to review the letter? **[IF NO, GIVE THEM  MORE TIME.  IF YES, CONTINUE]**

**Q1.**

   a. Again, assuming that you received this letter in the mail for a debt that you owe, I would like to hear your thoughts on the letter. Please describe this letter to me in your own words. **[ALLOW RESPONDENT  TO  ANSWER  BEFORE  PROCEEDING  TO Q1b]**

      i. [*Optional Probe*] What makes you say that [repeat answer verbatim]?

   b. What are your initial  impressions?

**Q2.**

    a.   I'm going to ask you some more specific questions about the letter. Assuming you received this letter in the mail, for what reasons do you think you might have received this letter? **[ALLOW RESPONDENT TO ANSWER BEFORE PROCEEDING TO Q2b or Q2c]**

        i.   [*Optional Probe:*] Please explain.

    b.   Who do you think sent this letter?

        i.   [*Probe:*] What leads you to believe that?

    c.   [*If has not referred to kind of company*] What kind of company do you think sent this letter to you?

        i.   [*Probe:*] What makes you believe that [repeat answer verbatim]?

    d.   Why, do you think, would that type of company be sending you a letter?

        i.   [*Optional Probe:*] Please explain.

**Q3.**

    a.   Who at this company, do you think, made the decision to send you this letter?

        i.   [*Probe:*] What makes you think that?

    b.   [*If are unsure or did not refer to a particular job title in Q3a:*] What sort of position do you think the person who made the decision to send you this letter has at the company? **[IF UNSURE OR DON'T KNOW, SKIP TO Q4]**

        i.   [*Probe:*] What leads you to believe that?

    c.   What steps do you think he or she took to decide that you should receive this letter?

        i.   [*Optional Probe:*] What leads you to believe that?

**Q4.**

    a.   What, if anything, do you think this letter is asking you to do?

        i.   [*Optional Probe:*] What leads you to believe that?

**Q5.**

    a.   What, if anything, would you do if you received this letter?

        i.   [*If answer with an action as a response:*] What are your reasons for that response?

        ii.   [*If answer they would not act:*] For what reasons might you not do anything?

    b.  What do you think would happen, if anything, if you did not take the action requested of you in the letter?

        i.  [*Optional Probe:*] Please explain.

**Q6.**

    a.  Now please assume that you received this letter in the mail for a debt that you did not owe. If the letter was incorrect and you did not owe any money, what, if anything, would you do if you received this letter?

        i.  [*If answer with an action as a response:*] What are your reasons for that response?

        ii.  [*If answer they would not act:*] For what reasons might you not do anything?

**Q7.**

    a.  We're almost done, thank you for your responses so far. Now I'd like to know the answer to the following question.  Have you ever received a letter similar to the one you saw here in the past five years?

    b.  [*Follow up if yes to Q7a:*] Have you ever received a letter like this in the past five years when you didn't owe the debt?

    c.  [*Follow up if yes to Q7a:*] How many times have you received letters like this in the past five years, whether you owed the debt or not?

Thank you again for your time. This concludes our interview. As I mentioned earlier, your answers will remain anonymous and only be used for research purposes.  Have a great day.

**APPENDIX G**

**STIMULI USED IN EXPLORATORY INTERVIEWS**

# WW&R Co., LTD
### COLLECTION SERVICES

*Over 80 Years of Service.*

———

323 W. Lakeside Ave Ste. 200 Cleveland OH 44113-1009
(216) 335-5387   (877) 330-9586
Mon-Thurs 8 am- 9 pm, Fri 8 am- 5 pm, & Sat 8 am- 12 pm EST

November 15, 2017

████████████████
████████████

RE:   Current Creditor:  Midland Funding LLC
      Original Creditor: Capital One
      No.: XXXXXXXX7762
      WWR No.:  0289154
      Balance Due as of November 15, 2017: $1,402.92

Dear ████████████████:

Despite previous notices and demands for payment, you have failed to liquidate the above referenced obligation. Your continued failure to satisfy your obligation may result in additional efforts on behalf of the current creditor to collect this account.

Failure to resolve this matter may result in continued collection efforts against you or possible legal action by the current creditor to reduce this claim to judgment. In the event a judgment is rendered against you, the current creditor may choose to exercise their option to proceed with any and all post judgment proceedings as allowed by law in your state to protect their rights. Therefore, please submit your payment to us by mail.

Please contact our office should you have any further questions regarding this matter. This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose.

Sincerely,
WW&R Co., LTD

WONWELT01243

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

323 W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1009
ADDRESS SERVICE REQUESTED

**WWR No.:  0289154**
Balance Due as of November 15, 2017: $1,402.92

November 15, 2017

████████████████
████████████

**WW&R CO., LTD**
P.O. Box 6597
Cleveland, OH 44101-1597

G-1

# WW&R Co., LTD
### COLLECTION SERVICES

*Over 80 Years of Service.*

_____

323 W. Lakeside Ave. Ste. 200 Cleveland, OH 44113 - 1009
(216) 335 - 5387   (877) 330 - 9586
Mon - Thurs 8 am - 9 pm, Fri 8 am - 5 pm, & Sat 8 am - 12 pm EST

November 15, 2017

████████████████
██████████│████████
████████████████████

RE:   Current Creditor:  Midland Funding LLC
      Original Creditor: Capital One
      Account No.: XXXXXXXX7762
      WWR No.:  0289154
      Balance Due as of November 15, 2017: $1,402.92

Dear ████████████████████:

Please be advised that the above referenced account has been placed with us to collect the outstanding balance due and owing on this account to the current creditor referenced above. As of the date of this letter you owe the amount listed above. Therefore, it is important that you contact us at 1-877-330-9586 to discuss an appropriate resolution for this matter.

This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose. Unless you dispute the validity of this debt, or any portion thereof, within thirty (30) days after receipt of this letter, we will assume that the debt is valid. If you notify us in writing within the thirty (30) day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment and a copy of such verification or judgment will be mailed to you. If you request in writing within the thirty (30) day period, we will provide you with the name and address of the original creditor if different from the current creditor.

Thank you for your attention to this

matter. Sincerely,
WW&R Co., LTD

WONWELT01323

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

323 W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1009

ADDRESS SERVICE
REQUESTED


November 15, 2017

████████████████
██████████│████████
████████████████████

**WWR No.: 0289154**
Balance Due as of November 15, 2017: $1,402.92



**WW&R CO., LTD**
P.O. Box 6597
Cleveland, OH 44101-1597

G-2

# WELTMAN, WEINBERG & REIS Co., LTD

### COLLECTION SERVICES

*Over 80 Years of Service.*

---

323 W.  Lakeside Ave. Ste. 200 Cleveland, OH  44113 - 1009
( 2 1 6 ) 3 3 5 - 5 3 8 7   ( 8 7 7 ) 3 3 0 - 9 5 8 6
Mon- Thurs 8 am- 9 pm, Fri 8 am- 5 pm, & Sat 8 am- 12 pm EST

November 15, 2017

█████████████████

████████████

RE:    Current Creditor:  Midland Funding LLC
        Original Creditor: Capital  One
        No.: XXXXXXXX7762
        WWR No.:  0289154
        Balance Due as of November 15, 2017: $1,402.92

Dear ████████████████:

Despite previous notices and demands for payment, you have failed to liquidate  the above referenced obligation.  Your continued failure to satisfy  your obligation  may result in additional  efforts  on behalf of the current creditor to collect this account.

Failure to resolve this matter may result in continued collection efforts  against you or possible legal action by the current creditor to reduce this claim to judgment.  In the event a judgment is rendered against you, the current creditor may choose to exercise their option  to proceed with any and all post judgment proceedings as allowed by law in your state to protect their rights. Therefore, please submit your payment to us by mail.

Please contact our office  should you have any further  questions regarding this matter. This communication is from a debt collector attempting  to collect this debt for the current creditor and any information  obtained  will be used for that purpose.

Sincerely,

Weltman, Weinberg & Reis Co., LTD

WONWELT01243

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

323  W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1009

ADDRESS SERVICE  REQUESTED

**WWR No.:  0289154**
Balance Due as of November 15, 2017: $1,402.92

November 15, 2017

████████████████████

████████████████

**WELTMAN,  WEINBERG  & REIS  CO., LTD**
P.O. Box 6597
Cleveland, OH 44101-1597

# WELTMAN, WEINBERG & REIS Co., LTD

### COLLECTION SERVICES

*Over 80 Years of Service.*

323 W.  Lakeside Ave. Ste. 200 Cleveland, OH  44113 - 1009
(216) 335 - 5387   (877) 330 - 9586
Mon- Thurs 8 am- 9 pm, Fri 8 am- 5 pm, & Sat 8 am- 12 pm EST

November 15, 2017



RE:   Current Creditor:  Midland Funding LLC
       Original Creditor: Capital One
       Account No.: XXXXXXXX7762
       WWR No.:  0289154
       Balance Due as of November 15, 2017: $1,402.92

Dear ████████████████:

Please be advised that the above referenced account has been placed with us to collect the outstanding  balance due and owing on this account to the current creditor referenced above. As of the date of this letter you owe the amount listed above. Therefore, it is important that you contact us at 1-877-330-9586 to discuss an appropriate resolution for this matter.

This communication is from a debt collector attempting  to collect this debt for the current creditor and any information  obtained will be used for that purpose. Unless you dispute the validity of this debt, or any portion thereof, within thirty (30) days after receipt of this letter,  we will assume that  the debt is valid. If you notify  us in writing within the thirty  (30) day period that the debt, or any portion thereof,  is disputed,  we will obtain  verification  of the debt or a copy of a judgment and a copy of such verification  or judgment will be mailed to you. If you request in writing within  the thirty  (30) day period, we will provide you with the name and address of the original creditor if different  from the current creditor.

Thank you for your attention  to this

matter. Sincerely,

Weltman, Weinberg & Reis Co., LTD

ONWELT01323

---

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***

323 W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1009

**WWR No.: 0289154**
Balance  Due as of November 15, 2017: $1,402.92

ADDRESS SERVICE
REQUESTED

November 15, 2017

**WELTMAN,  WEINBERG  & REIS  CO., LTD**
P.O. Box 6597
Cleveland, OH 44101-1597

G-4

# WELTMAN, WEINBERG & REIS Co., LPA

### ATTORNEYS AT LAW

*Over 80 Years of Service.*

323 W.  Lakeside Ave. Ste. 200 Cleveland, OH  44113 - 1009
(216) 335 - 5387   (877) 330 - 9586
Mon - Thurs 8 am - 9 pm, Fri 8 am - 5 pm, & Sat 8 am - 12 pm EST

November 15, 2017

████████████████
████████████

RE:    Current Creditor:  Midland Funding LLC
       Original Creditor: Capital One
       No.: XXXXXXXX7762
       WWR No.:  0289154
       Balance Due as of November 15, 2017: $1,402.92

Dear ████████████████:

Despite previous notices and demands for payment, you have failed to liquidate the above referenced obligation.  Your continued failure to satisfy your obligation may result in additional efforts on behalf of the current creditor to collect this account.

Failure to resolve this matter may result in continued collection efforts against you or possible legal action by the current creditor to reduce this claim to judgment.  In the event a judgment is rendered against you, the current creditor may choose to exercise their option to proceed with any and all post judgment proceedings as allowed by law in your state to protect their rights. Therefore, please submit your payment to us by mail.

Please contact our office should you have any further questions regarding this matter. This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose.

Sincerely,
Weltman, Weinberg & Reis Co., L.P.A.

WONWELT01243

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

323 W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1009
ADDRESS SERVICE REQUESTED

**WWR No.:  0289154**
Balance Due as of November 15, 2017: $1,402.92

November 15, 2017

████████████████
██████████

**WELTMAN, WEINBERG & REIS CO., L.P.A.**
P.O. Box 6597
Cleveland, OH 44101-1597

G-5

# WELTMAN, WEINBERG & REIS Co., LPA

### ATTORNEYS AT LAW

*Over 80 Years of Service.*

323 W. Lakeside Ave. Ste. 200 Cleveland, OH 44113-1009
(216) 335-5387  (877) 330-9586
Mon-Thurs 8 am- 9 pm, Fri 8 am- 5 pm, & Sat 8 am- 12 pm EST

November 15, 2017

███████████████
███████████

RE:   Current Creditor:  Midland Funding LLC
      Original Creditor: Capital One
      Account No.: XXXXXXXX7762
      WWR No.:  0289154
      Balance Due as of November 15, 2017: $1,402.92

Dear ████████████████:

Please be advised that the above referenced account has been placed with us to collect the outstanding balance due and owing on this account to the current creditor referenced above. As of the date of this letter you owe the amount listed above. Therefore, it is important that you contact us at 1-877-330-9586 to discuss an appropriate resolution for this matter.

This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose. Unless you dispute the validity of this debt, or any portion thereof, within thirty (30) days after receipt of this letter, we will assume that the debt is valid. If you notify us in writing within the thirty (30) day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment and a copy of such verification or judgment will be mailed to you. If you request in writing within the thirty (30) day period, we will provide you with the name and address of the original creditor if different from the current creditor.

Thank you for your attention to this

matter. Sincerely,

Weltman, Weinberg & Reis Co., L.P.A.

WONWELT01323

*** To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

323 W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1009

ADDRESS SERVICE
REQUESTED

**WWR No.: 0289154**
Balance Due as of November 15, 2017: $1,402.92

November 15, 2017

███████████████
██████ █ █████████
███████████████

**WELTMAN, WEINBERG & REIS CO., L.P.A.**
P.O. Box 6597
Cleveland, OH 44101-15

G-6

**APPENDIX H**
**SCREENING PROGRAMMING INSTRUCTIONS FOR EXPLORATORY INTERVIEWS**

## Exploratory Interview Screener and Programing Instructions

*Quota: n=30 (5 per stimuli group).*

[NOTES TO PROGRAMMER IN BOLD AND ALL CAPS WITH BRACKETS]

[DISABLE THE BROWSER'S "BACK" BUTTON AND DO NOT SHOW A "BACK" BUTTON WITHIN THE SURVEY]

[EVERY QUESTION IS A SEPARATE SCREEN UNLESS OTHERWISE SPECIFIED]

[REQUIRE RESPONSES TO ALL QUESTIONS]

**[Section I: Screener]**

[NO SURVEY/SECTION TITLES OR QUESTION NUMBERS TO BE DISPLAYED TO RESPONDENTS]

[PANEL MEMBERS WHO ARE ASKED S9 SHOULD BE MATCHED TO THE CENSUS ON AGE, GENDER, AND GEOGRAPHY. THAT IS, THE REMAINING QUESTIONS OF THE SCREENER SHOULD BE APPLIED TO A SAMPLE REPRESENTATIVE OF THE GENERAL POPULATION IN THE UNITED STATES SO THAT THE FINAL SAMPLE IS REPRESENTATIVE OF THE TARGET POPULATION FOR THE SURVEY (BASED ON ACTUAL QUALIFICATION).]

[DETECT DEVICE RESPONDENT IS USING; IF IT IS A SMARTPHONE OR OTHER MOBILE DEVICE (NOT A DESKTOP, LAPTOP, OR TABLET), INSTRUCT TO LOG BACK IN WITH APPROVED DEVICE WITH THE MESSAGE: "Sorry, only desktops, laptops, or tablets can be used for this survey. Please close this window and go to a desktop, laptop computer, or tablet device to take the survey. Once at one of these devices, please click on the same link to take the survey."]

S0.    CAPTCHA [OR PANEL-BASED MECHANISM TO ENSURE REAL RESPONDENTS]

**[INTRODUCTION]**

Thanks for taking this survey! Your answers are important to us. We want to know your thoughts and opinions, so there are no correct or incorrect answers. Please provide your most accurate answer. If you don't know the answer to a particular question, please choose the "Don't know/ I am unsure" option. Please do not try to guess. Please do not use the "back" button during this survey.

Your answers will be kept in strict confidence. This study will not be used to sell you anything.

You are going to be asked a couple of questions to determine if you qualify for a phone interview. If you qualify for a phone interview, you will be asked to set up a time for a phone interview, and you will receive compensation after the phone interview is completed. When you are ready, please select the "Next" arrow below to continue.

**S1.** **How old are you?**
*Mark one answer*

**[RANDOMIZE BETWEEN THIS ORDER AND REVERSE; KEEP "PREFER NOT TO ANSWER" LAST]**

| | | |
|---|---|---|
| $\bigcirc_1$ | Under 18 | **[TERMINATE]** |
| $\bigcirc_2$ | 18-24 | |
| $\bigcirc_3$ | 25-34 | |
| $\bigcirc_4$ | 35-44 | |
| $\bigcirc_5$ | 45-54 | |
| $\bigcirc_6$ | 55-64 | |
| $\bigcirc_7$ | 65+ | |
| $\bigcirc_8$ | Prefer not to answer | **[TERMINATE]** |

**[TERMINATE IF AGE DOES NOT MATCH THE VALUE ON FILE]**

**S2.** **What is your gender?**
*Mark one answer*

**[RANDOMIZE OPTIONS; KEEP "OTHER" AND "PREFER NOT TO ANSWER" LAST]**

| | | |
|---|---|---|
| $\bigcirc_1$ | Male | |
| $\bigcirc_2$ | Female | |
| $\bigcirc_3$ | Other | |
| $\bigcirc_4$ | Prefer not to answer | **[TERMINATE]** |

**S3.** **What state do you live in?**
*Mark one answer*

**[DROP DOWN MENU OF ALL 50 STATES AND D.C.]**

**S4.** **Which of the following includes your total household income before taxes?**
*Mark one answer*

[RANDOMIZE BETWEEN THIS ORDER AND REVERSE; KEEP "DON'T KNOW/PREFER NOT TO ANSWER" LAST]

| | |
|---|---|
| $\bigcirc_1$ | Less than $20,000 |
| $\bigcirc_2$ | $20,000 - $39,999 |
| $\bigcirc_3$ | $40,000 - $59,999 |
| $\bigcirc_4$ | $60,000 - $79,999 |
| $\bigcirc_5$ | $80,000 - $99,999 |
| $\bigcirc_6$ | $100,000 - $119,999 |
| $\bigcirc_7$ | $120,000 - $139,999 |
| $\bigcirc_8$ | $140,000 - $159,999 |
| $\bigcirc_9$ | $160,000 - $179,999 |
| $\bigcirc_{10}$ | $180,000 - $199,999 |
| $\bigcirc_{11}$ | $200,000 + |
| $\bigcirc_{12}$ | Don't know / prefer not to answer                          **[TERMINATE]** |

**S5.** **What is the highest level of formal education you have completed?**
*Mark one answer*

[RANDOMIZE BETWEEN THIS ORDER AND REVERSE; KEEP "PREFER NOT TO ANSWER" LAST]

| | |
|---|---|
| $\bigcirc_1$ | Completed some high school |
| $\bigcirc_2$ | High school degree or equivalent |
| $\bigcirc_3$ | Completed some college |
| $\bigcirc_4$ | Associate's degree / 2 year degree |
| $\bigcirc_5$ | Bachelor's degree / 4 year degree |
| $\bigcirc_6$ | Completed some postgraduate |
| $\bigcirc_7$ | Master's degree |
| $\bigcirc_8$ | Doctorate, law or professional degree |
| $\bigcirc_9$ | Prefer not to answer                          **[TERMINATE]** |

**S6.** **Are you of Hispanic, Latino, or Spanish origin?**
*Mark one answer*

[RANDOMIZE BETWEEN THIS ORDER AND REVERSE; KEEP "PREFER NOT TO ANSWER" LAST]

| | |
|---|---|
| $\bigcirc_1$ | Yes |
| $\bigcirc_2$ | No |
| $\bigcirc_3$ | Prefer not to answer                          **[TERMINATE]** |

**S7.** **What is your race?**

H-3

*Mark all answers that apply*

**[RANDOMIZE OPTIONS; KEEP "OTHER" AND "PREFER NOT TO ANSWER" LAST]**

| | | |
|---|---|---|
| O 1 | Black or African American | |
| O 2 | American Indian or Alaska Native | |
| O 3 | White | |
| O 4 | Asian | |
| O 5 | Native Hawaiian or other Pacific Islander | |
| O 6 | Other | |
| O 7 | Prefer not to answer | **[EXCLUSIVE]** **[TERMINATE]** |

**S8.**  **Have you or any of your family members ever been employed by any of the following types of companies or organizations?**
*Mark all answers that apply*

**[RANDOMIZE OPTIONS; KEEP "NONE OF THE ABOVE" LAST]**

| | | |
|---|---|---|
| O 1 | A bank | **[TERMINATE]** |
| O 2 | A legal organization | **[TERMINATE]** |
| O 3 | A real estate agency | |
| O 4 | A retail store | |
| O 5 | A grocery store | |
| O 6 | A debt/bill collection agency | **[TERMINATE]** |
| O 7 | An academic institution | |
| O 8 | A food service company | |
| O 9 | A healthcare provider | |
| O 10 | A construction company | |
| O 11 | A marketing, market research, or advertising agency | **[TERMINATE]** |
| O 12 | A technology company | |
| O 13 | None of the above | **[EXCLUSIVE]** |

**[RANDOMIZE BETWEEN STARTING WITH BLOCK A (S9) OR BLOCK B (S10-S11)]**

**BLOCK A: Credit Card Experience (S9)**

**S9.**     **Have you or have you not used a credit card to make any purchases in the last 5 years? Please only consider credit card purchases for personal or household use when answering this question. Do not consider credit card purchases for business use when answering this question.**
*Mark one answer*

**[RANDOMIZE OPTIONS; KEEP "DON'T KNOW/ I AM UNSURE" LAST]**

| | |
|---|---|
| O 1 | Yes, I have used a credit card |
| O 2 | No, I have not used a credit card |
| O 3 | Don't know/ I am unsure |

**BLOCK B: Other Loan Experience (S10- S11)**

**S10.**     **Have you or have you not borrowed money in the last 5 years? Please only consider money borrowed to pay for personal or household expenses when answering this question. Do not consider money borrowed for business use when answering this question.**
*Mark one answer*

**[RANDOMIZE OPTIONS; KEEP "DON'T KNOW/ I AM UNSURE" LAST]**

| | |
|---|---|
| O 1 | Yes, I have borrowed money |
| O 2 | No, I have not borrowed money |
| O 3 | Don't know/ I am unsure |

**[IF "YES" IS SELECTED, CONTINUE TO S11]**

**[IF "YES" IS NOT SELECTED, SKIP TO S12]**

**S11.**     **Please indicate which, if any, of the following types of people or organizations you have borrowed money from in the last 5 years. Please only consider money borrowed for personal or household use when answering this question. Do not consider money borrowed for business use when answering this question.**
*Mark all answers that apply*

**[RANDOMIZE OPTIONS; KEEP "OTHER" AND "DON'T KNOW/ I AM UNSURE" LAST]**

H-5

| | |
|---|---|
| O 1 | A friend |
| O 2 | A family member |
| O 3 | A bank |
| O 4 | A retail store |
| O 5 | A payday lender |
| O 6 | A car dealership |
| O 7 | A utilities company |
| O 8 | A property owner |
| O 9 | The federal government |
| O 10 | A pawn shop |
| O 11 | A company that offers a car title loan |
| O 12 | A credit card company |
| O 13 | An online lender |
| O 14 | A credit union |
| O 15 | An academic institution |
| O 16 | Other (please specify)                    **[SHORT TEXT BOX]** |
| O 17 | Don't know / I am unsure                    **[EXCLUSIVE]** |

**[Section II: Interview Scheduling]**

**S12.** Based on the responses you gave us, you are eligible to participate in a more detailed market research discussion over the phone. It is an opportunity to express your opinions, which we value greatly. We will hold this discussion at a time that is convenient for you.

Please select the "Next" arrow below to continue.

**S13.** To show our appreciation for your time and interest in our project, if you complete a phone interview, you will be compensated. You will be **interviewed individually** for about 20 to 25 minutes. The interview may be audio recorded for analysis purposes. This will not involve a sales pitch of any kind and your name will not be released for any sales or marketing purposes. All of your responses will remain anonymous.

If you are willing to participate, please continue through the survey to enter dates and times you would be available for an interview. We will contact you within a week to confirm your time if you are chosen to participate. For this interview, you will need access to a desktop computer, laptop computer, or tablet to view an image. We will email you a link to view this image before the interview.

Are you willing to share your thoughts, ideas, and opinions about some of the types of companies that were asked about in this survey for 20 to 25 minutes over the phone?

**[RANDOMIZE OPTIONS; KEEP "DON'T KNOW/ I AM UNSURE" LAST]**

| | | |
|---|---|---|
| O₁ | Yes, I am willing to share my opinions on the phone | |
| O₂ | No, I am not willing to share my opinions on the phone | **[TERMINATE]** |
| O₃ | Don't know/ I am unsure | **[TERMINATE]** |

**S14.**  Thank you for your willingness to participate in an interview. There are just a few more items to complete. Before scheduling your interview, we will first ask you a few questions that will later be used to make sure you are the same person who filled out this survey.

Please select the "Next" arrow below to continue.

**S15.**  The next question is going to ask you for the house number of your address. We do not need your street or city address; just the address number. For example, if you lived on 333 Central Avenue, the correct answer would be 333.

Just to make sure this question is clear, if you lived on **901 Diamond Street in Faribault Minnesota**, what would be the address number?

**[SHORT ANSWER TEXTBOX; ONLY ALLOW DIGITS (MIN=1, MAX = 999999)**

**[IF THEY ANSWER 901, CONTINUE.  IF NOT, REPEAT S15 A SECOND TIME.  IF THEY ANSWER 901 THE SECOND TIME, CONTINUE.  IF THEY DO NOT ANSWER 901 THE SECOND TIME, TERMINATE.]**

**S16.**  What is the house number of your address?

**[SHORT ANSWER TEXTBOX; ONLY ALLOW DIGITS (MIN=1, MAX = 999999)]**

**S17.**  Which of these colors do you like best?  Note that we are not testing you on these colors, but you will need to provide the same answer at a later time.

*Mark one answer*

**[RANDOMIZE ORDER]**

| | |
|---|---|
| O₁ | Blue |
| O₂ | Pink |
| O₃ | Orange |
| O₄ | Green |

H-7

**S18.** **What was the name of your elementary school?  Note that we are not testing you about your elementary school, but you will need to provide the same answer at a later time.**

**[SHORT ANSWER TEXTBOX]**

---

**S19.** Please continue through the survey to fill in your contact information and your availability for a telephone interview.

| | |
|---|---|
| First name: | **[DO NOT ALLOW BLANK]** |
| Last name: | **[DO NOT ALLOW BLANK]** |
| Best phone number to reach you for this interview: <br> (enter a 10 digit number) | **[10 DIGIT NUMBER  – INCLUDE AREA CODE]** |
| Backup number <br> (optional – in case we have trouble reaching you): | **[10 DIGIT NUMBER  – INCLUDE AREA CODE]** |
| Email address: | |
| Confirm email address: <br> (both emails must match) | **[MUST MATCH EMAIL ABOVE]** |

---

**S20.** Please select all of the appointment times that will work for your schedule. The more appointment times you chose, the more likely we will be able to schedule a call with you. For this reason, please select as many days and times that work for you as possible.

Please note that all times are based on **Eastern Standard Time**
**[INSERT POSSIBLE APPOINTMENT  TIMES WITH "NONE" OPTION. IF "NONE IS SELECTED,"  TERMINATE.]**

---

**APPENDIX I**

**PROGRAMMING INSTRUCTIONS FOR ONLINE SURVEY**

## Programming Instructions for Online Survey

_Quota: n=600 (200 per stimuli group)._

**[NOTES TO PROGRAMMER IN BOLD AND ALL CAPS WITH BRACKETS]**

**[DISABLE THE BROWSER'S "BACK" BUTTON AND DO NOT SHOW A "BACK" BUTTON WITHIN THE SURVEY]**

**[EVERY QUESTION IS A SEPARATE SCREEN UNLESS OTHERWISE SPECIFIED]**

**[REQUIRE RESPONDENTS TO ANSWER ALL QUESTIONS]**

**[Section I: Screener]**

**[NO SURVEY/SECTION TITLES OR QUESTION NUMBERS TO BE DISPLAYED TO RESPONDENTS]**

**[PANEL MEMBERS WHO ARE ASKED S5 SHOULD BE MATCHED TO THE CENSUS ON AGE, GENDER, AND REGION. THAT IS, THE REMAINING QUESTIONS OF THE SCREENER SHOULD BE APPLIED TO A SAMPLE REPRESENTATIVE OF THE GENERAL POPULATION IN THE UNITED STATES SO THAT THE FINAL SAMPLE IS REPRESENTATIVE OF THE TARGET POPULATION FOR THE SURVEY (BASED ON ACTUAL QUALIFICATION).]**

**[DETECT DEVICE RESPONDENT IS USING; IF IT IS A SMARTPHONE OR OTHER MOBILE DEVICE (NOT A DESKTOP COMPUTER, LAPTOP, OR TABLET), INSTRUCT TO LOG BACK IN WITH APPROVED DEVICE WITH THE MESSAGE: "Sorry, only desktop computers, laptop computers, or tablets can be used for this survey. Please close this window and go to a desktop computer, laptop computer, or tablet to take the survey. Once at one of these devices, please click on the same link to take the survey."]**

**S0.** CAPTCHA **[OR PANEL-BASED MECHANISM TO ENSURE REAL RESPONDENTS]**

**[INTRODUCTION]**

Thanks for taking this survey! Your answers are important to us. We want to know your thoughts and opinions, so there are no correct or incorrect answers. Please provide your most accurate answer. If you don't know the answer to a particular question, please choose the "Don't know / I am unsure" option. Please do not try to guess. Please do not use the "back" button during this survey.

Your answers will be kept in strict confidence. This study will not be used to sell you anything. If you wear glasses or corrective lenses when using a desktop computer, laptop computer, or tablet, please wear them throughout the survey.

When you are ready, please select the "Next" arrow below to continue.

**S1.**  How old are you?
*Mark one answer*

**[RANDOMIZE BETWEEN THIS ORDER AND REVERSE; KEEP "PREFER NOT TO ANSWER" LAST]**

| | | |
|---|---|---|
| O₁ | Under 18 | **[TERMINATE]** |
| O₂ | 18-24 | |
| O₃ | 25-34 | |
| O₄ | 35-44 | |
| O₅ | 45-54 | |
| O₆ | 55-64 | |
| O₇ | 65+ | |
| O₈ | Prefer not to answer | **[TERMINATE]** |

**[TERMINATE IF AGE DOES NOT MATCH THE VALUE ON FILE]**

**S2.**  What is your gender?
*Mark one answer*

**[RANDOMIZE OPTIONS; KEEP "OTHER" AND "PREFER NOT TO ANSWER" LAST]**

| | | |
|---|---|---|
| O₁ | Male | |
| O₂ | Female | |
| O₃ | Other | |
| O₄ | Prefer not to answer | **[TERMINATE]** |

**S3.**  What state do you live in?
*Select one answer*

**[DROP DOWN MENU OF ALL 50 STATES AND D.C.]**

**S4.** Have you or anyone else in your household ever been employed by any of the following types of companies or organizations?
*Mark all types of companies or organizations that have ever employed you or anyone else in your household*

**[RANDOMIZE OPTIONS; KEEP "NONE OF THE ABOVE" LAST]**

| | | |
|---|---|---|
| ☐₁ | A bank, credit card company, or other financial organization | **[TERMINATE]** |
| ☐₂ | A law firm, legal services organization, or court | **[TERMINATE]** |
| ☐₃ | A real estate agency | |
| ☐₄ | A retail store | |
| ☐₅ | A grocery store | |
| ☐₆ | A debt or bill collection agency | **[TERMINATE]** |
| ☐₇ | An academic institution | |
| ☐₈ | A food service company | |
| ☐₉ | A healthcare provider or medical office | |
| ☐₁₀ | A construction company | |
| ☐₁₁ | A marketing, market research, or advertising agency | **[TERMINATE]** |
| ☐₁₂ | A technology company | |
| ☐₁₃ | None of the above | **[EXCLUSIVE]** |

**S5.** Have you or have you not used a credit or charge card to make any purchases for personal or household expenses in the last 5 years? Please only consider credit or charge card purchases for personal or household expenses when answering this question. Do not consider credit or charge card purchases for business expenses when answering this question.
*Mark one answer*

**[RANDOMIZE OPTIONS; KEEP "DON'T KNOW / I AM UNSURE" LAST]**

| | |
|---|---|
| ○₁ | Yes, I have used a credit or charge card for personal or household expenses in the last 5 years. |
| ○₂ | No, I have not used a credit or charge card for personal or household expenses in the last 5 years. |
| ○₃ | Don't know / I am unsure |

**S6.** Other than any outstanding balances on a credit or charge card, have you or have you not borrowed money for personal or household expenses in the last 5 years? Please only consider money borrowed for personal or household expenses when answering this question. Do not consider money borrowed for business expenses when answering this question.
*Mark one answer*

**[RANDOMIZE OPTIONS; KEEP "DON'T KNOW / I AM UNSURE" LAST]**

| | |
|---|---|
| ○₁ | Yes, I have borrowed money for personal or household expenses in the last 5 years. |
| ○₂ | No, I have not borrowed money for personal or household expenses in the last 5 years. |
| ○₃ | Don't know / I am unsure |

**[IF "YES" IS SELECTED  IN S6, CONTINUE  TO S7]**

**[IF "YES" IS NOT SELECTED  IN S6 AND "YES" WAS NOT SELECTED  IN S5, TERMINATE]**

**[IF "YES" IS NOT SELECTED  IN S6 AND "YES" WAS SELECTED  IN S5, SKIP TO S8]**

---

**S7.** Please indicate which, if any, of the following types of people or organizations you have borrowed money from for personal or household expenses in the last 5 years.  Please only consider money borrowed for personal or household expenses when answering this question. Do not consider money borrowed for business expenses when answering this question. *Mark all answers that apply*

**[RANDOMIZE OPTIONS; KEEP "OTHER" AND "DON'T KNOW / I AM UNSURE"  LAST]**

| | |
|---|---|
| ☐₁ | A friend |
| ☐₂ | A family  member |
| ☐₃ | A bank |
| ☐₄ | A retail store |
| ☐₅ | A payday lender |
| ☐₆ | A car dealership |
| ☐₇ | A utilities  company |
| ☐₈ | A property owner |
| ☐₉ | The federal government |
| ☐₁₀ | A pawn shop |
| ☐₁₁ | A company that offers a car title loan |
| ☐₁₂ | An online lender |
| ☐₁₃ | A credit union |
| ☐₁₄ | An academic institution |
| ☐₁₅ | Other (please specify)                                    **[SHORT TEXT  BOX]** |
| ☐₁₆ | Don't know / I am unsure                                          **[EXCLUSIVE]** |

**[IF ONLY "A FRIEND" OR "A FAMILY MEMBER"  IS SELECTED  AND "YES" WAS NOT SELECTED  IN S5, TERMINATE]**

**[IF ONLY "DON'T KNOW/ I AM UNSURE"  IS SELECTED  AND "YES" WAS NOT SELECTED  IN S5, TERMINATE]**

---

**S8.** To get to the next part of the survey, please write the word "Next" in the box below. *Please type in your response.*

┌─────────────────────────────────────────────────────┐
│                                                       │
│                                                       │
│                                                       │
└─────────────────────────────────────────────────────┘

**[PROVIDE RESPONSE BOX LIMITING TO 1000 CHARACTERS]**
**[DO NOT FORCE RESPONSE; DO NOT TERMINATE  IF THE RESPONDENT  DOES NOT TYPE "NEXT" IN THE  TEXT  BOX]**

I-4

**[Section II: Stimuli Review and Assessment]**

Q1.    On the following screen, you will see an image of a letter. Please review this letter assuming that you have received the letter in the mail for a debt that you owe. You will be able to review the letter for as long as you like. As you're reading this letter, the word "NEXT" will appear at the bottom of the webpage. Please read the letter at your own pace before selecting the "NEXT" button. We will then ask you several questions about the letter.

We want to know your thoughts and opinions, so there are no correct or incorrect answers. Please provide your most accurate answer. If you don't know the answer to a particular question, please choose the "Don't know / I am unsure" option. Please do not try to guess.

☐ Please check the box and select the "NEXT" arrow if you understand these instructions and are willing to participate in this survey

**[IF RESPONDENT SELECTS "NEXT" WITHOUT CHECKING THE BOX, THE FIRST TIME RETURN TO Q1 AND SHOW MESSAGE "Please review the instructions and check the box if you agree."]**

**[TERMINATE RESPONDENT IF HE/SHE DOES NOT CHECK BOX AND CLICK "CONTINUE" WITHIN 5 MINUTES]**

Q2.    **[RANDOMLY ASSIGN RESPONDENTS INTO ONE OF THE FOLLOWING THREE GROUPS:**
        **(1) GROUP 1 - WW&R; Collection Services**
        **(2) GROUP 2 - Weltman Weinberg & Reis; Collection Services**
        **(3) GROUP 3 - Weltman Weinberg & Reis; Attorneys at Law]**

**[A RESPONDENT SHOULD BE SHOWN ONE STIMULUS CORRESPONDING TO THE GROUP TO WHICH HE OR SHE WAS RANDOMLY ASSIGNED. THE CORRESPONDING STIMULI ARE LISTED BELOW.]**

**GROUP 1**

**WW&R Co., LTD**
COLLECTION SERVICES

*Over 80 Years of Service.*
_____

323 W. Lakeside Ave. Ste. 200 Cleveland, OH  44113-1009
(216) 335-5387   (877) 330-9586
Mon-Thurs 8 am-9 pm, Fri 8 am-5 pm, & Sat 8 am-12 pm EST

January 16, 2018

████████████████████

RE:  Current Creditor: Midland Funding LLC
     Original Creditor: ██████████
     Account No.: XXXXXXXX7762
     WWR No.: 0289154
     Balance Due as of January 16, 2018: $1,402.92

Dear ████████████████:

Please be advised that the above referenced account has been placed with us to collect the outstanding balance due and owing on this account to the current creditor referenced above. As of the date of this letter you owe the amount listed above. Therefore, it is important that you contact us at 1-877-330-9586 to discuss an appropriate resolution for this matter.

This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose. Unless you dispute the validity of this debt, or any portion thereof, within thirty (30) days after receipt of this letter, we will assume that the debt is valid. If you notify us in writing within the thirty (30) day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment and a copy of such verification or judgment will be mailed to you. If you request in writing within the thirty (30) day period, we will provide you with the name and address of the original creditor if different from the current creditor.

Thank you for your attention to this matter.

Sincerely,
WW&R Co., LTD

WONWELT01323

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

|                                      | **WWR No.:  0289154** |
|--------------------------------------|------------------------|
| 323 W. Lakeside Ave. Ste. 200        | Balance Due as of January 16, 2018 : $1,402.92 |
| Cleveland, OH 44113-1009             |                        |
| ADDRESS SERVICE REQUESTED            |                        |

January 16, 2018

████████████████████
██████████

**WW&R CO., LTD**
P.O. Box 6597
Cleveland, OH 44101-1597

I-6

**GROUP 2**

# WELTMAN, WEINBERG & REIS Co., LTD
### COLLECTION SERVICES

*Over 80 Years of Service.*

323 W. Lakeside Ave. Ste. 200 Cleveland, OH 44113-1009
(216) 335-5387  (877) 330-9586
Mon-Thurs 8 am-9 pm, Fri 8 am-5 pm, & Sat 8 am-12 pm EST

January 16, 2018

▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬
▬▬▬▬▬

RE:   Current Creditor: Midland Funding LLC
      Original Creditor: ▬▬▬▬
      Account No.: XXXXXXXX7762
      WWR No.: 0289154
      Balance Due as of January 16, 2018 : $1,402.92

Dear ▬▬▬▬▬▬▬▬:

Please be advised that the above referenced account has been placed with us to collect the outstanding balance due and owing on this account to the current creditor referenced above. As of the date of this letter you owe the amount listed above. Therefore, it is important that you contact us at 1-877-330-9586 to discuss an appropriate resolution for this matter.

This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose. Unless you dispute the validity of this debt, or any portion thereof, within thirty (30) days after receipt of this letter, we will assume that the debt is valid. If you notify us in writing within the thirty (30) day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment and a copy of such verification or judgment will be mailed to you. If you request in writing within the thirty (30) day period, we will provide you with the name and address of the original creditor if different from the current creditor.

Thank you for your attention to this matter.

Sincerely,
Weltman, Weinberg & Reis Co., LTD

WONWELT01323

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

**WWR No.: 0289154**
Balance Due as of January 16, 2018 : $1,402.92

323 W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1009
ADDRESS SERVICE REQUESTED

January 16, 2018

**WELTMAN, WEINBERG & REIS CO., LTD**
P.O. Box 6597
Cleveland, OH 44101-1597

▬▬▬▬▬▬▬▬
▬▬▬▬▬
▬▬▬▬▬

I-7

**GROUP 3**

## WELTMAN, WEINBERG & REIS Co., LPA

ATTORNEYS AT LAW

*Over 80 Years of Service.*

———

323 W. Lakeside Ave. Ste. 200 Cleveland, OH 44113-1009
(216) 335-5387 (877) 330-9586
Mon - Thurs 8 am - 9 pm, Fri 8 am - 5 pm, & Sat 8 am - 12 pm EST

January 16, 2018

█████████████████████
████████████████

RE: Current Creditor: Midland Funding LLC
   Original Creditor: ████████
   Account No.: XXXXXXXX7762
   WWR No.: 0289154
   Balance Due as of January 16, 2018 : $1,402.92

Dear ████████████████████ :

Please be advised that the above referenced account has been placed with us to collect the outstanding balance due and owing on this account to the current creditor referenced above. As of the date of this letter you owe the amount listed above. Therefore, it is important that you contact us at 1-877-330-9586 to discuss an appropriate resolution for this matter.

This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose. Unless you dispute the validity of this debt, or any portion thereof, within thirty (30) days after receipt of this letter, we will assume that the debt is valid. If you notify us in writing within the thirty (30) day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment and a copy of such verification or judgment will be mailed to you. If you request in writing within the thirty (30) day period, we will provide you with the name and address of the original creditor if different from the current creditor.

Thank you for your attention to this matter.

Sincerely,
Weltman, Weinberg & Reis Co., L.P.A.

WONWELT01323

***To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope***

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

**WWR No.: 0289154**

323 W. Lakeside Ave. Ste. 200         Balance Due as of January 16, 2018 : $ 1,402.92
Cleveland, OH 44113-1009
ADDRESS SERVICE REQUESTED

January 16, 2018            **WELTMAN, WEINBERG & REIS CO., L.P.A.**
                  P.O. Box 6597
██████████████████      Cleveland, OH 44101-1597
████████████████

I-8

**PREVENT RESPONDENTS FROM CLICKING THE "NEXT" BUTTON UNTIL THEY HAVE SPENT AT LEAST 15 SECONDS ON THE SCREEN. ]**

---

**Q3.** You will now be asked several questions about the letter you just saw. Please answer these questions assuming that you have received the letter in the mail for a debt that you owe.

While answering these questions, if at any time you wish to view the letter you just saw, you can do so by clicking on the thumbnail at the top of the screen.

---

**[SHOW Q4 AND Q5 ON THE SAME PAGE - SHOW Q5 ONCE A RESPONSE IS TYPED IN Q4. IF "DON'T KNOW / I AM UNSURE" IS SELECTED IN Q4, DON'T SHOW Q5 AND, SKIP TO Q6]**

**Q4.** In your own words, what do you think is the main message of this letter?

*Either type in your response or click "Don't know / I am unsure"*

```
[                                                           ]
```

**[PROVIDE RESPONSE BOX LIMITING TO 1000 CHARACTERS]**
**[REQUIRE AT LEAST 4 CHARACTERS; SHOW ERROR "Please be thorough in your response." IF ENTRY IS LESS THAN 4 CHARACTERS]**

| | |
|---|---|
| ◯₂  Don't know / I am unsure | **[EXCLUSIVE]** **[SKIP TO Q6]** |

**Q5.** Why do you say that?

*Either type in your response or click "Don't know / I am unsure"*

```
[                                                           ]
```

**[PROVIDE RESPONSE BOX LIMITING TO 1000 CHARACTERS]**
**[REQUIRE AT LEAST 4 CHARACTERS; SHOW ERROR "Please be thorough in your response." IF ENTRY IS LESS THAN 4 CHARACTERS]**

| | |
|---|---|
| ◯₂  Don't know / I am unsure | **[EXCLUSIVE]** |

**[SHOW Q6 AND Q7 ON THE SAME PAGE - SHOW Q7 ONCE A RESPONSE IS TYPED IN Q6. IF "DON'T KNOW / I AM UNSURE" IS SELECTED IN Q6, DON'T SHOW Q7 AND SKIP TO Q8.]**

**Q6.** What <u>type</u> of company or organization do you think sent you this letter?

*Either type in your response or click "Don't know / I am unsure"*

```

```

**[PROVIDE RESPONSE BOX LIMITING TO 1000 CHARACTERS]**
**[REQUIRE AT LEAST 4 CHARACTERS; SHOW ERROR "Please be thorough in your response." IF ENTRY IS LESS THAN 4 CHARACTERS]**

○₂  Don't know / I am unsure                    **[EXCLUSIVE]**
                                                **[SKIP TO Q8]**

**Q7.** Why do you say that?

*Either type in your response or click "Don't know / I am unsure"*

```

```

**[PROVIDE RESPONSE BOX LIMITING TO 1000 CHARACTERS]**
**[REQUIRE AT LEAST 4 CHARACTERS; SHOW ERROR "Please be thorough in your response." IF ENTRY IS LESS THAN 4 CHARACTERS]**

○₂  Don't know / I am unsure                            **[EXCLUSIVE]**

**Q8.** Assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?

*Either type in your response or click "Don't know / I am unsure"*

```

```

**[PROVIDE RESPONSE BOX LIMITING TO 1000 CHARACTERS]**
**[REQUIRE AT LEAST 4 CHARACTERS; SHOW ERROR "Please be thorough in your response." IF ENTRY IS LESS THAN 4 CHARACTERS]**

| O₂ | Don't know / I am unsure | [EXCLUSIVE] [SKIP TO F1] |
|---|---|---|

**Q9.** Who else, if anyone, other than the person you just mentioned do you think reviewed your account before sending this letter?

*Either type in your response, click "No one else", or click "Don't know / I am unsure"*

```
                                                                        
                                                                        
                                                                        
```

**[PROVIDE RESPONSE BOX LIMITING TO 1000 CHARACTERS]**
**[REQUIRE AT LEAST 4 CHARACTERS; SHOW ERROR "Please be thorough in your response." IF ENTRY IS LESS THAN 4 CHARACTERS]**

| O₁ | No one else | [EXCLUSIVE] |
|---|---|---|
| O₂ | Don't know / I am unsure | [EXCLUSIVE] |

**Q10.** Now, you're going to see a list of people that may have been employed by the company that sent you this letter. You may have already said this, but assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?

*Mark all answers that apply*

**[RANDOMIZE OPTIONS; KEEP "NO ONE", "OTHER", AND "DON'T KNOW / I AM UNSURE" LAST]**

| ☐₁ | An administrative assistant | |
|---|---|---|
| ☐₂ | An accountant | |
| ☐₃ | A project manager | |
| ☐₄ | An account manager | |
| ☐₅ | An attorney | |
| ☐₆ | A debt collector | |
| ☐₇ | A paralegal | |
| ☐₈ | No one | [EXCLUSIVE] |
| ☐₉ | Other (please specify) | [SHORT TEXT BOX] |
| ☐₁₀ | Don't know / I am unsure | [EXCLUSIVE] |

I-11

**[Section III: Follow-Up Questions]**

**F1.**  Have you or have you not been contacted by a debt collection agency about a debt for personal or household expenses in the last 5 years?

*Mark one answer*

**[RANDOMIZE OPTIONS; KEEP "DON'T KNOW / I AM UNSURE" LAST]**

| | | |
|---|---|---|
| ○₁ | Yes, I have been contacted by a debt collection agency in the last 5 years. | |
| ○₂ | No, I have not been contacted by a debt collection agency in the last 5 years. | **[SKIP TO F3]** |
| ○₃ | Don't know / I am unsure | **[SKIP TO F3]** |

**F2.**  Have you or have you not been contacted by a debt collection agency about a debt for personal or household expenses that you did *not* owe in the last 5 years?

*Mark one answer*

**[RANDOMIZE OPTIONS; KEEP "DON'T KNOW / I AM UNSURE"  LAST]**

| | |
|---|---|
| ○₁ | Yes, I have been contacted by a debt collection agency for a debt that I did not owe in the last 5 years. |
| ○₂ | No, I have not been contacted by a debt collection agency for a debt that I did not owe in the last 5 years. |
| ○₃ | Don't know / I am unsure |

**F3.**  Are you or are you not aware of any lawsuits regarding debt collection agencies and the U.S. government?

*Mark one answer*

**[RANDOMIZE OPTIONS; KEEP "DON'T KNOW / I AM UNSURE"  LAST]**

| | | |
|---|---|---|
| ○₁ | Yes, I am aware of at least one lawsuit. | |
| ○₂ | No, I am not aware of any lawsuits. | **[SKIP TO END]** |
| ○₃ | Don't know / I am unsure | **[SKIP TO END]** |

**F4.**  In your own words, what is the lawsuit or what are the lawsuits regarding debt collection agencies and the U.S. government about?

*Either type in your response or click "Don't know / I am unsure"*

[                                                                    ]

**[PROVIDE RESPONSE BOX LIMITING TO 1000 CHARACTERS]**

I-12

**[REQUIRE AT LEAST 4 CHARACTERS; SHOW ERROR "Please be thorough in your response." IF ENTRY IS LESS THAN 4 CHARACTERS]**

| | | |
|---|---|---|
| O₂ | Don't know / I am unsure | **[EXCLUSIVE]** |

**[SHOW PANEL THANK YOU PAGE]**

**APPENDIX J**

**SCREENSHOTS  OF THE PROGRAMMED  SURVEY INSTRUMENT**



Please type the numbers in the empty box.

63 21462

6321462

Continue

© Powered by SSI

10%

J-1



Thanks for taking this survey! Your answers are important to us. We want to know your thoughts and opinions, so there are no correct or incorrect answers. Please provide your most accurate answer. If you don't know the answer to a particular question, please choose the "Don't know / I am unsure" option. Please do not try to guess. Please do not use the "back" button during this survey.

Your answers will be kept in strict confidence. This study will not be used to sell you anything. If you wear glasses or corrective lenses when using a desktop computer, laptop computer, or tablet, please wear them throughout the survey.

When you are ready, please select the "Next" arrow below to continue.

Next ›

© Powered by SSI



**How old are you?**
Mark one answer

65+

55-64

45-54

35-44

25-34

18-24

Under 18

Prefer not to answer

Next ›

© Powered by SSI

19%

J-3



**What is your gender?**

*Mark one answer*

Female

Male

Other

Prefer not to answer

Next ›

© Powered by SSI

J-4



**What state do you live in?**

Select one answer

Please select your answer

Next ❯

© Powered by SSI

J-5

28%

**Have you or anyone else in your household ever been employed by any of the following types of companies or organizations?**

Mark all types of companies or organizations that have ever employed you or anyone else in your household

A food service company

A technology company

A law firm, legal services organization, or court

A real estate agency

A retail store

A construction company

A debt or bill collection agency

A grocery store

An academic institution

A healthcare provider or medical office

A bank, credit card company, or other financial organization

A marketing, market research, or advertising agency

None of the above

Next ›

© Powered by SSI

J-6

33%

Have you or have you not used a credit or charge card to make any purchases for personal or household expenses in the last 5 years? Please only consider credit or charge card purchases for personal or household expenses when answering this question. Do not consider credit or charge card purchases for business expenses when answering this question.

Mark one answer

No, I have not used a credit or charge card for personal or household expenses in the last 5 years.

Yes, I have used a credit or charge card for personal or household expenses in the last 5 years.

Don't know / I am unsure

Next ⟩

© Powered by SSI

J-7

33%

Other than any outstanding balances on a credit or charge card, have you or have you not borrowed money for personal or household expenses in the last 5 years? Please only consider money borrowed for personal or household expenses when answering this question. Do not consider money borrowed for business expenses when answering this question.

Mark one answer

No, I have not borrowed money for personal or household expenses in the last 5 years.

Yes, I have borrowed money for personal or household expenses in the last 5 years.

Don't know / I am unsure

Next ❯

© Powered by SSI

J-8

40%

Please indicate which, if any, of the following types of people or organizations you have borrowed money from for personal or household expenses in the last 5 years. Please only consider money borrowed for personal or household expenses when answering this question. Do not consider money borrowed for business expenses when answering this question.

Mark all answers that apply

A family member

A bank

A retail store

A car dealership

A pawn shop

An online lender

A utilities company

A property owner

An academic institution

The federal government

A payday lender

A credit union

A friend

A company that offers a car title loan

Other (please specify) / ........

Don't know / I am unsure

Next ❯

J-9



To get to the next part of the survey, please write the word "Next" in the box below.

Please type in your response.

Next >

© Powered by SSI

J-10

46%

On the following screen, you will see an image of a letter. Please review this letter assuming that you have received the letter in the mail for a debt that you owe. You will be able to review the letter for as long as you like. As you're reading this letter, the word "NEXT" will appear at the bottom of the webpage. Please read the letter at your own pace before selecting the "NEXT" button. We will then ask you several questions about the letter.

We want to know your thoughts and opinions, so there are no correct or incorrect answers. Please provide your most accurate answer. If you don't know the answer to a particular question, please choose the "Don't know / I am unsure" option. Please do not try to guess.

☐ Please check the box and select the "NEXT" arrow if you understand these instructions and are willing to participate in this survey.

Next ⟩

© Powered by SSI

J-11



# WELTMAN, WEINBERG & REIS CO., LPA

ATTORNEYS AT LAW

323 W. Lakeside Ave. Ste. 200 Cleveland, OH 44113-1069
(216) 331-5747 | (877) 330-9156
Mon.–Thurs 8 am–9 pm, Fri 8 am–5 pm, & Sat 8 am–12 pm EST

January 16, 2018

RE: Current Creditor: Mariner Funding LLC
Original Creditor:
Account No. XXXXXXX762
WWR No.: 0289154
Balance Due as of January 16, 2018 : $1,402.92

Dear:

Please be advised that the above referenced account has been placed with us to collect the outstanding balance due and owing on this account to the current creditor referenced above. As of the date of this letter you owe the amount listed above. Therefore, it is important that you contact us at 1-877-330-9586 to discuss an appropriate resolution for this matter.

This communication is from a debt collector attempting to collect this debt for the current creditor and any information obtained will be used for that purpose. Unless you dispute the validity of this debt, or any portion thereof, within thirty (30) days after receipt of this letter, we will assume that the debt is valid. If you notify us in writing within the thirty (30) day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt or a copy of a judgment and a copy of such verification or judgment will be mailed to you. If you request in writing within the thirty (30) day period, we will provide you with the name and address of the original creditor if different from the current creditor.

Thank you for your attention to this matter.

Sincerely,

Weltman, Weinberg & Reis Co., L.P.A.

------- To receive proper credit on your account, please detach the bottom portion and return with your payment in the enclosed envelope* -------

323 W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1069

WWR No.: 0289154
Balance Due as of January 16, 2018 : $1,402.92

323 W. Lakeside Ave. Ste. 200
Cleveland, OH 44113-1069
ADDRESS SERVICE REQUESTED

WWR No.: 0289154
Balance Due as of January 16, 2018 : $1,402.92

January 16, 2018

# WELTMAN, WEINBERG & REIS CO., L.P.A.
P.O. Box 6597
Cleveland, OH 44101-1597

Next ›

J-12

60%

You will now be asked several questions about the letter you just saw. Please answer these questions assuming that you have received the letter in the mail for a debt that you owe.

While answering these questions, if at any time you wish to view the letter you just saw, you can do so by clicking on the thumbnail at the top of the screen.

Next  >

© Powered by SSI

J-13

*(To view the letter again, click on the thumbnail image below.)*



**In your own words, what do you think is the main message of this letter?**

Either type in your response or click 'Don't know / I am unsure'

Don't know / I am unsure

Next ›

© Powered by SSI

J-14



*(To view the letter again, click on the thumbnail image below.)*

**In your own words, what do you think is the main message of this letter?**

Either type in your response or click 'Don't know / I am unsure'

The main message

Don't know / I am unsure

**Why do you say that?**

Either type in your response or click 'Don't know / I am unsure'

Don't know / I am unsure

Next ›

© Powered by SSI

J-15



*(To view the letter again, click on the thumbnail image below.)*

**What type of company or organization do you think sent you this letter?**

Either type in your response or click 'Don't know / I am unsure'

Don't know / I am unsure

Next ❯

© Powered by SSI

J-16



*(To view the letter again, click on the thumbnail image below.)*

**What <u>type</u> of company or organization do you think sent you this letter?**

Either type in your response or click "Don't know / I am unsure"

Don't know / I am unsure

Next ›

© Powered by SSI

J-17



*(To view the letter again, click on the thumbnail image below.)*

**What type of company or organization do you think sent you this letter?**

Either type in your response or click 'Don't know / I am unsure'

Don't know / I am unsure

**Why do you say that?**

Either type in your response or click 'Don't know / I am unsure'

Don't know / I am unsure

Next ⟩

© Powered by SSI

J-18



*(To view the letter again, click on the thumbnail image below.)*

**Assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?**

Either type in your response or click "Don't know / I am unsure"

Don't know / I am unsure

Next ⟩

© Powered by SSI

J-19



*(To view the letter again, click on the thumbnail image below.)*

**Who else, if anyone, other than the person you just mentioned do you think reviewed your account before sending this letter?**

Either type in your response, click "No one else", or click "Don't know / I am unsure"

No one else

Don't know / I am unsure

Next >

© Powered by SSI

J-20

*(To view the letter again, click on the thumbnail image below.)*



Now, you're going to see a list of people that may have been employed by the company that sent you this letter. You may have already said this, but assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?

Mark all answers that apply

An accountant

A project manager

A debt collector

An administrative assistant

A paralegal

An attorney

An account manager

Other (please specify) ✎ .........

No one

Don't know / I am unsure

Next ›

© Powered by SSI

J-21

92%

Have you or have you not been contacted by a debt collection agency about a debt for personal or household expenses in the last 5 years?

Mark one answer

No, I have not been contacted by a debt collection agency in the last 5 years.

Yes, I have been contacted by a debt collection agency in the last 5 years.

Don't know / I am unsure

Next ›

© Powered by SSI

J-22

94%

Have you or have you not been contacted by a debt collection agency about a debt for personal or household expenses that you did not owe in the last 5 years?

Mark one answer

No, I have not been contacted by a debt collection agency for a debt that I did not owe in the last 5 years.

Yes, I have been contacted by a debt collection agency for a debt that I did not owe in the last 5 years.

Don't know / I am unsure

Next ❯

© Powered by SSI

J-23

96%

**Are you or are you not aware of any lawsuits regarding debt collection agencies and the U.S. government?**

Mark one answer

No, I am not aware of any lawsuits.

Yes, I am aware of at least one lawsuit.

Don't know / I am unsure

Next  ›

© Powered by SSI

J-24



**In your own words, what is the lawsuit or what are the lawsuits regarding debt collection agencies and the U.S. government about?**

Either type in your response or click "Don't know / I am unsure"

Don't know / I am unsure

Next 〉

© Powered by SSI

J-25



Sorry, only desktop computers, laptops, or tablets can be used for this survey. Please close this window and go to a desktop computer, laptop, or tablet to take the survey. Once at one of these devices, please click on the same link to take the survey.

Close

**APPENDIX K**

**EXAMPLE SSI PANEL RECRUITMENT MATERIALS**







**APPENDIX L**

**BLIND CODING INSTRUCTIONS**

**Blind Coding Instructions**

## I.  Overview

You are one of two people being asked to code the responses to an online survey. 666 respondents were asked multiple open-ended questions in this survey. As a coder, we are asking you to carefully review and categorize each open-ended response.

## II.  Guide to coding open-ended answers

You are being asked to categorize the responses to the four following open-ended survey questions:

- Q6: What type of company or organization do you think sent you this letter?

- Q7: Why do you say that?

- Q8: Assuming that you have received this letter in the mail for a debt that you owe, who, if anyone, do you think reviewed your account before sending this letter?

- Q9: Who else, if anyone other than the person you just mentioned, do you think reviewed your account before sending this letter?

An Excel spreadsheet containing the responses to each of these open-ended questions and the categories will be provided to you. In this Excel spreadsheet, responses will be separated into separate tabs by question number. We are asking you to determine whether an open-ended response meets the criteria of a particular category based on the category definitions below.

### A.  Open-ended response categorization

Each coder will review the open-ended responses to Q6, Q7, Q8, and Q9 independently of each other and determine whether an open-ended response meets the criteria of each category outlined below. Please base your coding solely on the information provided (the instructions, the questions, and the answers) and do not rely on any outside resources.

Please note that *accountant, accounting_firm, original_lender, lawyer*, *law_firm*, *collector, collection_agency, paralegal,* and *other* are <u>not</u> mutually exclusive (i.e., one response can be coded to pertain to multiple categories). However *no_one* and *non_response* are mutually exclusive from all other categories (i.e., one response cannot be coded as *no_one* in addition to another category, and one response cannot be coded as *non_response* in addition to another category). Additionally, *accountant* and *accounting_firm, lawyer, paralegal* and *law_firm*, and *collector* and *collection_agency,* should be mutually exclusive unless a respondent specifically answered with both terms.

- ***accountant:*** Please enter a "1" in the *accountant* category if the corresponding respondent answered an accountant or accountants. Please enter a "0" in the *accountant* category if the corresponding responded did NOT answer an accountant or accountants.

- ***accounting_firm:*** Please enter a "1" in the *accounting_firm* category if the corresponding respondent answered accounting firm. Please enter a "0" in the *accounting_firm* category if the corresponding respondent did NOT answer accounting firm.

L-1

- **original_lender:** Please enter a "1" in the *original_lender* category if the corresponding respondent answered a lending agency, creditor, or organization to whom money is owed. Please enter a "0" in the *original_lender* category if the corresponding respondent did NOT answer a lending agency, creditor, or organization to whom money is owed.

- **lawyer:** Please enter a "1" in the *lawyer* category if the corresponding respondent answered a lawyer or attorney or lawyers or attorneys. Please enter a "0" in the *lawyer* category if the corresponding respondent did NOT did not answer a lawyer or attorney or lawyers or attorneys.

- **law_firm:** Please enter a "1" in the *law_firm* category if the corresponding respondent answered a law firm, law office, or legal services organization. Please enter a "0" in the *law_firm* category if the corresponding respondent did NOT answer a law firm, law office, or legal services organization.

- **collector:** Please enter a "1" in the collector category if the corresponding respondent answered a debt or bill collector or debt or bill collectors. Please enter a "0" in the *collector* category if the corresponding respondent answered a debt or bill collector or debt or bill collectors.

- **collection_agency:** Please enter a "1" in the *collection_agency* category if the corresponding respondent answered a debt or bill collection agency, or collection service. Please enter a "0" in the *collection_agency* category if the corresponding respondent did NOT answer a debt or bill collection agency, collection service, or debt collector

- **paralegal:** Please enter a "1" in the *paralegal* category if the corresponding respondent answered a paralegal or legal aid or paralegals or legal aides. Please enter a "0" in the *paralegal* category if the corresponding respondent did NOT answer a paralegal or legal aid or paralegals or legal aids.

- **named_company_only:** Please enter a "1" in the *named_company_only* category if the corresponding respondent answered with the name of a specific company and did NOT describe the type of company. Please enter a "0" in the *named_company_only* category if the corresponding respondent did NOT answer with the name of a specific company OR they answered with the name of a specific company but also described the type of company.

- **no_one:** Please enter a "1" in the *no_one* category if the corresponding respondent answered "no one" or the sentiment of "not anyone". Please enter a "0" in the *no_one* category if the corresponding respondent did NOT answer "no one" or the sentiment of "not anyone."

- **other:** Please enter a "1" in the *other* category if the corresponding respondent answered an organization or person other than those listed in the above categories. Please enter a "0" in the *other* category if the corresponding respondent did NOT answer an organization or person other than those listed in the above categories.

- **non_response** Please enter a "1" in the *non_response* category if the corresponding respondent answered something other than a person or organization and did not answer "no one" nor the sentiment of "no one." Please enter a "0" in the *non_response* category if the corresponding

respondent answered a type of person or organization or answered "no one" or the sentiment of "not anyone."

If other phrases or synonyms are used in respondents' open-ended responses, please use your best judgment to categorize these responses based on the category definitions above. Please note that responses may include misspellings and/or grammatical errors.

### B.  Discussion of coding and tiebreaking

After both coders have coded all of the responses, you will meet to discuss and resolve ("tiebreak") any disagreements in the coding.

In the case that you disagree, you and the other coder will jointly decide on how this response should be coded. You will jointly recode the response in question.