**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | Case No. 1:17 CV 817 |
| Plaintiff, | Judge Donald C. Nugent |
| v. | Magistrate Judge William H. Baughman, Jr. |
| WELTMAN, WEINBERG & REIS CO., L.P.A., | |
| Defendant. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE DR. RONALD GOODSTEIN**

**INTRODUCTION**

Dr. Ronald Goodstein conducted a consumer survey to test consumer's perceptions of WWR's initial demand letter. Dr. Goodstein's survey tested whether and to what extent survey respondents thought that an attorney was involved in sending WWR's initial demand letter. Dr. Goodstein concluded that there is strong empirical evidence that consumers believed an attorney reviewed their account, and that a lawyer or law firm sent them the letter. These opinions are squarely relevant to the issues in this case and will assist the trier of fact in determining whether Defendant Weltman, Weinberg & Reis Co., L.P.A.'s (WWR) letters are misleading.

WWR does not want this Court or the advisory jury to hear Dr. Goodstein's opinions or to hear how Dr. Goodstein designed and conducted the consumer survey and to decide whether to credit his opinions. WWR did not depose Dr. Goodstein and does not argue that Dr. Goodstein is not qualified, but it nevertheless attempts to second-guess Dr. Goodstein's survey and his opinions. Had it deposed Dr. Goodstein, WWR would have learned that Dr. Goodstein conducted a consumer survey that he designed according to scientific principles in his field. At

1

each step of designing and conducting the survey, Dr. Goodstein followed protocol that are well-established and rigorously tested in his field. He conducted preliminary research on the subject, applied principles of survey analysis to determine the relevant population, designed questions according to prevailing protocol in the field, pretested the survey, and then thoroughly validated his results. Dr. Goodstein reliably applied these principles and methods to the facts of the case. Anchoring his survey with WWR's actual demand letter template at the heart of this action, Dr. Goodstein was able to situate his study within the reality of the case.

Dr. Goodstein's testimony is reliable, relevant, and admissible.

## FACTUAL BACKGROUND

Dr. Ronald Goodstein, an Associate Professor of Marketing at Georgetown University's McDonough School of Business, conducted a consumer survey to test consumer's perceptions of WWR's initial demand letter. Expert Report of Ronald C. Goodstein, Ph.D., ECF No. 44, Ex. 24, Ex. A (Goodstein Rep.) at ¶ 9. Dr. Goodstein's survey, which he designed and conducted in accordance with accepted scientific standards of consumer survey methodology, tested whether and to what extent respondents thought that an attorney was involved in sending WWR's initial demand letter. *Id*. Dr. Goodstein opined in his expert report that there is strong empirical evidence that consumers believed an attorney reviewed their account, and that a lawyer or law firm sent them the letter. *Id.* ¶ 68. Compared with survey respondents who viewed WWR's letter with law-identifying words such as "Attorneys at Law" and "LPA" removed, respondents who viewed WWR's original initial demand letter were 2.5 to 4.0 times more likely to believe that an attorney reviewed their account, and 5.7 to 29.0 times more likely to think a lawyer or law firm sent them the letter. *Id.* ¶¶ 50, Table 4.

I.     **Dr. Ronald Goodstein's Qualifications.**

2

Dr. Goodstein is an Associate Professor of Marketing at Georgetown University's McDonough School of Business with over 30 years of experience in the field of marketing. Curriculum Vitae of Ronald C. Goodstein, Ph.D., App'x A to Goodstein Rep. (Goodstein CV). He teaches various courses on marketing (Goodstein Decl., ECF No. 44, Ex. 24 ¶ 2), and is widely published in the field. Along with the over 40 articles, conference presentations, and case studies he has published, Dr. Goodstein also serves on the editorial board for two leading peer-reviewed journals in his field, and serves as a reviewer for several more. Goodstein CV. In addition to his academic service, Dr. Goodstein provides consulting services to corporate clients such as Verizon, Microsoft, IBM, and Johnson & Johnson, and non-profits including Headstart. Goodstein CV. Dr. Goodstein will testify that one of his specialties within his field is measuring consumer reactions in the marketplace. He will also testify that, as part of his teaching, academic service, and corporate and non-profit consulting, Dr. Goodstein frequently designs, conducts, and critiques consumer surveys.

## II. Dr. Goodstein's Survey Design Methodology

Dr. Goodstein designed and conducted a written survey of 634 participants to test their impressions of WWR's demand letter. In doing so, he followed "generally accepted principles for the design of surveys in litigation as described in key treatises on the topic." Goodstein Rep. ¶ 16. Among the steps Dr. Goodstein took in designing and conducting the consumer survey were: a) conducting initial research of the subject matter (i.e., consumer responses to the topic of debt collection and vocabulary used); b) defining of the relevant population; c) determining the nature of the test stimuli shown to sampled consumers; d) designing survey questions informed by the prior research; and e) validating and testing the robustness of the survey results. *Id.*

### A. Initial Research: In-Depth Interviews

Pursuant to well-established protocol in his field, Dr. Goodstein conducted in-depth interviews with consumers as part of his preliminary research of the subject matter to learn "the typical vocabulary consumers use when faced with a collections letter," and determine "a survey format that would be understood and elicit accurate responses." Goodstein Rep. ¶¶ 18-19. The "insight and vocabulary gained from the exploratory discussion informed the development and design of the survey." *Id.* ¶ 24.

### B. Defining the Relevant Population

To ensure an appropriate target population took the survey, Dr. Goodstein applied certain screening criteria. In order to determine this criteria, Dr. Goodstein relied on protocol established by consumer research methodology, and was instructed by counsel on the definition of "consumer" and "debt" under the FDCPA and the CFPA.[1] Goodstein Rep. ¶ 25. He therefore restricted the survey to individuals who either had debt or allegedly had debt by including participants who had used a credit card or taken out a personal loan. *Id.* ¶ 27. Dr. Goodstein can testify at trial that, once these criteria are put into place, the survey becomes available to millions of potential survey respondents.

### C. Survey Stimuli: Deciding What to Test

Survey methodology protocol established in Dr. Goodstein's field require that survey stimuli be identical except for the elements that are being studied. Goodstein Rep. ¶ 37. Dr.

---

[1] The FDCPA defines a consumer as "any natural person obligated or allegedly obligated to pay any debt" and defines debt as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(3)); 15 U.S.C. § 1692a(5). The CFPA defines "consumer" as an "individual or an agent, trustee, or representative acting on behalf of an individual." 12 U.S.C. § 5481(4).

Goodstein created three letters, labeled Letters A, B, and C in his expert report, to test consumer responses to letters with and without certain law identifying material.

For Letter A, Dr. Goodstein made superficial changes to WWR's demand letter template to ensure it would look like a letter that a consumer would realistically get in the mail. As a result, and as WWR concedes, ECF No. 62, Mot. at 5, Letter A closely tracks the letter that WWR sends to consumers. *See* Ex. 1, Letter A. Dr. Goodstein then constructed control letters, labeled Letters B and C in his report, by making small alterations to Letter A to isolate and test the impact particular legal references had on survey respondents. For Letter B, Dr. Goodstein removed "Attorneys at Law," and "L.P.A.," and replaced them with "Collection Services," and "LTD" respectively. Goodstein Rep. ¶ 36; Ex. 2, Letter B. Letter C retains the changes to Letter B and in addition replaces "Weltman, Weinberg & Reis Co." with "WW&R, Co." *See* Ex. 3, Letter C. In his exploratory interviews with consumers, Dr. Goodstein found that respondents reported that three consecutive last names sounded like a law firm, and that therefore it was necessary to measure the impact on consumer perceptions, if any, of three names. Goodstein Rep. ¶ 35 n.38.

### D.  Designing Survey Questions and Conducting the Online Survey

Dr. Goodstein followed standard protocol for the design of each survey question. His questions "moved from broad to narrow in scope," were "non-leading," and did not force participants to guess. Goodstein Rep. ¶ 43. He also asked several follow-up questions after the survey, including whether the participant had ever been contacted by a debt collector. *Id.* at App'x I, I-12. After designing each survey question, Dr. Goodstein then conducted a pretest of the survey, which is a standard element of most consumer surveys. His pretest ensures that the "respondents understand the wording of the questions" and cannot "intuit the purpose of the

5

survey." *Id.* ¶ 43. During the pretest, Dr. Goodstein made slight changes to the survey questions in order to guarantee that each question was understood consistently by respondents. *Id.* ¶ 43, n.49. Then Dr. Goodstein fielded the online survey. Survey respondents accessed the survey by clicking on a survey link and filled out the survey online on a computer or tablet. The survey participant group was evenly divided into three groups, and each participant saw only one letter. *Id.* ¶ 38.

### E. Dr. Goodstein Conducted Quality Control and Validated the Survey Results

Finally, after Dr. Goodstein conducted the survey, he performed a variety of quality control measures to confirm the robustness of his results. Goodstein Rep. ¶ 65. Dr. Goodstein found that his results were statistically significant at the 99.9% confidence interval, meaning the chance of the different responses between groups receiving Letters A, B, and C being due to chance is less than 1 and 1000. *Id.* ¶¶ 50, 53, 54, 57, 61, 62, 63. Dr. Goodstein also confirmed that the results of the survey do not change whether he included or excluded participants who responded that they had been contacted by a debt collector. *Id.* ¶ 65, n.75.

### III. Survey Results

Dr. Goodstein's expert opinion is to a reasonable degree of scientific certainty that there is strong empirical evidence that consumers receiving Letter A believed an attorney reviewed their account, and that a lawyer or law firm sent them the letter. Goodstein Rep. ¶ 68. Compared with respondents who viewed WWR's letter with law-identifying words such as "Attorneys at Law" and "LPA" removed (Letters B and C), respondents who viewed WWR's original initial demand letter (Letter A) were 2.5 to 4 times more likely to believe that an attorney reviewed their account, and 5.7 to 29 times more likely to think a lawyer or law firm sent them the letter. *Id.* ¶ 50, Table 4. Dr. Goodstein's study was performed to the standards that he would use in his

own academic work and produced data that is statistically significant at the 99.9% confidence interval. *Id.* ¶¶ 50, 53, 54, 57, 61, 62, 63.

## LEGAL STANDARD

Under Rule 702, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if four conditions are met. Fed. R. Evid. 702. First, the expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. *Id*. Second, the testimony must be based on sufficient facts or data. *Id*. Third, the testimony must be the product of reliable principles and methods. *Id*. And, finally, the expert must have reliably applied the principles and methods to the facts of the case. *Id.*; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993) (The Court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

Regarding expert testimony, district courts serve as gatekeepers, recognizing that the Federal Rules of Evidence "strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017) (citation omitted), *cert. denied*, 137 S. Ct. 2231 (2017). The "rejection of expert testimony is the exception, rather than the rule." *Id.* at 442.

## ARGUMENT

I. **Dr. Goodstein's Expert Testimony Meets the Requirements of Rule 702 and Should be Admitted.**

   A. **Dr. Goodstein is Well-Qualified to Provide an Expert Opinion on Consumer Reactions to WWR's Demand Letter.**

Based on his knowledge, skill, experience, training, and education, Dr. Goodstein is more than qualified to design and conduct a consumer survey and to testify about consumer

7

perceptions of WWR's demand letters based on that survey. *See* Fed. R. Evid. 702. He is well-published in peer-reviewed journals in the field of marketing and consumer behavior and regularly teaches and advises on these topics. *See, e.g., Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 721 (E.D. Mich. 2015) (expert testimony of "well-credentialed" marketing professor will aid the trier of fact). He has a breadth of experience in the field; along with his academic work he also consults on marketing issues, including consumer behavior, to major corporations. He can also testify that he has conducted or critiqued over 100 consumer surveys in his career. Based on these qualifications, Dr. Goodstein is eminently qualified to testify concerning consumer impressions of WWR's demand letters.

In fact, WWR makes no real challenge to Dr. Goodstein's qualifications. WWR complains a few times that Dr. Goodstein is not a debt collection expert, ECF No. 62, Mot. at 1, 5, but the Bureau is not offering Dr. Goodstein as a debt collection expert. WWR cites no case holding that a consumer survey expert must also be an expert in the industry that is the underlying subject matter of the survey.

### B. Dr. Goodstein's Specialized Knowledge Will Assist the Trier of Fact in Determining Whether WWR's Letters are Misleading.

In addition to being qualified as an expert by his knowledge, skill, experience, training, and education, Dr. Goodstein's consumer survey will help the trier of fact understand whether WWR's demand letters are likely to mislead consumers into believing that an attorney was meaningfully involved with their account. Fed. R. Evid. 702(a).

In this case, the Bureau continues to maintain that this Court should hold as a matter of law that WWR's form demand letters convey to consumers that they are from an attorney under

the FDCPA.[2] However, this Court declined to hold that WWR's demand letters were misleading as a matter of law and instead held that whether WWR's letters "are misleading is a question of fact that must be determined by a jury." MSJ Order, ECF No. 61 at 7.

Courts, including in the Sixth Circuit, regularly credit consumer surveys demonstrating the effect that a communication has on a consumer as evidence that goes to whether a communication is misleading. *ECM BioFilms, Inc. v. F.T.C.*, 851 F.3d 599, 611 (6th Cir. 2017) (survey testing consumer's impressions is valid extrinsic evidence and was substantial evidence in support of the Federal Trade Commission's deception finding); *Rocky Brands, Inc. v. Red Wing Shoe Co.*, No. 2:06-CV-00275, 2009 WL 5125475, at *8 (S.D. Ohio Dec. 28, 2009). The questions Dr. Goodstein addressed in his survey – whether consumers who received a letter modelled after WWR's demand letter believed an attorney had reviewed their account and that a lawyer had sent them the letter – go directly to whether the demand letters are misleading. Dr. Goodstein's consumer survey will provide the advisory jury valuable evidence about an issue that this Court has indicated it will find helpful in resolving this matter – whether WWR's demand letters are deceptive because they imply meaningful attorney involvement.

### 1. Dr. Goodstein's testimony is relevant.

WWR first attacks Dr. Goodstein's opinions as irrelevant, arguing that whether consumers receiving WWR's letters perceive that a lawyer reviewed the consumer's account

---

[2] A "letter sent on law firm letterhead, *standing alone*, does represent a level of attorney involvement to the debtor receiving the letter." *Greco v. Trauner, Cohen & Thomas, L.L.P.*, 412 F.3d 360, 364 (2d Cir. 2005). Accordingly, courts considering similar collection letters have consistently held that the letters convey to consumers that an attorney was meaningfully involved in collecting the debt. *See, e.g., Lesher v. Law Offices of Mitchell N. Kay, P.C.*, 650 F.3d 993, 1003 (3d Cir. 2011) (holding that collection letters on law firm letterhead or that included the phrase "law offices" and instructing consumer to make payments to the firm conveyed the impression "that an attorney, acting as an attorney" was involved in collecting the debt); *Nielsen v. Dickerson*, 307 F.3d 623, 635-36 (7th Cir. 2002); *Avila v. Rubin*, 84 F.3d 222, 229 (7th Cir. 1996).

"fails to address any issues before the trier of fact." ECF No. 62, p. 11. But for years, courts have focused on precisely this question as the relevant inquiry in these types of "meaningful attorney involvement" cases under the FDCPA. For example, the Third Circuit held that collection letters on law firm letterhead or that included the phrase "law offices" and instructed the consumer to make payments to the firm conveyed the impression "that an attorney, acting as an attorney" was involved in collecting the debt. *Lesher*, 650 F.3d at 1003. In affirming summary judgment for the plaintiff, the court reasoned that consumers receiving these letters "may reasonably believe that an attorney has reviewed his file and has determined that he is a candidate for legal action." *Id*.[3]

Dr. Goodstein's survey confirms the wisdom of these cases and is squarely relevant to this inquiry.

Ignoring decades of case law, WWR makes up a new "relevant question" for the jury to decide: whether individuals who hear a description of WWR's internal collection processes "would have said that the process was more or less than what they expected to have occurred after looking at [WWR's] letter." ECF. No. 62, pp. 11-12. WWR cites no authority for the proposition that this is the "relevant question." That is because none of the ample case law applying the meaningful attorney involvement rule suggests such an inquiry is relevant, let alone dispositive. Dr. Goodstein's opinion properly and helpfully provides evidence regarding consumer's perceptions of WWR's letters. It is squarely relevant and should be admitted.

### 2. Dr. Goodstein's testimony will not invade the province of the jury.

In the same breath, WWR reverses course and argues that maybe Dr. Goodstein's

---

[3] This is consistent with numerous courts across the country that have held that a letter from an attorney or a law firm implies an attorney "has reached a considered, professional judgment that the debtor is delinquent and is a candidate for legal action." *Nielsen*, 307 F.3d at 635; *see also Avila*, 84 F.3d at 229; *Clomon v. Jackson*, 988 F.2d 1314, 1320 (2d Cir. 1993); *Cordes v. Frederick J. Hanna & Assocs., P.C.*, 789 F. Supp. 2d 1173, 1177-78 (D. Minn. 2011).

opinions are *too* relevant, claiming Dr. Goodstein's opinion might "answer the very question the jury is asked to consider." ECF No. 62, p. 12. But the two cases WWR cites for this point are wholly distinguishable. In both *Honeywell* and *Filing*, the court excluded the expert testimony because the expert was improperly advising the jury on the law. *Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 1010 (D. Minn. 2014) (rejecting purported expert testimony where the expert would testify on "the alleged legal impropriety or irrelevance of" testimony); *Filing v. Phipps*, No. 5:07CV1712, 2009 WL 10688906, at *3 (N.D. Ohio Oct. 21, 2009) (excluding expert report where the opinion "would essentially be telling the judge and the jury what the law is, what the facts are, and how to apply the law to the facts"). Here, Dr. Goodstein will not opine on the law. He will not tell the jury how to apply the facts to the law. His survey and opinions instead test consumer's impressions upon seeing WWR's letters, which is relevant and helpful evidence that will go to whether those letters are misleading.

### 3. Dr. Goodstein's testimony will not confuse the jury.

WWR's insinuation that Dr. Goodstein's findings will confuse the jury has no basis. ECF No. 62, p. 13. WWR will have full opportunity to fully explore any weaknesses it sees in Dr. Goodstein's methodologies at trial. *See United States v. Smithers*, 212 F.3d 306, 316 (6th Cir. 2000). Expert testimony would not unduly sway the jury where "cross-examination and jury instructions can be used to question the qualifications of the proffered expert, undermine the basis of the expert's theories, explain the limits of social science's validation studies and pick apart research methods," and the jury has the analytical and decision-making abilities to weigh that evidence. *Id.*

### C. Dr. Goodstein's testimony is based on sufficient facts or data under Rule 702.

It is unclear whether WWR actually challenges whether Dr. Goodstein's testimony is supported by sufficient facts or data. WWR's scattershot motion challenges Dr. Goodstein's

11

opinion on a number of bases, but WWR does not actually argue that Dr. Goodstein's testimony is not based on sufficient facts or data. WWR spends several pages trying to pick apart the responses of five survey respondents (out of 200) and attempts to use those responses for its own argument. ECF No. 62, pp. 7-9, 12-13. Specifically, WWR argues that the responses of those five respondents suggest they believed the letter was reviewed by a lawyer for a lender, not a WWR attorney. *Id.* at 12-13. But neither WWR nor its counsel have the technical expertise to explain how these five responses impact the overall survey findings. Dr. Goodstein does have that technical expertise and he can place these five responses in the overall context based on his training and accepted survey methodology. WWR's cherry-picking exercise is not a reliable nor valid analysis, and it obscures the strong overall finding that respondents who received Letter A most frequently associated "lawyers" as being from a law firm or legal organization.

At trial, Dr. Goodstein could explain that, notwithstanding WWR's attempt to conduct a lay analysis of these five responses, the numbers overwhelmingly tell a different story. Specifically, a significantly larger number of people – 46 respondents who viewed Letter A – responded that exclusively a legal entity sent the letter (this number increases to 52 for respondents who listed a legal entity and another entity) and a lawyer reviewed their account. The numbers simply do not bear out WWR's theory.

Relatedly, WWR complains that Dr. Goodstein did not ask survey respondents whether a *WWR* attorney (as opposed to an attorney from another entity) had reviewed their account before sending a collection letter. ECF No. 62, pp. 9-12. As an initial matter, WWR has not cited any authority suggesting this distinction actually matters. WWR cannot, consistent with FDCPA, "mislead the debtor regarding meaningful 'attorney' involvement in the debt collection process." *See*, *e.g.*, *Greco,* 412 F.3d at 364. But WWR cites no authority suggesting it is relevant whether

the consumer receiving a collection letter must have an opinion about who employs the attorney. At any rate, asking this type of question would violate one of the protocols of survey methodology, which is that survey questions cannot lead the respondent to the answer. Open-ended questions give the respondent fewer hints about expected answers and gauge what comes first to a respondent's mind. Shari Seidman Diamond, Reference Manual on Scientific Evidence 392-394 (3d Ed.). Accordingly, Dr. Goodstein's study should be accorded more probative weight because he elicited respondent impressions through open-ended questions.

### D. Dr. Goodstein's testimony is the product of reliable principles and methods that he reliably applied to the facts of the case.

WWR has not proffered any rebuttal expert to challenge the principles and methods Dr. Goodstein applied, and it is unclear whether WWR disputes this prong of Rule 702. WWR complains that survey participants could not ask clarifying questions in the survey, and did not know what the phrase "reviewed your account" meant. ECF No. 62, pp. 6-7, 13. WWR concludes, without citing to any survey expert, that this means Dr. Goodstein's opinions are not relevant. *Id*. at 11. To the extent this is actually an objection to the relevance of Dr. Goodstein's opinions, these opinions are squarely relevant for the reasons explained in Section I(B) above.

WWR's real complaint, however, appears to be an attack on how Dr. Goodstein designed the survey. That attack must fail. Dr. Goodstein conducted preliminary research to understand vocabulary used by consumers when discussing debt collection letters. Dr. Goodstein conducted this preliminary research to ensure that the survey used language that is commonly understood by the relevant population. Once the survey was designed, he then pretested each of the survey questions to ensure that the target population understands each survey question. As part of a pretest, interviewers observe respondents for any difficulties they may have with the questions and probe for the source of any such difficulties so that the questions can be rephrased if

13

confusion or other difficulties arise. Diamond, pp. 388-389. Following this standard, Dr. Goodstein carefully pretested the survey in the field and, based on his training and expertise, concluded that the respondents understood the terms used in final survey questions. So while WWR thinks the phrase "reviewed your account" is ambiguous, Dr. Goodstein designed the survey to ensure that the survey respondents understood the questions.[4]

## II. Any Purported Defects in Dr. Goodstein's Survey go to Weight, not Admissibility.

It is well-established that any purported defects WWR sees in Dr. Goodstein's survey methodology go to weight, not exclusion. *See, e.g.*, *Innovation Ventures, LLC*, 90 F. Supp. 3d at 720–21 ("[E]rrors in survey methodology are more properly directed against the weight a jury should give the survey, rather than overall admissibility.") (citations omitted); *Rocky Brands, Inc. v. Red Wing Shoe Co.*, No. 2:06-CV-00275, 2009 WL 5125475, at *3 (S.D. Ohio Dec. 28, 2009) ("Because almost all surveys are subject to some sort of criticism, courts generally hold that flaws in survey methodology go to the evidentiary weight of the survey rather than its admissibility.") (internal quotations and citations omitted); *Whirlpool Props., Inc. v. LG Elecs. USA, Inc.*, No. 1:03 CV 414, 2006 WL 62846, at *2 (W.D. Mich. Jan. 10, 2006) ("the majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence").

Outright exclusion of a consumer survey expert is typically only warranted where "the person who designed the survey does not qualify as an expert" or "[i]f the survey was so informally designed and conducted that it fails key tests of professionalism and reliability." *Deere & Co. v. FIMCO Inc.*, 239 F. Supp. 3d 964, 977 (W.D. Ky. 2017) (citations omitted). No

---

[4] WWR also appears to challenge the criteria Dr. Goodstein used to screen out certain potential survey participants. ECF No. 62, pp. 5-6. WWR does not actually argue that these criteria were improper or render the survey results invalid. Regardless, WWR will have an opportunity to explore these issues with Dr. Goodstein at trial.

such problems exist here. The jury should hear Dr. Goodstein's opinions, hear how he conducted the survey and hear his explanations for why he made certain choices that WWR now challenges. The jury and this court can then determine whether to credit these opinions. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (When testimony is sufficiently relevant and reliable, "[t]he fact-finder is entitled to hear [the expert's] testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility."). Defendant may not agree with the choices Dr. Goodstein made or the conclusions he came to, but it will have ample opportunity to explore these issues in cross examination, by presenting contrary evidence, and through jury instructions. *Neal v. Second Sole of Youngstown, Inc.*, No. 1:17-CV-1625, 2018 WL 1740140, at *3 (N.D. Ohio Apr. 11, 2018) (quoting *Daubert*).

### III. Dr. Goodstein's Testimony Presents no Hearsay Problem.

Finally, WWR passingly suggests, without any support or further articulation, that Dr. Goodstein's expert testimony presents hearsay problems. ECF No. 62, p. 1. On the contrary, as this court has recognized, "[t]he facts and data upon which the expert's opinion is based need not necessarily be admissible on their own." *Galoski v. Stanley Black & Decker, Inc.*, No. 1:14 CV 553, 2017 WL 2291431, at *1-2 (N.D. Ohio May 25, 2017) (J. Nugent) (quoting Fed. R. Evid. 703). Moreover, a consumer survey is admissible and will survive a hearsay challenge when introduced by an outside expert. *Deere & Co.,* 239 F. Supp. 3d at 977 ("as numerous courts and commentators have made clear, since at least 1951 the cases are now unanimous that evidence of the state of mind of persons surveyed is not inadmissible as hearsay.") (internal citations omitted).

### CONCLUSION

For the reasons stated above, the WWR's Motion in Limine to Exclude Dr. Ronald Goodstein should be denied.

Dated: April 27, 2018

                Respectfully submitted,

                Attorneys for Plaintiff
                Consumer Financial Protection Bureau

                KRISTEN A. DONOGHUE
                Enforcement Director

                DEBORAH MORRIS
                Deputy Enforcement Director

                MICHAEL G. SALEMI
                Assistant Litigation Deputy

                /s/ *Rebeccah G. Watson*
                Rebeccah G. Watson
                1700 G Street NW
                Washington, DC 20552
                Phone: (202) 435-7895
                Facsimile: (202) 435-9346
                Email: rebeccah.watson@cfpb.gov
                Sarah Preis
                Phone: (202) 435-9318
                Facsimile: (202) 435-9346
                Email: sarah.preis@cfpb.gov
                Jehan A. Patterson
                Phone: (202) 435-7264
                Facsimile: (202) 435-9346
                Email: jehan.patterson@cfpb.gov
                Zol D. Rainey
                Phone: (202) 435-9483
                Facsimile: (202) 435-9346
                Email: zol.rainey@cfpb.gov

                *Enforcement Counsel*

**Certificate of Service**

  I hereby certify that on April 27, 2018, a copy of the foregoing Plaintiff's Opposition to Defendant's Motion in Limine to Exclude Dr. Ronald Goodstein was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

            /s/ Rebeccah G. Watson
            Rebeccah G. Watson
            Phone: (202) 435-7895
            Facsimile: (202) 435-9346
            Email: rebeccah.watson@cfpb.gov