IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,**<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>**WELTMAN, WEINBERG & REIS CO., L.P.A.,**<br><br>　　　　Defendant. | Civil Action No. 1:17-cv-00817-dcn<br><br>Judge Donald C. Nugent<br><br>Magistrate Judge William H. Baughman, Jr. |

**DEFENDANT WELTMAN, WEINBERG & REIS CO., L.P.A.'S MOTION FOR ATTORNEY'S FEES AND INCORPORATED MEMORANDUM IN SUPPORT**

　　On January 23, 2018, the Wall Street Journal published an opinion piece written by Mick Mulvaney, the Consumer Financial Protection Bureau's acting director, criticizing the Bureau's philosophy of "pushing the envelope" in enforcement efforts.  (Exhibit B.)  Mr. Mulvaney wondered aloud, when the Bureau loses a case because it "pushed too hard," "where do those we charged go to get their time, their money and their good names back?" (*Id.*)  Moving forward, he assured that the Bureau would focus on cases with "quantifiable and unavoidable harm to the consumer" and engage in more formal rulemaking—rather than regulating by enforcement—because "the people we regulate should have the right to know what the rules are before being charged with breaking them." (*Id.*)  Mr. Mulvaney announced a new mission for the Bureau—a mission that would no longer tolerate the agency's aggressive and excessive use of its "almost unparalleled power." (*Id.*)

NAI-1504316735v1

From its start, this case has been an abuse of the Bureau's power. For more than two years before it filed the Complaint, the Bureau investigated Defendant Weltman, Weinberg & Reis Co. L.P.A.'s debt collection practices, and Weltman, at great expense, cooperated. Through that investigation, the Bureau found that Weltman has an extensive and rigorously enforced compliance program designed and implemented—successfully—by the firm's attorneys. What the Bureau did not find was any instance in which any consumer was harmed, any consumer was misled, or any consumer was confused by any of Weltman's collection practices.

The Bureau moved forward in any event, filing the Complaint on April 17, 2017, after Weltman refused to enter into a consent decree at the close of the investigation. The Complaint alleged that Weltman misrepresented the level of attorney involvement in demand letters and calls to consumers in violation of the Fair Debt Collection Practices Act ("FDCPA") and the Consumer Financial Protection Act of 2010 ("CFPA"). The Complaint's theory—that lawyers are required to review account-level documentation for each individual account before a law firm communicates with consumers—is nowhere expressed in the FDCPA or the CFPA or in any rule issued by the Bureau. When the Bureau's former director was asked specifically about that theory, his testimony reflected the Bureau's utter indifference to the merits of the suit: "the Bureau's theories . . . may be right or they may be wrong, but that's the case that was brought." (Deposition of Richard Cordray ("Cordray Dep.") at 130:14-16.)[1]

Following a year of litigation, the Bureau's last-minute dismissal of half its claims and request for millions in disgorgement on the eve of trial, and a four-day trial, the Court ruled in Weltman's favor on all remaining counts. (ECF No. 87.) Though Weltman prevailed at trial, the Bureau's blind pursuit of its groundless case cost Weltman dearly, both in terms of the

---

[1] Excerpts from the deposition of Richard Cordray are attached as Exhibit C.

substantial expense Weltman incurred in its defense and the reputational harm that cost the firm valued clients and employees.  For the reasons below, Weltman, as the prevailing party, respectfully requests an award of its reasonable attorney's fees of $1,207,481.25 under 28 U.S.C. § 2412(b), as outlined in the Declaration of James R. Wooley ("Wooley Decl.," attached as Exhibit A), because the Bureau brought and prosecuted this case in bad faith.

I.  BACKGROUND

    A.  **The Bureau's Investigation and Complaint**

Before filing the Complaint, the Bureau conducted an extensive investigation of Weltman's practices.  (Tr. 251:20-256:2.)[2]  That investigation began four years ago, in August 2014.  (*Id.*)  The Bureau's investigation entailed four comprehensive Civil Investigative Demands, and Weltman cooperated completely, providing the Bureau with hundreds of thousands of pages of documents, over a million call recordings, and the sworn testimony of two Weltman shareholders.  (*Id.*)  Weltman incurred expenses in excess of $500,000, which does not include the costs associated with the hundreds of hours its employees devoted to complying with the Bureau's requests.  (Declaration of Scott S. Weltman ("Weltman Decl.," attached as Exhibit D) at ¶ 7.)  Notwithstanding the broad net it cast, the sole focus of the Bureau's investigation became Weltman's practice of truthfully identifying itself as a law firm in written and oral communications with consumers.

On April 17, 2017, the Bureau filed a ten-page Complaint containing six counts.  The Complaint alleged that Weltman, in the collection of consumer debt, violated Sections 807(3), 807(10), and 814(b)(6) of the FDCPA, 15 U.S.C. §§ 1692e(3), (10), and 1692l(b)(6); and Sections 1031(a), 1036(a)(1), 1054, and 1055 of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1),

---

[2] Citations to "Tr." refer to the transcript of the advisory jury trial in this matter.

5564, and 5565. (ECF No. 1, ¶ 1.) Counts I, II, and III collectively alleged that Weltman's letters violated the FDCPA and CFPA by misrepresenting the level of attorney involvement in preparing and sending the letters. Counts IV, V, and VI alleged that Weltman's calls to consumers during which non-attorney debt collectors sometimes referred to Weltman as a law firm similarly misrepresented the level of attorney involvement. The crux of the Complaint, in the Bureau's words, was that "[t]he Defendant engages in unlawful collection activities by misrepresenting the level of attorney involvement in demand letters and calls to consumers." (*Id.* at ¶ 2.)

The Complaint sought three categories of monetary damages: (1) civil money penalties, (2) disgorgement, and (3) restitution. (ECF No. 1, 9-10.) Though the Bureau never publicly stated the aggregate amounts it sought for each category, it represented to the Court that it was seeking Tier 1 civil money penalties under the CFPA of $5,639 beginning on July 21, 2011, which would have totaled more than $13 million at the time of trial. (ECF No. 69 at 10.) As for disgorgement, the Bureau's Rule 30(b)(6) witness testified that the Bureau was seeking nearly $13 million in disgorgement for 2016 *alone*—a figure representing all of the gross revenue of Weltman's agency collections business unit for that year.[3] (Deposition of Matthew Heidari at 30:1-4, 30:24-31:1.)[4] Notwithstanding that the Bureau claimed that it was seeking "disgorgement of ill-gotten revenue" for 2011 through the date of trial, the witness it designated to provide Weltman with the Bureau's calculation of that total testified that he was unaware of any calculation having been done (*id.* at 15:2-16:12), he was unprepared to talk about any year

---

[3] Weltman's agency collections business unit is primarily responsible for the firm's consumer debt collection efforts on behalf of large clients, many of which are heavily regulated financial institutions. (Tr. 143:3-10; 141:24-142:3; 304:22-25; 331:6-12.)

[4] Excerpts from the Deposition of Matthew Heidari are attached as Exhibit E.

other than 2016 (*id.* at 16:13-25), and he had no way of knowing whether the $13 million included revenue from collections that were done in compliance with the law (*id.* at 18:19-19:25).  In sum, the Bureau threatened Weltman with disgorgement of *all* of one business unit's revenue for seven years based on no facts and no calculation of any kind.  The Bureau abandoned its restitution claim during discovery, effectively conceding that there was nothing to return to consumers because no consumers were ever harmed by Weltman's practices..

        B.        **Former Director Cordray's Knowledge of Weltman's Practices**

The Bureau's former director, Richard Cordray, personally authorized the filing of the Complaint. (ECF No. 87, ¶ 28.)  Mr. Cordray was, however, familiar with Weltman's collection practices long before April 2017.  Weltman had collected debts for the State of Ohio using substantially similar collection letters to those at issue in this case while Mr. Cordray served as the Ohio Attorney General.  (*Id.* at ¶ 27.)  As Ohio Attorney General, Mr. Cordray approved those letters, and with full knowledge of their content, he approved using those letters for the State of Ohio's collection efforts.  (*Id.*)

Mr. Cordray's knowledge and prior approval of Weltman's practices notwithstanding, the Bureau issued a press release the same day it filed the Complaint, quoting Mr. Cordray, who publicly accused Weltman of "mask[ing] millions of debt collection letters and phone calls with the professional standards associated with attorneys when attorneys were, in fact, not involved." (Exhibit F at 1.)  "Such illegal behavior," Mr. Cordray stated, "will not be allowed in the debt collection market."  (*Id.*)  The Bureau told the public it was "seeking to stop the unlawful

practices and recoup compensation for consumers who have been harmed." (*Id.*) The Plain Dealer picked up the story the next day, as did other local and national news outlets.[5]

In the days following the Bureau's press release, Weltman lost several large clients. (Weltman Decl. at ¶¶ 2-3.) Some clients recalled all of their current debt placements with the firm. (*Id.* at ¶ 3.) Others notified Weltman that they wouldn't be placing any new debts for collection. (*Id.*) Some of these clients represented to Weltman expressly that they were taking these actions as a direct result of the Bureau's lawsuit. (*Id.* at ¶ 4.) In the weeks and months following the Bureau's press release, Weltman, with a shrinking revenue stream, expended considerable resources to defend itself and was forced to downsize. (*Id.* at ¶ 5-6.) Thirty seven employees lost their jobs. (*Id.* at ¶ 6.)

      **C.**    **Weltman Prevails after Trial**

Notwithstanding the broad scope of its pre-suit investigation, the Bureau made numerous substantial discovery requests, serving four sets of requests for production of documents, two sets of interrogatories that far exceeded the 25 permitted by Rule 33(a)(1)[6], and two sets of requests for admissions. The Bureau also noticed and took full-day depositions of five Weltman employees. Two of those deponents—Eileen Bitterman and Charles Pona—had each already provided the Bureau with more than eight hours of sworn testimony during the investigation. (*See* Tr. 253:21-25; 254:21-24.)

---

[5] *See*, *e.g.*, Murray, Teresa Dixon, *Consumer Financial Protection Bureau Sues Weltman, Weinberg & Reis Over Alleged Collection Tactics*, THE PLAIN DEALER (Apr. 18, 2017), https://www.cleveland.com/business/index.ssf/2017/04/feds_sue_weltman_weinberg_reis.html; Mannion, Cara, *CFPB Sues Debt Collection Law Firm Over Atty 'Involvement,'* LAW360 (Apr. 17, 2017), https://www.law360.com/articles/914172.

[6] The Bureau never sought the Court's permission for these improper interrogatories and never explained to Weltman why they were necessary. Weltman incurred expenses making its objections to excessive interrogatories that the Bureau never even attempted to justify.

Following discovery, both parties moved for summary judgment. (ECF Nos. 44 and 45.) The Bureau's motion did not address Counts IV, V, and VI, the telephone call counts, presumably because by then the Bureau recognized that there was no law to support the theory underlying those claims. The Bureau did not dismiss the frivolous claims at that time, so Weltman prepared its trial brief, jury instructions, and trial outlines based on all six counts in the Complaint. The Court denied the motions on April 9, 2018, by Memorandum Opinion and Order. (ECF No. 61.) The case proceeded to an advisory jury trial on May 1, 2018. (ECF No. 84.) Before the jury's empanelment, the Bureau dismissed with prejudice Counts IV, V, and VI—all of which related to Weltman's collection calls—and withdrew its request for disgorgement, leaving only Counts I, II, and III for trial.[7] (ECF No. 79.) After a four-day trial, the advisory jury returned a verdict in Weltman's favor. (ECF No. 87, 2-3.) The Court then instructed the parties to present their proposed findings of fact and conclusions of law.

On July 25, 2018, the Court ruled in favor of Weltman on all remaining counts and entered judgment in Weltman's favor. (ECF Nos. 87, 88.) The Court found, among other things, that Weltman's demand letters were truthful on their face, that Weltman's attorneys were meaningfully and substantially involved in the debt collection process both before and after the issuance of the demand letters, and that the Bureau failed to prove that Weltman's letters violated either the FDCPA or the CFPA. (ECF No. 87, ¶¶ 41-43.) The Bureau called no consumers to testify; it did not play a single recorded phone call of the million Weltman had produced; it did not offer evidence of any Weltman account that had been mishandled in any way. (*Id.* at 11.)

---

[7] The Bureau did not disclose that it planned to voluntarily dismiss Counts IV, V, and VI and abandon its request for disgorgement until just before it filed its trial brief on April 26, five days before trial commenced. (*See* ECF No. 69 at 4 n.2.) Indeed, during discussions in the weeks before trial, the Bureau continued to threaten Weltman with a judgment that would include disgorgement.

The Bureau in fact offered no evidence showing either that any consumer had been harmed or that, even if Weltman's letters had misrepresented the level of attorney involvement, the representation was material.  (*Id.* at ¶¶ 29, 46.)  The only evidence presented by the Bureau in support of its argument that Weltman's letters could mislead certain consumers "came exclusively from an expert that the Court [did] not find credible."  (*Id.* at 3.)

## II.     LEGAL ARGUMENT

The Equal Access to Justice Act ("EAJA") waives the government's sovereign immunity for attorney's fees and costs under certain circumstances.  *See generally* 28 U.S.C. § 2412.  Relevant here is § 2412(b), which permits a court to award "reasonable fees and expenses of attorneys" to the prevailing party in a civil action brought by any agency of the United States "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award."  28 U.S.C. § 2412(b).  In other words, the EAJA puts the United States on equal footing with private litigants under common law and statute, and courts applying § 2412(b) hold the government to "the same standard of good faith that is expected of all parties to litigation."  Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3660.1 (4th ed.).

It is well established that courts possess the "inherent authority to sanction a party when it litigates 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *United States ex rel. Tingley v. PNC Fin. Servs. Grp., Inc.*, 705 F. App'x 342, 344 (6th Cir. 2017).  And § 2412(b) of the EAJA permits a court to sanction the United States and its agencies for attorney's fees under this common law "bad faith" exception to the American Rule that each party bears its own attorney's fees.  *See Griffin Indus., Inc. v. U.S. E.P.A.*, 640 F.3d 682, 685 (6th Cir. 2011) (discussing § 2412(b) and a court's inherent authority to impose sanctions under the bad faith

exception).  "The award of fees for bad faith conduct is intended both to compensate the prevailing party and to deter the United States from future wrongdoing." Wright & Miller, Federal Practice and Procedure § 3660.1 (4th ed.).

To impose a sanction for attorney's fees under the bad faith exception, a court "must conclude that (1) the claims advanced were meritless, (2) counsel knew or should have known that the claims were meritless, and (3) the suit was brought for an improper purpose." *Tingley*, 705 F. App'x at 344-45.  While the Sixth Circuit has recognized that the power to impose sanctions under a court's inherent authority should be exercised with restraint, courts nevertheless "should not shrink from exercising [their power] when sanctions are justified by the circumstances."  *Stalley v. Methodist Healthcare*, 517 F.3d 911, 920 (6th Cir. 2008).

As the prevailing party, Weltman is entitled to its reasonable attorney's fees, because the Bureau prosecuted this action in bad faith.  Trial demonstrated that the Bureau's claims were meritless.  And the Bureau knew, or should have known, that its claims lacked merit long before it even filed the Complaint.  Indeed, as a government agency with broad authority to conduct civil investigations, the Bureau was uniquely situated to ascertain the merits of its case pre-suit, and it used that power here to investigate Weltman for more than two years.  From that investigation, the Bureau knew no consumer had been harmed, misled, or confused by Weltman's practice of truthfully identifying itself as a law firm.  Indeed, if the Bureau had any evidence to support its claims, it surely would have presented it during motion practice or at trial.

The Bureau also knew that Weltman's attorneys were meaningfully involved in every step of the debt collection process.  During the Bureau's investigation, Weltman provided hundreds of thousands of pages of its records for the Bureau's review, and made shareholders Eileen Bitterman, Weltman's Compliance Officer, and Charles Pona, Managing Partner of the

Consumer Collections Unit, available for extensive examination under oath. (*See* Tr. 253:21-25; 254:21-24.) The evidence Weltman presented at trial to demonstrate, as the Court found, that "Weltman attorneys [are] meaningfully and substantially involved in the debt collection process," relied heavily on the very documents produced during the investigation and the testimony of Ms. Bitterman and Mr. Pona. (*See* ECF No. 87 at 9-11, 13-14.) That same evidence was in the Bureau's hands long before it brought this case. What's more, Mr. Cordray, at the time the Bureau filed suit, knew that Weltman had collected debts on his behalf and with his approval as the Ohio Attorney General using substantially similar practices to those the Bureau targeted in this case.

That the Bureau knew its claims to be meritless is starkly demonstrated by the Bureau dismissing half its case, that is, the three counts of the Complaint related to Weltman's phone calls, the morning of the first day of trial. To Weltman's knowledge, no court has ever imposed liability on a party for violating the FDCPA or the CFPA due to a non-attorney debt collector's truthful identification of his or her employer as a law firm on a phone call. And there is no statute or rule prohibiting that practice. But in the year between when the Complaint was filed and trial, Weltman was forced to expend considerable time and incur significant expense in preparing to defend itself from those allegations.

For example, Weltman asked the Bureau to identify the calls that the Bureau claimed to violate the law. (*See* Exhibit G at Interrogatory No. 1.) The Bureau identified about 140 calls, which Weltman's counsel reviewed and, for the purposes of preparing for trial, had transcribed. Those transcriptions showed that Weltman's personnel were consistently truthful, polite, and acting in compliance with the law. In one striking example, the Bureau identified the following call, reproduced in its entirety below (with names redacted to protect the privacy of the

consumer), as one that allegedly violated the law:



There is nothing illegal about this innocuous conversation or the others identified by the Bureau during discovery. What part of this exchange could possibly mislead the consumer and cause him to pay a debt he would not otherwise pay? It is difficult to fathom that the Bureau

legitimately believed this call—which it identified as its evidence—was misleading. Nonetheless, the Bureau pursued Counts IV through VI from the case's inception through discovery, pre-trial motion practice, and mediation.  It was only at the moment the Bureau would have to prove these counts that it dismissed them, at which point the usefulness of threatening Weltman with massive liability under the meritless claims had run out.

Despite knowing that (1) its two-year investigation had found no evidence of unlawful conduct or consumer harm, (2) Weltman maintained a robust and rigorously enforced compliance program, (3) Mr. Cordray approved Weltman's collection practices as the Ohio Attorney General, and (4) no statute or regulation proscribed Weltman truthfully identifying itself as a law firm, the Bureau publicly accused Weltman of serious misconduct contemporaneously with the filing of the Complaint.  With no basis in law or fact, the Bureau proclaimed that Weltman engaged in "illegal behavior" by "mask[ing] millions of debt collection letters and phone calls with the professional standards associated with attorneys when attorneys were, in fact, not involved" and promised to "recoup compensation for consumers who have been harmed." (Exhibit F at 1.)

The consequences of those false, public accusations were immediate and severe. Weltman lost valued clients and revenue, and a number of Weltman employees lost their jobs. (Weltman Decl. at ¶¶ 2-6.)  On top of that, Weltman was forced to incur the expense of litigating a case through trial under threat of tens of millions of dollars in penalties that would have doomed the firm.

The testimony of the very person who authorized the filing of this case demonstrates the Bureau's complete indifference to those consequences.  Mr. Cordray was deposed in this lawsuit, and he was asked to explain how the letters sent on his behalf, as the Ohio Attorney General,

were not misleading, while nearly identical letters, sent on behalf of other Weltman clients, were "illegal." Under oath, Mr. Cordray's statements about the Bureau's case and Weltman's conduct were more equivocal than what he gave to the press. Far from characterizing Weltman's collection practices as patently illegal, Mr. Cordray testified that the Complaint's theories "may be right or they may be wrong." (Cordray Dep. at 130:14-16.) And when asked specifically about the guidance that the Bureau had issued to make law firms aware of what standards were being applied to their conduct, Mr. Cordray acknowledged that "[t]here have been no rules or regulations issued on debt collection" and that the Bureau's "guidance" has been given "through other enforcement actions and orders and court decisions." (Cordray Dep. 116:12-117:9.) The disregard for the merits of the Bureau's case, particularly in light of the lack of any rules or regulations supporting the Complaint's theories, is exactly in line with the Bureau's philosophy to, in Mr. Cordray's words, "send a message" by "pushing the envelope." (*See* Exhibit B.)

Under § 2412(d)(1)(B) of the EAJA, the government is presumptively liable for a prevailing party's attorney's fees unless the government can show that its position was "substantially justified." 28 U.S.C. § 2412(d)(1)(B). "The government's position is substantially justified if it is 'justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person.'" *Carter v. Astrue*, No. 1:09-CV-0667, 2011 WL 722774, at *2 (N.D. Ohio Feb. 23, 2011) (*quoting Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). While subsection (d) of the EAJA is inapplicable here, the "substantially justified" standard shows the Bureau's case was improper from the start. Mr. Cordray could not justify the Bureau's position at all, let alone substantially justify it. The best he could do was acknowledge that the Complaint's theories "may be right or they may be wrong," a theme that carried over to

trial where the Bureau presented no credible evidence of any misconduct. No reasonable person could conclude that the Bureau's case was substantially justified here.

Even today, despite Weltman prevailing at trial, the Bureau's dismissal of half its case, and the Bureau's failure to show any evidence of consumer harm, the Bureau's website still unequivocally and affirmatively describes Weltman's conduct as illegal: "[Weltman] made statements on collection calls and sent collection letters creating the false impression that attorneys had meaningfully reviewed the consumer's file, when no such review has occurred. The CFPB is seeking to stop the unlawful practices and recoup compensation for consumers who have been harmed." (Exhibit H.)

This case is the concrete example of what happens when the Bureau "pushes too hard" and subjects an innocent company to unwarranted scrutiny in an attempt to regulate by litigating, rather than by establishing rules before charging a company with allegedly breaking them. The Bureau's acting director has rightly characterized the conduct that led to the filing and prosecution of this meritless case as an abuse of governmental power, and the Court need not look further than that to find an "improper purpose" here.

Mr. Mulvaney's question—"where do those we charged go to get their time, their money and their good names back?"—may have been rhetorical. But the law provides an answer. When a party prevails in the face of the undue and unconscionable pressure of a government prosecuting unfounded claims, the law provides a remedy. When the government makes a brazen, unsupported, and unsupportable announcement that a reputable and innocent company has engaged in "illegal" conduct, the law provides a sanction. This Court has the inherent authority to sanction the Bureau for abusing its unparalleled power to pursue a meritless case, and the Court should exercise that power to award Weltman its reasonable attorney's fees.

### III. CONCLUSION

For the reasons above, the Court should grant this motion and award Weltman its reasonable attorney's fees of $1,207,481.25.  In the alternative, while Weltman believes the evidence presented here conclusively demonstrates the Bureau's bad faith, Weltman respectfully requests a hearing on this Motion, if the Court believes it necessary.

Dated: August 24, 2018

Respectfully submitted,

s/ James R. Wooley
James R. Wooley  (0033850)
Tracy K. Stratford  (0069457)
Ryan A. Doringo  (0091144)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114.1190
Telephone:     216.586.3939
Facsimile:     216.579.0212
Email:         jrwooley@jonesday.com
               tkstratford@jonesday.com
               radoringo@jonesday.com

Attorneys for Defendant
Weltman, Weinberg & Reis Co., L.P.A.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this non-dispositive motion is no more than 15 pages in length, and, therefore, it conforms to the page limitation for standard track cases set forth in Local Rule 7.2(f).

s/ James R. Wooley
One of the Attorneys for Weltman, Weinberg & Reis Co., L.P.A.

NAI-1504316735v1

## CERTIFICATE OF SERVICE

    I hereby certify that on August 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following at their e-mail addresses on file with the Court:

Zol Rainey
Sarah Preis
Rebeccah Watson
Jehan Patterson
1700 G Street NW
Washington, DC 20552

Counsel for Plaintiff, Consumer
Financial Protection Bureau

 

s/  James R. Wooley
One of the Attorneys for Weltman, Weinberg &
Reis Co., L.P.A.